## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | |
|---|---|
| The State of Georgia, et al.,<br><br>                     Plaintiffs,<br><br>v.<br><br>Joseph R. Biden in his official capacity as President of the United States, et al.,<br><br>                Defendants. | Civil Action No. 1:21-cv-163-RSB-BKE |

## <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT</u>

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 3

BACKGROUND AND STATEMENT OF FACTS ................................... 6

 A. President Biden establishes the Safer Federal Workforce
   Task Force ...................................................................................... 6

 B. President Biden issues Executive Order 14042 ....................... 7

 C. The Task Force issues the mandatory, binding guidance........... 8

 D. Agency implementation.................................................................. 9

 E. Plaintiffs' roles as federal contractors.......................................11

LEGAL STANDARD .............................................................................. 14

ARGUMENT ........................................................................................... 14

 I. Plaintiffs are likely to succeed on the merits............................ 14

  A. The Contractor Mandate exceeds the President's
    authority under the Procurement Act. ............................... 14

   1. The Procurement Act does not give the President
     unlimited authority.............................................................. 14

   2. The Contractor Mandate is beyond the President's authority
     under the Procurement Act. ................................................. 16

  B. The Contractor Mandate is unlawful for failure to follow
    notice-and-comment rulemaking requirements. .............. 19

   1. The Procurement Policy Act requires the administration to
     submit the Task Force Guidance and the FAR Deviation
     Clause to notice and comment rulemaking. ....................... 19

   2. The FAR Council failed to provide public notice and
     comment to implement the Contractor Mandate. .............. 21

  C. If the Procurement Act authorizes the Contractor
    Mandate, then the Procurement Act and the Mandate are
    unconstitutional. .................................................................. 23

   1. The Procurement Act and the Mandate are unconstitutional
     under the non-delegation doctrine. ..................................... 23

   2. The Procurement Act and the Mandate are unconstitutional
     because they exceed Congress' authority.............................. 26

 II. Plaintiffs Will Suffer Substantial and Irreparable Harm
   Absent Preliminary Relief ..................................................... 27

 III. The Balance of Equities and Public Interest Favors Granting
   Preliminary Relief .................................................................. 31

CONCLUSION ....................................................................................... 32

## INTRODUCTION

This case is not about whether vaccines are good or bad.  This case is about the Biden Administration unilaterally imposing a mass vaccine mandate beyond the scope of permissible presidential power, thereby cutting the States out of their central role in deciding whether to impose a vaccination mandate by administrative fiat.  In mid-July, the Administration correctly explained it was "not the role of the federal government" to mandate vaccinations.[1]  Yet, less than two months later, President Biden issued the Contractor Mandate,[2] federally mandating the mass vaccination of employees of federal contractors and subcontractors, without regard to the immense burden on federal contractors caused by an already-existing labor shortage.  The Administration was right when it explained that it had no authority to mandate vaccinations in July, and its subsequent actions are illegal and unconstitutional.  The illegal Contractor Mandate purports to impose a full-vaccination requirement by January 4, 2022.  Executive Order 14042 set the original deadline for full vaccination of covered contractor employees as December 8, 2021.

---

[1] Office of Public Engagement, Transcript, Press Briefing by Press Secretary Jen Psaki (July 23, 2021), https://bit.ly/303pHZt (last visited Nov 5, 2021).

[2] As used herein, the "Contractor Mandate" or "Mandate" refers to (1) Executive Order 14042: "Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors," (2) the Safer Federal Workforce Task Force COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors which sets out the specifics of the mass vaccination and other Covid-related requirements imposed on federal contractors, (3) the Federal Acquisition Registry Council's ("FAR Council") Class Deviation Clause 52.223-99, the contract clause federal agencies are ordered to insert into contracts to require that federal contractors follow the guidance requiring mass vaccination and other Covid-related requirements, and (4) the Office of Management and Budget's *Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042*, which purports to bless the Safer Federal Workforce Task Force guidance requiring that federal contractors follow mass vaccination and other Covid-related requirements.

On November 4, 2021, the original December 8, 2021 deadline was extended to January 4, 2022—not through executive order, not through the Task Force Guidance, not through an OMB determination, but through a White House press release.  Office of Public Engagement, Fact Sheet: Biden Administration Announces Details of Two Major Vaccination Policies (Nov. 4, 2021), https://bit.ly/3C19fpT (last visited Nov. 5, 2021).  As a result, Plaintiffs respectfully request that this Court enter a preliminary injunction no later than December 7, 2021, the date on which federal contractor employees would be required to receive a first dose of the Moderna vaccine.

The Contractor Mandate is overtly unlawful and unconstitutional for multiple, independent reasons.  The Federal Property and Administrative Services Act, 40 U.S.C. § 121 (the "Procurement Act"), the authority under which President Biden purported to issue the Mandate, does not grant him the vast authority to mandate vaccinations for all employees of federal contractors and subcontractors.  Further, the Administration never put the Contractor Mandate through the rigors of notice-and-comment, contrary to the clear requirements of the Office of Federal Procurement Policy Act, as well as the similar requirements applicable to the actions of the Federal Acquisition Regulatory Council ("FAR Council") and the Office of Management and Budget ("OMB").  In addition to its statutory and regulatory failings, the Contractor Mandate also unconstitutionally violates separation of powers by imposing a nationwide vaccination mandate for federal contractors without any authority grounded in the Constitution or any intelligible guiding principle from Congress.

The Mandate imposes massive, irreparable harm on the State Plaintiffs, which all have instrumentalities and agencies that serve as federal contractors and

subcontractors.   Under the Contractor Mandate, Plaintiffs' employees must be vaccinated or terminated—regardless of whether they work on federal contracts—if there is a chance they may come in contact with an employee who is working on a federal contract.   There are no exceptions for employees who work alone, work outside, or work solely remotely, and there is no allowance for even minimal contact without falling within the coercive requirements of the Mandate, even if the employees simply walk past other employees outside, in a parking lot.   The Contractor Mandate does not give federal contractor employees the option to regularly test for COVID-19 instead of being vaccinated or permit alternative safety precautions such as social distancing.

The Administration has given federal contractors, including Plaintiffs, an impossible timeline to comply with the Mandate's illegal terms.   The Mandate requires all federal contractors to comply fully by January 4—meaning that every unvaccinated federal contractor employee must obtain their final vaccine dose by that date.   That timeline is unworkable, especially given the number of covered employees to be vaccinated, the data collection and reporting requirements imposed on federal contractors, and the ambiguities in, and ever-changing nature of, the guidance.

The harms that the Mandate will impose on Plaintiff States, absent this Court's immediate action, are staggering.   Plaintiffs receive billions of dollars under federal contracts.[3]   Absent immediate relief from this Court, the Contractor Mandate

---

[3] *See, e.g.*, Declaration of Jason Guilbeault ("AU Dec."), Exhibit 1, at ¶ 7 ($17.1 million); Declaration of Michael P. Shannon ("GA Tech Dec."), Exhibit 2, at ¶ 7 ($663.8 million); Declaration of Jill Tincher ("UGA-1 Dec."), Exhibit 3, at ¶ 6 ($56 million); Declaration of Kathleen E. Toomey ("GDPH Dec."), Exhibit 4, at ¶ 4 (two contracts totaling $2.9 million); Declaration of James B. Aydelotte ("BVRHS Dec."), Exhibit 5, at ¶ 12 ($338,700); Declaration of Torrey E. Lawrence ("UI Dec."), Exhibit 6, at ¶ 5

will put Plaintiffs in an impossible position: they must comply with the Mandate, which may not be possible absent termination of all unvaccinated employees, *or* risk losing billions of dollars in federal funding.  For these reasons, Plaintiffs have no choice but to seek a preliminary injunction from this Court.[4]

## BACKGROUND AND STATEMENT OF FACTS

### A.   President Biden establishes the Safer Federal Workforce Task Force

In January 2021, President Biden established the Safer Federal Workforce Task Force ("Task Force") by executive order.  Exec. Order No. 13991, *Executive Order on Protecting the Federal Workforce and Requiring Mask-Wearing*, 86 Fed. Reg. 7045 (Jan. 20, 2021) ("EO 13991").  The Task Force's mission is to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic."  *Id*.  The Task Force's guidance must include "public health best practices as determined by the CDC," and further guidance on COVID-19 testing, vaccination, transmission, and workplace best practices, among other things.  *Id*.  The President did not purport to issue EO 13991 or create the Task Force under his Procurement

---

($22 million); Declaration of Jane Elizabeth Burdeshaw ("ADRS Dec."), Exhibit 7, at ¶¶ 7, 9 ($13.4 million); Declaration of Matthew K. Wilde ("BSU Dec."), Exhibit 8, at ¶ 5 ($25 million); Declaration of Donna Lybecker ("ISU Dec."), Exhibit 9, at ¶ 5 ($23 million); Declaration of Finis E. St. John IV ("UAS Dec."), Exhibit 10, at ¶ 6 ($663 million for the University of Alabama, the University of Alabama Birmingham, and the University of Alabama Huntsville); Declaration of Nathan Checketts ("UDOH Dec."), Exhibit 11, at ¶ 5 ($811,000.00).

[4] The Contractor Mandate has been challenged in several lawsuits in other districts.  Five such challenges are: *State of Texas v. Biden et al.*, No. 3:21-cv-00309 (S.D. Tx.); *State of Texas v. Nelson et al.*, No. 8:21-cv-02524 (M.D. Fl.); *State of Missouri et al. v. Biden et al.*, no. 4:21-cv-01300 (E.D. Mo.); *Brnovich et al. v. Biden et al.*, No. 2:21-cv-01568 (D. Az.); and *Commonwealth of Kentucky et al. v. Biden et al.*, No. 3:21-cv-00055 (E.D. Ky.).

Act Authority, 40 U.S.C. § 121.  And at least until September 2021, none of the Task Force's operations had anything to do with federal contracting.

### B.   President Biden issues Executive Order 14042

On September 9, 2021, President Biden announced that his patience was "wearing thin" with unvaccinated Americans. Office of Public Engagement, Transcript, Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021), https://bit.ly/3wgXRVr.  President Biden generalized that "[m]any of us are frustrated with the nearly 80 million Americans who are still not vaccinated." *Id.* As a result, President Biden signed Executive Order 14042, *Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors* ("EO 14042" or "Order"). *See* EO 14042, attached to Declaration of Charles Peeler ("Peeler Dec."), Exhibit 12, as Ex. A.  In that Order, President Biden relied on the Procurement Act to direct federal agencies to implement a mass vaccination requirement for all employees of federal contractors and subcontractors.  *Id.* at 1.  EO 14042 set forth a series of conclusory assertions without any factual support in an effort to frame the Order as promoting "economy and efficiency in Federal Procurement."  *Id.*  According to the President, the implementation of vaccine mandates "will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government."  *Id.*

President Biden's implementation plan had several layers.  *Id.*  First, he directed the Task Force to prescribe COVID-19 guidance for federal contractors.  *Id.* Next, he directed the OMB Director to "determine whether the Task Force guidance would "promote economy and efficiency in Federal contracting," and if so, to publish

her determination in the Federal Register. *Id*. This OMB "determination," however, was a foregone conclusion. Before President Biden turned this "determination" over to the OMB Director, President Biden had already declared "[t]his order promotes economy and efficiency in Federal procurement. . . ." *Id*. President Biden further directed that once the OMB Director rubberstamped the Task Force guidance:

- All executive agencies subject to the Procurement Act <u>must</u> include a clause in their contracts that requires contractors and all subcontractors to comply with all present and *future* guidance issued by the Task Force;

- The FAR Council must amend the FAR to include the same clause; and

- Agencies should ensure that any contracts not governed by the FAR contain the same clause. *Id*.

### C. The Task Force issues the mandatory, binding guidance

On September 24, 2021, the Task Force issued *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* ("Task Force Guidance"). Peeler Dec. at Ex. B. Among other things, the Task Force Guidance—which, again, is mandatory for all federal agencies under Executive Order 14042—requires federal contractors and subcontractors to ensure their employees are vaccinated and that "all individuals, including covered contractor employees and visitors, comply with published CDC guidance for masking and physical distancing at a covered contractor workplace." *Id*. at 6. Contractual obligations requiring federal contractors to comply with the CDC guidance are effective immediately. To comply with the President's revised deadline for vaccination, all "covered contractor employees" must receive the final dose of the COVID-19 vaccine by January 4, 2022. *See Supra* Introduction.

Thus, to comply with the January 4 deadline, covered employees must obtain their first dose of the Moderna vaccine by December 7, 2021, their first dose of the Pfizer vaccine by December 14, 2021, or the single dose of the Johnson & Johnson vaccine by January 4, 2022.  Centers for Disease Control and Prevention, *Different COVID-19 Vaccines*, (Oct. 20, 2020), https://bit.ly/3wphNWb.

The scope of the Mandate is staggering.  A "covered contractor employee" is "any full-time or part-time employee of a covered contractor" who is working "at a covered contractor workplace." Peeler Dec., Ex. B at 3–4.  The definition of a "covered contractor workplace" requires employees who do not work on federal contracts to be vaccinated unless a federal contractor "can affirmatively determine that none of its employees on another floor or in separate areas of the building will come into contact with" an employee who works on federal contracts.  *Id*. at 10.  Thus, the mandate "includes employees of covered contractors who are not themselves working on or in connection with a covered contract."  *Id*. at 4.  Under the current guidance, federal contractors with multiple buildings must affirmatively determine that there will be no interaction between covered contractor employees and non-covered contractor employees—even in common areas like lobbies, elevators, stairwells, and parking garages—or the non-covered employees may also have to be vaccinated.

### D.  Agency implementation

As the President directed in EO 14042, the OMB Director published a determination in the Federal Register on September 28, 2021, stating, in conclusory fashion, that "compliance by Federal contractors and subcontractors with the COVID-19-workplace safety protocols detailed in that guidance will improve economy and

efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." 86 Fed. Reg. 53,691 (Sept. 28, 2021) (the "OMB Determination"); *see* Peeler Dec. at Ex. C. The Director referenced no research or data to support her conclusion and there was no opportunity for the public to comment or submit data.

Both EO 14042 and the Task Force Guidance provided that the FAR Council[5] must conduct a "rulemaking" to amend the FAR[6] to require federal contractors to comply with the Task Force Guidance. Peeler Dec. at Exs. A and B. The Guidance further recommended that prior to the FAR rulemaking, agencies should "exercise their authority to deviate from the FAR" to implement their own vaccine mandates. Peeler Dec. at Ex. B. at 12, Q15.

On September 30, 2021, in response to EO 14042, the Task Force Guidance, and the OMB Determination, the FAR Council issued Class Deviation Clause 52.223-99 ("FAR Deviation Clause") with accompanying guidance. Peeler Dec. at Ex. D. The FAR Deviation Clause commits the contractor to complying "with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https:/www.saferfederalworkforce.gov/contractors/." *Id*. The FAR

---

[5] The Federal Acquisition Regulatory Council was established to assist in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities in the Federal Government, in accordance with Title 41, Chapter 7, Section 421 of the Office of Federal Procurement Policy ("OFPP") Act.

[6] The Federal Acquisition Regulation ("FAR") is the primary regulation for use by all executive agencies in their acquisition of supplies and services with appropriated funds. *See, e.g.,* https://bit.ly/3BKz39j.

Council never published the FAR Deviation Clause in the Federal Register for the purpose of receiving public comment. Several agencies, including NASA, DOD, CDC, USDA, GSA, and others, have now implemented the FAR Deviation Clause by issuing memoranda requiring compliance with the Mandate. *See, e.g.*, Declaration of Catherine Mochan Donald ("ADPH Dec."), Exhibit 13, at ¶ 15, Ex. A.

### E. Plaintiffs' roles as federal contractors

Plaintiffs have thousands of contracts and subcontracts with the federal government, meaning thousands of Plaintiffs' employees are "covered contractor employees" under the Mandate. *See, e.g.*, Declaration of Teresa MacCartney ("Board of Regents Dec."), Exhibit 14, at ¶ 18; AU Dec. at ¶ 8; GA Tech Dec. at ¶ 7; UGA-1 Dec. at ¶ 4.[7] Federal contracts comprise significant portions of Plaintiffs' budgets. For example, Plaintiff Board of Regents ("Board of Regents") of the University System of Georgia's ("University System") impacted research institutions—Augusta University, Georgia Institute of Technology, and the University of Georgia— collectively maintain over 2,000 federal agency contracts. Board of Regents Dec. at ¶ 18; *see* AU Dec. at ¶ 8; GA Tech Dec. at ¶ 7; Declaration of Margaret A. Amstutz, Ph.D ("UGA-2 Dec."), Exhibit 15. These three institutions generated approximately $736,968,899.00 in revenue from federal contracts for fiscal year 2021. Board of Regents Dec. at ¶ 19. The University System derives approximately 9% of its annual

---

[7] Due to President Biden announcing a new vaccination deadline just yesterday, November 4, 2021, various declarations that were signed prior to November 4 referenced herein refer to the prior deadline of December 8, 2021 instead of the new January 4, 2022 deadline.

budget from federal contracts within Augusta University, Georgia Institute of Technology, and the University of Georgia alone.  Board of Regents Dec. at ¶¶ 7, 19.

Plaintiffs are attempting to comply with the Contractor Mandate, at great cost to themselves and the taxpayers.  For example, the Board of Regents' impacted institutions have begun: (1) tracking employee vaccination statuses; (2) creating a process to review requests for accommodation; (3) identifying impacted employees and locations; (4) expending their financial resources to ensure compliance; and (5) tracking the above data from their subcontractors to ensure that they are likewise complying with the mandate.  Board of Regents Dec. at ¶ 21.  Despite diligently working to attempt compliance, the impacted institutions are deeply concerned they will be unable to reach full compliance by the January 4, 2022 deadline.  Board of Regents Dec. at ¶ 22.  Further, while it has encouraged all Board employees to obtain a COVID-19 vaccine, the Board is concerned that all covered institutions may not reach full compliance by the January 4, 2022 deadline.  Board of Regents Dec. at ¶ 23. Based on the Board of Regents' understanding of the Contractor Mandate, if its covered contractor employees do not obtain a final dose of a COVID-19 vaccine by January 4, 2022, those employees will have to be removed from working on federal contracts and relocated to a workplace that is not a covered contractor workplace or be terminated.  Board of Regents Dec. at ¶ 24.

The employee discipline and termination process is lengthy, costly, and will require the states to expend extensive resources to ensure compliance.  Board of Regents Dec. at ¶ 26; UI Dec. at ¶ 13; ADRS Dec. at ¶ 20.  Plus, the loss of technically-skilled employees will impact Plaintiffs' ability to perform the services required by

their contracts, especially because it may not be possible to replace those employees in the current labor market.  Board of Regents Dec. at ¶ 26; GA Tech Dec. at ¶ 7; UGA-2 Dec. at ¶ 10; UI Dec. at ¶ 13.

Many state agencies administer services for their citizens that depend on federal agency contracts.  For example, Plaintiff Alabama Department of Public Health ("ADPH") has primary responsibility for serving Alabamians' public health needs.  ADPH Dec. at ¶ 5.  ADPH has over 2,600 employees, many of whom are unvaccinated and likely to quit their jobs if forced to receive the COVID-19 vaccination as a condition of further employment.  ADPH Dec. at ¶¶ 6, 13.  While the precise number of ADPH's unvaccinated employees is as yet undetermined, Alabama's county rates for full vaccination range from 22.74% in Russell County to 49.73% in Lowndes County, indicating that the majority of ADPH's employees are likely in jeopardy of termination.  *Vaccine Doses Administered*, Alabama Public Health, https://bit.ly/3CL87rm.  The same is true for Plaintiff Alabama Department of Agriculture and Industries ("ADAI"), which provides services for farmers and consumers of agricultural projects.  Declaration of Richard Stewart Pate ("ADAI Dec."), Exhibit 16, at ¶ 13.  ADAI has leased property to the United States Department of Agriculture ("USDA") continuously for the past 26 years.  On October 20, 2021, a USDA officer sent ADAI a lease amendment incorporating a "mandatory Executive Order 14042 [clause] . . . which needs to be part of every Federal contract now."  ADAI requested clarification on October 22, 2021, to which USDA sent the following response: "[I]t's 'encouraged' for the Lessors to sign, BUT if you don't, then [USDA] won't be able to do any future lease actions with you if you don't, as well as

anything regarding the current lease, such as an extensions or expansions if needed. So we'd have to move out when the lease expires."  ADAI Dec. at Ex. A (emphasis in original).  Each Plaintiff faces this kind of choice.

## LEGAL STANDARD

Plaintiffs seek a preliminary injunction under Federal Rule of Civil Procedure 65(a) to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.   Plaintiffs are likely to succeed on the merits.

The Contractor Mandate is illegal for multiple, independent reasons, any one of which makes Plaintiffs "likely to succeed on the merits."  *Winter*, 555 U.S. at 20.

### A.   The Contractor Mandate exceeds the President's authority under the Procurement Act.

#### 1.   The Procurement Act does not give the President unlimited authority.

The Procurement Act only empowers the President to issue "policies and directives" that have a reasonably close nexus to "provid[ing] the Federal Government with an economical and efficient system for . . . contracting."  40 U.S.C. § 101; *see* 40 U.S.C. § 121(a).  The authorized "policies and directives" may only be those matters necessary to "carry out" the Procurement Act.  *Id.*

The Procurement Act does not give the President *any* power to make decisions that have vast economic and political significance or that alter the federal/state balance. *First,* when the executive branch lays claim to powers of "vast economic and political significance," the Supreme Court requires that "Congress [] speak clearly" before the executive branch may exercise such powers. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). *Second*, when the executive branch invokes powers that would "significantly alter the balance between federal and state power," Congress must impart those powers with even greater clarity. *Id.* In that context, the Supreme Court's "precedents require Congress to enact *exceedingly clear language*" granting the executive branch such authority. *Id.* (emphasis added) (citing *U.S. Forest Serv. v. Cowpasture River Preservation Ass'n.*, 140 S. Ct. 1837, 1850 (2020)); *see Bond v. United States*, 572 U.S. 844, 858 (2014) (same). Nothing in the Procurement Act meets these demanding standards, and thus any action that the President would purport to take under the Act that has vast economic significance or alters the federal/state balance is unlawful.

Even if the Act permitted the issuance of procurement regulations that did not need to comply with the major questions doctrine and clear statement rule, the Act does not give the President unlimited authority. *See Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996). That means that the exercise of purported "procurement authority" must have a "nexus" with "some delegation of the requisite legislative authority by Congress . . . reasonably within the contemplation of that grant of authority." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 306 (1979). If there

is not a "reasonably close nexus between the efficiency and economy criteria of the Procurement Act and any exactions imposed upon federal contractors," the order issued under the Act is unlawful. *Liberty Mut. Ins. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981); *see Reich*, 74 F.3d at 1331.

### 2. The Contractor Mandate is beyond the President's authority under the Procurement Act.

The Contractor Mandate exceeds the President's authority under the Procurement Act for three independent reasons.

*First*, the Contractor Mandate is beyond the President's Procurement Act authority because the Mandate is a procurement regulation that purports to control numerous third parties, not a mere "polic[y]" or directive[]," 40 U.S.C. § 101. "[P]olicies and directives" refer *only* to the President's power to direct the way in which procurement authority is exercised by the executive branch, *not to issue sweeping regulations on third parties. Cf. Centralizing Border Control Policy Under the Supervision of the Attorney General*, 26 Op. O.L.C. 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President.").

*Second*, the Contractor Mandate is beyond the President's Procurement Act authority because the Mandate not only has "vast economic and political significance," but would also "significantly alter the balance between federal and state power." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (internal citation omitted). The decision whether millions of Americans must be vaccinated is plainly one of "vast economic and political significance," *id.*, and one which Congress did not speak to

when it enacted the Procurement Act.  Indeed, the Mandate is a thinly veiled attempt by President Biden to do what he has admitted he could not do: impose a nationwide vaccine mandate.  *See* supra at 1.  That is something no President has previously done and, if upheld by the courts, would permit Presidents to advance virtually any public health (or, indeed, public policy) goal by imposing requirements on the millions of Americans who happen to work for federal contractors, at the stroke of a pen. Further, the determination whether to require vaccinations falls within the discretion of the States—not the federal government.  *See, e.g.*, *Barsky v. Bd. of Regents*, 347 U.S. 442, 449 (1954) ("It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there."); *Hill v. Colorado*, 530 U.S. 703, 715 (2000) ("It is a traditional exercise of the States' police powers to protect the health and safety of their citizens.").  The Procurement Act contains no language extending power to the President to regulate public health or impose mass vaccination policies.

*Third*, the Mandate is also unlawful because no "reasonably close nexus" exists between and the Contractor Mandate and "the efficiency and economy criteria of the Procurement Act."  *Friedman*, 639 F.2d at 170.  Other than a series of conclusory statements that the Mandate promotes "efficiency and economy in Federal procurement," the President made no attempt to show any link at all between the scope of the Mandate and efficiency and economy in federal procurement.  Peeler Dec. at Ex. A.  Rather, the Mandate's application to contractor employees that neither work on federal contracts nor pose a real risk of transmitting COVID-19 on a federal contract worksite (for example, federal contractor employees who work solely from

home) makes clear that the President made a *public health policy*, not a policy with any "reasonably close nexus" to "the efficiency and economy criteria of the Procurement Act." *Friedman*, 639 F.2d at 170.  The Task Force mandates that a "covered contractor employee" must include all full-time or part-time employees that work on a federal contract, in connection with a federal contract, or at a contractor workplace.  Peeler Dec. at Ex. A, 3–4.  Thus, the Mandate requires that employees who do not even work on federal contracts be vaccinated if they simply walk past another employee in the building lobby.  *See id.*, 10–11.  And the Contractor Mandate does not exempt remote workers, employees who work exclusively or primarily outside, or employees who work in a socially distanced environment.

That means the Mandate is certain to promote *inefficiency* by jeopardizing contractors' ability to timely perform under federal contracts.  Employee terminations and departures, which will be necessary in order to comply with the Contractor Mandate, will result in contractors losing individuals servicing federal contracts that have valuable institutional knowledge.  The Mandate will force contractors to require replacements to undergo substantial training and experience to adequately replace the departing employees.  *See* GDPH Dec. at ¶ 10.  And some employees are entirely irreplaceable, either as members of professions for which there are critical shortages or due to a nonfungible specialized skillset.  *Id.*  Further promoting inefficiency, the Mandate requires each federal contractor to implement administrative measures to monitor and enforce the Mandate, adding operational costs on top of the costs of recruiting, replacing, and re-training employees.  *See* GA Tech. Dec., ¶¶ 11–16

18

(detailing the administrative hurdles and costs required for compliance with the Contractor Mandate); UGA-1 Dec., ¶¶ 4–8 (same); GDPH Dec., ¶¶ 8–10 (same).

### B. The Contractor Mandate is unlawful for failure to follow notice-and-comment rulemaking requirements.

The Contractor Mandate is *doubly* unlawful for failure to comply with notice-and-comment rulemaking.

#### 1. The Procurement Policy Act requires the administration to submit the Task Force Guidance and the FAR Deviation Clause to notice and comment rulemaking.

a. The Office of Federal Procurement Policy Act, 41 U.S.C. § 1707(a) ("Procurement Policy Act"), requires that before issuing "a procurement policy, regulation, procedure, or form," an agency must subject "that procurement policy, regulation, procedure, or form" to the strictures of notice-and-comment rulemaking, if it "(A) relates to the expenditure of appropriated funds; and (B) (i) has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, or form; or (ii) has a significant cost or administrative impact on contractors or offerors." 41 U.S.C. § 1707(a). This applies to "an amendment or modification" to an existing procurement policy, rule, or regulation. *Id*. § 1707(a)(1).

b. Both the Task Force Guidance and the FAR Deviation Clause are a "procurement policy, regulation, procedure, or form," subject to the Procurement Policy Act, and were issued without following notice-and-comment rulemaking procedures. A "policy" is "[a] standard course of action that has been officially established by an organization." Policy, *Black's Law Dictionary* (11th ed. 2019). A "regulation," in turn, is "an official rule or order, having legal force, issued by an

administrative agency." Regulation, *Black's Law Dictionary* (11th ed. 2019). The Task Force Guidance is a procurement policy because it prescribes a standard course of action for federal contractors as they perform their obligations pursuant to federal contracts and changes their obligations to maintain a safe workplace under FAR Subparts 22 and 23. *See* 48 C.F.R. §§ 22.000–23.1105. Similarly, the FAR Deviation Clause is a "procurement regulation," as it is a part of the Federal Acquisition Regulation issued by the Federal Acquisition Regulatory Council and governs federal contracting and procurement for certain executive agencies. And both have "a significant cost or administrative impact on contractors or offerors," 41 U.S.C. § 1707(a)(1)(A)–(B), for the reasons already given. *See supra* I.A.2.

The Task Force Guidance and the FAR Deviation Clause also both "relate[] to the expenditure of appropriated funds," 41 U.S.C. § 1707(a)(1)(A), as they set out the preconditions to federal contracting. Pursuant to EO 14042, federal agencies must comply with the Task Force Guidance as a condition of federal contracting. All federal agencies awarding procurement contracts are subject to the FAR and many have already issued contract guidance to their contracting officials directing them to use the FAR Deviation Clause to require compliance with the Task Force Guidance. *See, e.g.,* BVRHS Dec. at ¶ 12 (noting the CDC has already sought to modify contracts to include the Contractor Mandate).

Defendants neither published the Task Force Guidance or the FAR Deviation Clause for public comment in the Federal Register nor sought to invoke any exception to the notice and comment requirement. The Defendants did not even attempt to show "urgent and compelling circumstances [that would have made] compliance with

the requirements impracticable," which would have permitted the Mandate to take effect on a temporary basis (but still only after a 30-day public comment period). 41 U.S.C. § 1707(d)–(e). That renders the Task Force Guidance and the FAR Deviation Clause invalid. *See generally Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1396 (D.C. Cir. 1985); *see also* 41 U.S.C. § 1707(a)(1).

## 2. The FAR Council failed to provide public notice and comment to implement the Contractor Mandate.

a. The FAR is the primary regulation governing federal procurement and government contracting. The FAR Council oversees the FAR and "assist[s] in the direction and coordination of Government-wide procurement policy." 41 U.S.C. § 1302(a). The FAR Council consists of two councils that must coordinate to revise the FAR, but primary responsibility to "prepare[], issue[], and maintain[]" the FAR lies jointly with the Secretary of Defense, the Administrator of General Services, and the NASA Administrator. 41 U.S.C. § 1303(a)(1); 48 C.F.R. § 1.103(b). A "significant revision" to the FAR is any revision that "alter[s] the substantive meaning of any coverage in the FAR [s]ystem," and has "a significant cost or administrative impact on contractors" or a "significant effect beyond the internal operating procedures of the issuing agency." 48 C.F.R. § 1.501-1. Before the FAR Council may make "significant revisions" to the FAR, it must provide an opportunity for public comments and consider those comments when making its decision. *Id.* §§ 1.501-1; 1.501-2. The FAR explains that the FAR Council will consider the "[v]iews of agencies and nongovernmental parties" when crafting "acquisition policies and procedures." *Id.* § 1.501-2(a). When initiating a public comment period, DOD, NASA, and GSA must

jointly publish a notice in the Federal Register. *Id.* §§ 1.501-2(b); 1.201-1; 1.103. The notices must contain the text of the revision and provide at least 30 days, but preferably at least 60 days, for receipt of comments. *Id.* § 1.501-2(b), (c).

b. The FAR Deviation Clause implementing the Task Force Guidance—Deviation Clause 52.223-99—is a significant revision as defined by the FAR yet was not subject to notice-and-comment rulemaking. Deviation Clause 52.223-99 alters the substantive meaning of contractors' obligations to their workforces and workplace safety duties under FAR Subparts 22 and 23. *See* 48 C.F.R. §§ 22.000–23.1105. Complying with Deviation Clause 52.223-99 will have a crushing administrative impact on federal contractors, as described elsewhere in this brief. *See supra* I.A.2. To comply, contractors must ensure all their covered employees are vaccinated, implement masking and social-distancing in workplaces, create and implement a contact-tracing program, and monitor the Task Force's website so they can scramble to comply with any new guidance that the Task Force may release at a moment's notice. Thus, Deviation Clause 52.223-99 is a significant revision and is thereby subject to notice and comment procedures. But the FAR Council did not even attempt to comply. *See Sunoco, Inc. v. United States*, 59 Fed. Cl. 390, 396 (Fed. Cl. 2004). Nor did FAR even attempt to invoke the "urgent and compelling circumstances" exception. 48 C.F.R. § 1.501-3(b); *see supra* I.B.1.

Instead of providing public notice and a comment period for the Contractor Mandate, the FAR Council began enforcing the Mandate as a purported FAR class deviation. That is unlawful, first, because Deviation Clause 52.223-99 does not fit the definition of a deviation, which is meant to be a slight departure from an existing

FAR clause or minimal change to the procurement process for a particular contract. *See* 48 C.F.R. § 1.401(a)–(f).  But, more importantly, even class deviations must be submitted as a FAR revision and subjected to notice-and-comment when they are implemented on a permanent basis.  *Id.* at 1.404(b).  Deviation Clause 52.223-99 has no expiration date, yet there was no notice-and-comment.

The President directed the FAR Council to implement the Task Force Guidance to ensure that federal agencies would incorporate the requirements of the Mandate into those contracts, and the executive branch has provided no indication that those requirements are time limited.  As a result, the FAR Council was required to treat the implementation of the Task Force Guidance as a FAR revision subject to notice-and-comment. It has failed to do so.  That failure requires invalidation of Deviation Clause 52.223-99.  *Sunoco, Inc.*, 59 Fed. Cl. at 396; 48 C.F.R. §§ 1.501-1; 1.501-2.

### C.   If the Procurement Act authorizes the Contractor Mandate, then the Procurement Act and the Mandate are unconstitutional.

#### 1.   The Procurement Act and the Mandate are unconstitutional under the non-delegation doctrine.

a. All legislative powers granted by the Constitution are vested in Congress. U.S. Const., art. I, § 1.  "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935); *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 342 (1974).  "Congress cannot grant to an officer under its control what it does not possess." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986).  The principle of nondelegation "is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the

constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892); *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 673 (1980) (Rehnquist, J., concurring in judgment).   While Congress may delegate a certain extent of its authority, it must "lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform" in order to constitutionally delegate authority.   *Mistretta v. United States* 488 U.S. 361, 372 (1989) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

The specificity of the principle that Congress must supply under the intelligible principal test depends, at least in part, on the "extent and character" of the power conferred.   *J.W. Hampton, Jr., & Co.,* 276 U.S. at 406*; see Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 475 (2001) ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred.").   Congress cannot delegate "powers which are strictly and exclusively legislative," but may delegate with respect to areas of "less interest, [for] which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details." *United States v. Cooper*, 750 F.3d 263, 266–67 (3d Cir. 2014) (quoting *Wayman v. Southard*, 23 U.S. 1, 42–43 (1825)); *see United States Telecomms. Ass'n v. FCC,* 855 F.3d 381, 402 (D.C. Cir. 2017) (Brown, J., dissenting) (articulating the same principle and describing the exclusively legislative issues as "important subjects, which must be entirely regulated by the legislature itself").   And when delegating powers in a way that impacts the federal/state balance of power, even more clarity than normal is required in order for a delegation to be effective.   *See Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 456 (6th Cir. 2021) (applying the clear statement

24

rule to Congress's attempt to delegate issues that would authorize a departure "from the Constitution's traditional distribution of authority"), *vacated for rehearing en banc on other grounds*, 2 F.4th 576, 577 (2021).

b. If this Court concludes that the Procurement Act is so capacious as to permit the President to adopt the Contractor Mandate, the Act would violate the nondelegation doctrine. Under the Procurement Act, the President's actions must have a nexus to promoting "econom[y] and efficien[cy]" in contracting. 40 U.S.C. §101. Especially if this Court agrees that these terms are broad enough to give the President the authority to impose a vaccine mandate under the guise of vague, conclusory "economy" and "efficiency" concerns that he has articulated here, then the Procurement Act is unconstitutional. Under this reading, the Act would lack any boundaries that would direct the President as to how he is permitted to exercise delegated authority, eliminating the possibility that Congress has effectively delegated authority under the Act. *Mistretta*, 488 U.S. at 372–73.

Even if the Procurement Act's open-ended policy aims could be sufficient guidance in certain contexts to support delegation, the "extent and character" of the powers the President seeks to exercise through the Contractor Mandate are so expansive that they are nondelegable. Because the Mandate regulates the public health, something traditionally reserved to the States, even more clarity would be required in order for Congress to have authorized the Contractor Mandate by delegation. *See infra* I.C.2. Here, the President can point to no intelligible principle that would guide his unilateral implementation of a sweeping vaccination requirement, which is so significant in its extent and character that it is not subject

to delegation to begin with.  Accordingly, if the Procurement Act were read to authorize the Contractor Mandate, both would be unconstitutional.

### 2. The Procurement Act and the Mandate are unconstitutional because they exceed Congress' authority.

"[L]aws that undermine the structure of government established by the Constitution" by usurping state sovereignty are "not consistent with the letter and spirit of the [C]onstitution," and are therefore "not [a] proper means" for Congress to exercise its enumerated powers under the Necessary and Proper Clause. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 559 (2012) (internal citations, quotation marks, and alterations omitted); U.S. Const. art. I, § 8, cl. 18.  Even if a particular policy is "necessary" to a legislative scheme, it is not "proper" if it unduly expands federal powers at the states' expense. *Id.* at 559–60; *Printz v. United States*, 521 U.S. 898, 923–25 (1997).  Relatedly, the Tenth Amendment provides guidance as to whether a particular legislative action encroaches on state sovereignty and is thus not a "proper" exercise of Congress' constitutional authority: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.

The Contractor Mandate regulates public health and enacts an extensive mass vaccination mandate that would affect millions of people, even though the States' police power has long included public health regulation. *See supra* I.A.2.  The Contractor Mandate thus surpasses Congress's authority by encroaching on state sovereignty and attempting to unduly expand federal powers. *See Sebelius,* 567 U.S. at 559.  That intrusion on Plaintiff-States' sovereignty has a real-world impact.

26

States have the authority to determine the vaccination policies that should be applicable to their citizens.  When the federal government seeks to infringe upon the States' sovereignty in this sensitive area—as the Contractor Mandate does—the result is arbitrary legal requirements within a particular state, whereby some citizens must be vaccinated and others would not, simply based on whether the citizen had a tangential proximity to an employee of a federal contractor.  That intrusion would (and currently does, under the Mandate) interfere with the States' ability to craft uniform public health policy.    Thus, the Mandate is not constitutionally "proper," and, even if Congress had intended to authorize the executive branch to issue the Contractor Mandate, that delegation would be unconstitutional.

## II.  Plaintiffs Will Suffer Substantial and Irreparable Harm Absent Preliminary Relief

The second prong in the preliminary injunction analysis is whether injunctive relief is required due to "a substantial likelihood of irreparable injury."  *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir. 2000).  Absent an injunction, Plaintiffs face the untenable position of having to choose between (1) reassigning and physically moving or terminating all covered employees who choose not to get vaccinated, which will likely undermine Plaintiffs' ability to complete the contracts due to loss of needed personnel; or (2) risk breaching federal contracts collectively worth billions of dollars that Plaintiffs will later be unable to recover, while losing out on the contracts themselves, which will then undermine Plaintiffs' ability to recruit talented students and researchers.  Both outcomes would constitute irreparable harm. *See Thunder*

27

*Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring) ("[A] regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs."); *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) ("[N]umerous courts have held that the inability to recover monetary damages . . . renders the harm suffered irreparable."); *Georgia v. United States*, 398 F. Supp. 3d 1330, 1344 (S.D. Ga. 2019) (Plaintiffs "experience irreparable harm in the loss of the contract. . ., the loss of employees,. . . [etc.]."); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (classifying the loss of good will as irreparable harm); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013) (recognizing that irreparable injury may include "different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction").  These irreparable harms are imminent because the Contractor Mandate requires covered employees to receive a final vaccine dose by January 4, 2022.  *See, e.g.,* Board of Regents Dec. at ¶ 24.

In all probability, on January 4, Plaintiffs will have many covered contractor employees who have not been vaccinated unless Plaintiffs engage in mass firings.  For the Georgia Plaintiffs, nearly 50% of Georgians are fully vaccinated; the remaining 50% have yet to obtain a vaccine. Georgia Department of Public Health, Press Release, *50% of Georgians Fully Vaccinated Against COVID-19* (Oct. 25, 2021), https://bit.ly/3bIQ0GL.  While the precise number of covered employees that will remain unvaccinated is unknown, under these odds there is a serious threat that Plaintiffs will be unable to achieve total compliance without mass layoffs.  *See* GA Tech Dec. at ¶ 13; UGA-2 Dec. at ¶¶ 4–6.  For example, Georgia Tech employs

approximately 20,182 employees, including student employees, the majority of whom will likely be subject to the Contractor Mandate. GA Tech Dec. at ¶¶ 9–10. Even if Georgia Tech's covered contractor employees beat the state average vaccination rate by 20% (using 70% as an example), thousands of employees will have to be vaccinated, removed, replaced, disciplined, or terminated by January 4. Other named Plaintiffs will undergo similarly severe hardships. Plaintiff Alabama Department of Public Health ("ADPH") has over 2,600 employees statewide in "covered contractor workplaces." ADPH Dec. at ¶ 6. Alabama's county rates for full vaccination are as low as 22.74% and as high as 49.73%. *Vaccine Doses Administered*, Alabama Public Health, available at https://bit.ly/3BGJ4EA (last visited Oct. 31, 2021). With this level of threatened personnel loss—and the delay associated with recruiting, hiring and training new employees, especially in such a tight labor market—many Plaintiffs risk being unable to carry out current federal contractual obligations. *See* GA Tech Dec. at ¶ 14; ADAI Dec. at ¶ 14; ADPH Dec. at ¶ 14; BSU Dec. at ¶ 14; ISU Dec. at ¶ 11; UI Dec. at ¶ 14; Declaration of Jane Elizabeth Burdeshaw ("ADRS Dec."), Exhibit 7 at ¶¶ 8, 12.

On the other hand, Plaintiffs may simply be *unable* to comply with the Contractor Mandate. This will cause Plaintiffs to *lose tens and hundreds of millions of dollars* that they will never be able to get back. *See* GA Tech Dec. at ¶ 7 (Georgia Tech received $663,868,899.00 in annual revenue from federal contracts in fiscal year 2021, accounting for 33% of total revenue); UGA-1 Dec. at ¶ 6 (UGA received $56 million in fiscal year 2021); AU Dec. at ¶ 7 (Augusta University received $17.1 million in fiscal year 2021); UI Dec. at ¶ 5 (University of Idaho received $22 million); BSU

Dec. at ¶ 5 (Boise State University received $25,057,355); ISU Dec. at ¶ 5 (Idaho State University received $25,057,355); UAS Dec. at ¶ 6 (putting the current value of federal contracts to the University of Alabama, the University of Alabama Birmingham, and the University of Alabama Huntsville at $663,079,382).

No dollar amount can address the inevitable (1) loss of personnel, (2) loss of institutional knowledge vested in each employee, (3) loss of specialized workers, (4) damage to reputation, (5) damage to good will, and (6) inability to carry out their respective missions, all of which constitute irreparable harms. *See Georgia v. United States*, 398 F. Supp. 3d 1330, 1344 (S.D. Ga. 2019) (holding plaintiffs would "experience irreparable harm in the loss of the contract. . ., the loss of employees,. . . [etc]."); *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) (finding that "the loss of customers and goodwill is an irreparable injury") (quoting *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir.1991)); *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1235 (10th Cir. 2019) (where the court identified "diminishment of competitive positions in marketplace" and "loss of employees' unique services" as factors supporting irreparable harm); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013); *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. Sept. 26, 2016) (stating "[a]n organization is harmed if the actions taken by the defendant have perceptibly impaired the organization's programs").

Here, Plaintiff universities will suffer nonmonetary harm through a loss of "recruiting and retaining talented faculty and students," because "[t]he talented individuals [Plaintiffs] recruit as faculty, staff, and students have every expectation

of having these challenging and exciting research opportunities available to them via the federal contracting process."  UGA-2 Dec. at ¶ 10; *see*, e.*g.,* AU Dec. *at* ¶ 18; GA Tech at ¶ 15.

The universities will also suffer irreparable harm from the masking and social distancing requirements in the Mandate.  The social distancing requirements in particular would effectively end a university's ability to hold in person instruction in many classes, which undermines the core function of a university—to educate its students.

## III.  The Balance of Equities and Public Interest Favors Granting Preliminary Relief

The balance of the equities and public interest factors also weigh in favor of granting Plaintiffs' motion.  When the government is the opposing party, these two factors "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010).  Defendants have no lawful interest in enforcing an unconstitutional and unlawful policy.  *See Odebrecht Const., Inc*, 715 F.3d at 1290. That is especially true because individual freedoms and liberties are at stake.  An injunction would serve the interest of the public because, absent an injunction, unvaccinated covered contractor employees across the country face reassignment, relocation, discipline or termination.  The public interest is further served with a preliminary injunction since covered contractor employees are being put to the choice to either keep their job by complying with an unlawful and unconstitutional mandate or lose the ability to put food on the table.  Defendants, on the other hand, would simply have to maintain their *status quo* rather than taking any affirmative act.  *See*

31

*United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983) ("Preservation of the status quo enables the court to render a meaningful decision on the merits."). Indeed, Defendants would merely have to maintain the same position they had in July 2021, when the White House admitted it was "not the role of the federal government" to mandate vaccination. *See supra* Introduction.

## CONCLUSION

For the above reasons, Plaintiffs respectfully request this Court preliminarily enjoin Defendants from implementing and enforcing the Contractor Mandate through and including trial of this matter.

Respectfully submitted this 5th day of November, 2021.

STATE OF GEORGIA
*Georgia Attorney General*
*Christopher M. Carr*

*/s/ Drew F. Waldbeser*
Drew F. Waldbeser (Pro Hac Vice pending)
  *Deputy Solicitor General*
Ross W. Bergethon
  *Deputy Solicitor General*
Office of the Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334
Tel.: (404) 458-3378
Fax: (404) 656-2199
dwaldbeser@law.ga.gov

*Counsel for State of Georgia Plaintiffs*

*/s/ Harold D. Melton*
Harold D. Melton (Ga Bar No. 501570)
Charles E. Peeler (Ga Bar No. 570399)
Misha Tseytlin (Admitted Pro Hac Vice)
  *Special Assistant Attorneys General*
  *for Plaintiffs the State of Georgia,*
  *Governor Brian P. Kemp in his official*
  *capacity, Commissioner Gary W.*
  *Black in his official capacity; and the*
  *Board of Regents of the University*
  *System of Georgia*

Troutman Pepper Hamilton Sanders LLP
Bank of America Plaza, Suite 3000
600 Peachtree Street N.E.
Atlanta, Georgia 30308-2216
Tel.:   (404) 885-3000
Fax:   (404) 962-6515

Harold.Melton@Troutman.com

*Counsel for State of Georgia Plaintiffs*

*/s/ Paul H. Dunbar III*
Paul H. Dunbar III  (233300)
Capers Dunbar Sanders & Bellotti, LLP
2604 Commons Boulevard
Augusta, Georgia 30909
Phone: (706) 722-7542
pauldunbar@bellsouth.net

*Local Counsel for Plaintiff-States and Agencies*

STATE OF ALABAMA
  *Office of the Attorney General Steve Marshall*

*/s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (Admitted Pro Hac Vice)
  *Solicitor General*
Thomas A. Wilson (Admitted Pro Hac Vice)
  *Deputy Solicitor General*
Office of the Attorney General
501 Washington Ave.
Montgomery, AL 36130
Tel.: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Thomas.Wilson@AlabamaAG.gov

*Counsel for Plaintiffs State of Alabama and Alabama Agencies*

*/s/ William G. Parker, Jr.*
William G. Parker, Jr. (Pro Hac Vice forthcoming)
  *General Counsel*
Office of the Governor
Alabama State Capitol
600 Dexter Avenue, Room N-203
Montgomery, Alabama 36130
Tel.: (334) 242-7120
Fax: (334) 242-2335
Will.Parker@governor.alabama.gov

*Counsel for Governor Kay Ivey*

STATE OF IDAHO
  *Office of the Attorney General Lawrence G. Wasden*

*/s/  W. Scott Zanzig*
W. Scott Zanzig (Pro Hac Vice forthcoming)
  *Deputy Attorney General*
954 W Jefferson, 2nd Floor
P. O. Box 83720
Boise, ID  83720-0010
Tel.: (208) 334-2400
Fax: (208) 854-8073
scott.zanzig@ag.idaho.gov

*Counsel for the State of Idaho*

STATE OF KANSAS
  *Office of Attorney General Derek Schmidt*

*/s/ Brant M. Laue*
Brant M. Laue (Pro Hac Vice forthcoming)
  *Solicitor General*
20 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Tel: (785) 296-2215
Fax: (785) 296-6296
brant.laue@ag.ks.gov

*Counsel for the State of Kansas*

STATE OF SOUTH CAROLINA
  *Office of South Carolina Attorney General Alan Wilson*

*/s/ J. Emory Smith, Jr.*
J. Emory Smith, Jr. (Pro Hac Vice forthcoming)
  *Deputy Solicitor General*

Thomas T. Hydrick  (Pro Hac Vice forthcoming)
  *Assistant Deputy Attorney General*

Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Tel.: (803) 734-3680
Fax: (803) 734-3677
esmith@scag.gov

*Counsel for the State of South Carolina*

STATE OF SOUTH CAROLINA
  *Office of Governor Henry McMaster*

*/s/ Thomas A. Limehouse, Jr.*
Thomas A. Limehouse, Jr. (Pro Hac Vice forthcoming)
  *Chief Legal Counsel*
Wm. Grayson Lambert  (Pro Hac Vice forthcoming)
  *Senior Legal Counsel*
Michael G. Shedd  (Pro Hac Vice forthcoming)
  *Deputy Legal Counsel*
Office of the Governor
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov

*Counsel for Henry McMaster, in his official capacity as Governor of the State of South Carolina*

STATE OF WEST VIRGINIA
  *Office of Attorney General Patrick Morrisey*

 */s/ Lindsay See*
Lindsay See (Pro Hac Vice forthcoming)
  *Solicitor General*
Office of the Attorney General
State Capitol Complex
Bldg. 1, Room E-26
Charleston, West Virginia 25305
Tel.: (304) 558-2021
Lindsay.S.See@wvago.gov

*Counsel for the State of West Virginia*

STATE OF UTAH
  *Office of the Attorney General Sean Reyes*

*/s/ Melissa A. Holyoak*
Melissa A. Holyoak (Pro Hac Vice forthcoming)
*Solicitor General*
Office of the Attorney General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel.: 385.271.2484
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 5, 2021, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record

I further certify that I shall cause to be served by hand delivery, as soon as is practicable, the foregoing document to the following non-CM/ECF participants:

> US Attorney
> Southern District of Georgia
> 600 James Brown Blvd, Suite 200
> Augusta, GA  30901

I further certify that I shall cause to be served by certified mail by the United States Postal Service the foregoing document to the following non-CM/ECF participants:

> US Attorney General
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

This 5th day of November, 2021.

> */s/ Harold D. Melton*
> Harold D. Melton (Ga Bar No. 501570)
> Troutman Pepper Hamilton Sanders LLP
> Bank of America Plaza, Suite 3000
> 600 Peachtree Street N.E.
> Atlanta, Georgia 30308-2216
> Harold.Melton@Troutman.com
> (404) 885-3000
> (404) 885-3900