# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### AUGUSTA DIVISION

| | |
|---|---|
| The States of Georgia, Alabama, Idaho, Kansas, South Carolina, Utah, West Virginia; Brian P. Kemp in his official capacity as Governor of the State of Georgia; Kay Ivey in her official capacity as Governor of the State of Alabama; Brad Little in his official capacity as Governor of the State of Idaho; Henry McMaster in his official capacity as Governor of the State of South Carolina; the Board of Regents of the University System of Georgia; Gary W. Black in his official capacity as Commissioner of the Georgia Department of Agriculture; Alabama Department of Agriculture and Industries; Alabama Department of Public Health; Alabama Department of Rehabilitation Services; Idaho State Board of Education, | Civil Action No. 1:21-cv-163-RSB-BKE |
| Plaintiffs, | |
| v. | |
| Joseph R. Biden in his official capacity as President of the United States; Safer Federal Workforce Task Force; United States Office of Personnel Management; Kiran Ahuja in her official capacity as director of the Office of Personnel Management and as co-chair of the Safer Federal Workforce Task Force; Office of Management and Budget; Shalanda Young in her official capacity as Acting Director of the Office of Management and Budget and as a member of the Safer Federal Workforce Task Force; General Services Administration; Robin Carnahan in her official capacity as | |

1

Administrator of the General Services Administration and as co-chair of the Safer Federal Workforce Task Force; Jeffrey Zients in his official capacity as co-chair of the Safer Federal Workforce Task Force and COVID-19 Response Coordinator; L. Eric Patterson in his official capacity as Director of the Federal Protective Service; James M. Murray in his capacity as Director of the United States Secret Service; Administrator Deanne Criswell in her official capacity as Administrator of Federal Emergency Management Agency; Rochelle Walensky in her official capacity as Director of the Center for Disease Control; United States Department of Defense; Lloyd Austin in his official capacity as the United States Secretary of Defense; United States Department of Health and Human Services; Xavier Becerra in his official capacity as the United States Secretary of Health and Human Services; National Institutes of Health; Francis S. Collins in his official capacity as Director of the National Institutes of Health; United States Department of Veterans Affairs; Denis Mcdonough in his official capacity as United States Secretary of Veterans Affairs; National Science Foundation; Sethuraman Panchanathan in his official capacity as Director of the National Science Foundation; United States Department of Commerce; Gina Raimondo in her official capacity as United States Secretary of Commerce; National Aeronautics and Space Administration; Bill Nelson in his official capacity as Administrator of the National Aeronautics and Space Administration; United States Department of Transportation; Richard Chávez, in his official capacity as the Director of the Department of Transportation; the

| |
|---|
| United States Department of Energy; and Jennifer Granholm in her official capacity as United States Secretary of Energy, |
| Defendants. |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

1.    On September 9, 2021, President Biden announced that his patience was "wearing thin" with unvaccinated Americans,[1] and he issued an executive order that required federal departments and agencies to mandate that all of their federal contractors fully vaccinate their workforce. Executive Order 14042 is astonishing—not only for its tremendous breadth and unworkably short deadline, but also because so little care has been given to how it will work in the real world. The mandate, as the federal government has conceived, and thus far implemented, applies not only to contractor employees working on federal contracts, but also *any* employee that *may* have contact with someone working on a federal contract (even if that contact is nothing more than walking past them outside, in a parking lot). There are no exceptions for employees that work alone, outside, or even exclusively remotely. And the federal government is insisting that every federal contractor fully comply by January 18, 2022, which means employees have until December 7, 2021 to begin their two-shot vaccine regimen. The contractual language in question even, remarkably,

---

[1] Office of Public Engagement, Transcript, Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/.

commits federal contractors to comply with any amendments to the administrative guidance that may be issued in the future.

2.      For state agencies that work on federal contracts, this situation is untenable. This mandate puts billions of contracting dollars in peril, including huge portions of some state agencies' budgets. Some agencies have received notice of their need to comply with this mandate (or lose all their funding) within the past few days, leaving compliance all but impossible. At its core, the mandate forces contractors to make an impossible choice: either (1) take enforcement action that may include termination of all unvaccinated employees, or (2) face losing billions of dollars in federal funding. And because the administration has already amended the guidance multiple times, there is no telling what other onerous obligations may put state agencies in breach at a moment's notice.

3.      The States of Georgia, Alabama, Idaho, Kansas, South Carolina, Utah, West Virginia, Georgia Governor Brian Kemp, Alabama Governor Kay Ivey, Idaho Governor Brad Little, South Carolina Governor Henry McMaster, the Board of Regents of the University System of Georgia, Commissioner Gary W. Black of the Georgia Department of Agriculture, the Alabama Department of Agriculture and Industries, the Alabama Department of Public Health, the Alabama Department of Rehabilitation Services, and the Idaho State Board of Education bring this action to stop this unprecedented and unconstitutional use of power by the federal government, and to end the nationwide confusion and disruption that the mandate has caused.

4

**PARTIES**

4.     Plaintiff State of Georgia is a sovereign state with many agencies that are federal contractors.

5.     Plaintiff State of Alabama is a sovereign state with many agencies that are federal contractors.

6.      Plaintiff State of Idaho is a sovereign state possessing all of the powers reserved to it under the 10th Amendment to the United States Constitution with many agencies that contract directly and administer contracts with the federal government.

7.     Plaintiff State of Kansas is a sovereign state of the United States of America. Several of its agencies are federal contractors, and some of these agencies, including multiple state universities, have already been presented with contract amendments incorporating the Contractor Mandate.[2] The State of Kansas employs "covered contractor employees" at "covered contractor workplaces" as defined by the Task Force Guidance.

8.     Plaintiff State of South Carolina is a sovereign state of the United States of America. South Carolina citizens and entities, who are federal contractors and subcontractors, have been and will be forced to comply with the unlawful COVID-19 vaccine mandate. Because of that unlawful action as to the State's citizens and

---

[2] As used throughout, Contractor Mandate includes, individually and collectively, Executive Order 14042, the Safer Federal Workforce Task Force COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors, the FAR Council's Class Deviation Clause 252.223-7999, and the Office of Management and Budget's *Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042.*

entities, Attorney General Alan Wilson brings this action on behalf of the State pursuant to his *parens patriae*, constitutional, and common law authority.

9.      Plaintiff State of Utah is a sovereign State and has the authority and responsibility to protect its sovereign interests, public fisc, and the health, safety, and welfare of its citizens. Utah has many state entities that are federal contractors and thus Utah employs "covered contractor employees" and maintains "covered contractor workplaces" as defined by the Contractor Mandate. These contracts are worth millions of dollars, if not more. Utah expects to continue pursuing government contracts in the future. Utah also has current contracts subject to renewal or the exercise of options. The federal government has presented Utah with contract modifications that incorporate the Contractor Mandate. Utah will face irreparable harm if forced to comply.

10.     Plaintiff State of West Virginia is a sovereign State and has the authority and responsibility to protect its sovereign interests, public fisc, and the health, safety, and welfare of its citizens. West Virginia has state entities that are signatories to "contract-like instruments" that may render affected employees and workplaces "covered contractor employees" and "covered contractor workplaces" as defined by the Contractor Mandate. These instruments are worth significant sums. West Virginia expects to continue pursuing government contracts in the future. West Virginia also has current agreements subject to renewal or the exercise of options. West Virginia will face irreparable harm if it is forced to comply with requirements imposed by the Contractor Mandate.

11.    Plaintiff Brian P. Kemp is named in his official capacity as Governor of the State of Georgia and appears on behalf of the State of Georgia.

12.    Plaintiff Kay Ivey is named in her official capacity as Governor of the State of Alabama and appears on behalf of the State of Alabama.

13.    Plaintiff Brad Little, in his official capacity as Governor of the State of Idaho, has an interest in preventing the loss of federal funding that will result as a direct consequence of the Contractor Mandate. Additionally, the Governor has an interest in ensuring that all State laws, including the Idaho Constitution and Idaho Statutes, are executed, rather than subverted through federal overreach.

14.    Plaintiff Henry McMaster is named in his official capacity as Governor of the State of South Carolina and appears on behalf of the State of South Carolina.

15.    Plaintiff Board of Regents of the University System of Georgia was established in 1931 as a part of a reorganization of Georgia's state government. The Georgia Constitution grants to the Board of Regents the exclusive right to govern, control, and manage the University System of Georgia, an educational system comprised of twenty-six institutions of higher learning including universities with extensive research institutions such as Augusta University, the Georgia Institute of Technology, Georgia State University, and the University of Georgia.

16.    Plaintiff Gary W. Black is named in his official capacity as Commissioner of the Georgia Department of Agriculture.

17.    Plaintiff Alabama Department of Agriculture and Industries is a state agency responsible for serving farmers and consumers of agricultural projects.

18.     Plaintiff Alabama Department of Rehabilitation Services is the state agency primarily responsible for serving Alabamians with disabilities.

19.     Plaintiff Alabama Department of Public Health is the state agency primarily responsible for serving Alabamians' public health needs.

20.     Plaintiff Idaho State Board of Education appears in its capacity as Regents of the University of Idaho, Board of Trustees of Boise State University, Board of Trustees of Idaho State University, and Board of Trustees of Lewis-Clark State College.

21.     Defendant Joseph R. Biden is the 46th President of the United States who, on September 9, 2021, signed Executive Order 14042, titled *Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors* ("EO 14042").

22.     Defendant Safer Federal Workforce Task Force (the "Task Force") was established pursuant to President Biden's Executive Order 13991 (86 Fed. Reg. 7045 (Jan. 25, 2021)). Three co-chairs oversee the Task Force, including: (1) the Director of the Office of Personnel Management ("OPM"); (2) the Administrator of the General Services Administration ("GSA"); and (3) the COVID–19 Response Coordinator. The Director of OPM is also a member of the Task Force.

23.     Defendant Office of Personnel Management Director, Kiran Ahuja ("Director Ahuja"), is a co-chair and member of the Task Force and represents the federal agency responsible for managing human resources for civil service of the federal government.

24.     Defendant Administrator of General Services, Robin Carnahan (the "GSA Administrator"), is a co-chair and member of the Task Force and represents the federal agency responsible for managing and supporting the basic functioning of federal agencies.

25.     Defendant COVID–19 Response Coordinator, Jeffrey Zients (the "COVID-19 Response Coordinator"), is a co-chair and member of the Task Force.

26.     Defendant Office of Management and Budget Director, Shalanda Young (the "OMB Director"), is a member of the Task Force and represents the federal agency with delegated authority, by President Biden, to publish determinations relevant to EO 14042 and the Task Force Guidance to the Federal Register.

27.     Defendant Director of the Federal Protective Service, L. Eric Patterson (the "FPS Director"), is a member of the Task Force.

28.     Defendant Director of the United States Secret Service, James M. Murray (the "Secret Service Director"), is a member of the Task Force.

29.     Defendant Director of the Federal Emergency Management Agency, Deanne Criswell (the "FEMA Director"), is a member of the Task Force.

30.     Defendant Director of the Center for Disease Control, Rochelle Walensky (the "CDC Director"), is a member of the Task Force.

31.     Defendant Office of Management and Budget ("OMB") is an agency of the United States government.

32.     Defendant Office of Personnel Management ("OPM") is an agency of the United States government.

9

33.     Defendant General Services Administration ("GSA") is an agency of the United States government, located within HHS.

34.     Defendant United States Department of Defense ("DOD") is an agency of the United States government.

35.     Defendant United States Secretary of Defense, Lloyd Austin, is named in his official capacity as the United States Secretary of Defense.

36.     Defendant United States Department of Health and Human Services ("DHHS") is an agency of the United States government.

37.     Defendant United States Secretary of Health and Human Services, Xavier Becerra, is named in his official capacity as the United States Secretary of Health and Human Services.

38.     Defendant National Institutes of Health ("NIH") is an agency of the United States government, located within DHHS.

39.     Defendant NIH Director, Francis S. Collins, is named in his official capacity as the Director of the NIH.

40.     Defendant United States Department of Veterans Affairs ("DVA") is an agency of the United States government.

41.     Defendant United States Secretary of Veterans Affairs, Denis McDonough, is named in his official capacity as the United States Secretary of Veterans Affairs.

42.     Defendant National Science Foundation ("NSF") is an agency of the United States government.

43.     Defendant Director of the NSF, Sethuraman Panchanathan, is named in his official capacity as the Director of the NSF.

44.     Defendant United States Department of Commerce ("DOC") is an agency of the United States government.

45.     Defendant United States Secretary of Commerce, Gina Raimondo, is named in her official capacity as the United States Secretary of Commerce.

46.     Defendant National Aeronautics and Space Administration ("NASA") is an agency of the United States government.

47.     Defendant Administrator of the NASA, Bill Nelson, is named in his official capacity as the Director of the NASA.

48.     Defendant United States Department of Transportation ("DOT") is an agency of the United States government.

49.     Defendant Director of the DOT, Richard Chávez, is named in his official capacity as the Director of the DOT.

50.     Defendant United States Department of Energy ("DOE") is an agency of the United States government.

51.     Defendant United States Secretary of Energy, Jennifer Granholm, is named in her official capacity as the United States Secretary of Energy.

## STATEMENT OF JURISDICTION AND VENUE

52.     This Court has exclusive jurisdiction over this case under 28 U.S.C. §§ 1331 and 1346 because Plaintiffs' claims arise under the Administrative Procedure Act, 5 U.S.C. §§ 702–703, and the United States Constitution, U.S. Const. art. III, § 2.

53.     This Court is authorized to grant the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, and 28 U.S.C. §§ 2201–02.

54.     Venue is proper within this District pursuant to 28 U.S.C. § 1391(e) because (1) certain Plaintiffs reside in Georgia and no real property is involved, and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

55.     Venue further lies in this District pursuant to 28 U.S.C. § 1391(e)(1) because the State of Georgia is a resident of every judicial district in its sovereign territory including this judicial District (and Division). *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018).

## FACTUAL ALLEGATIONS

### Executive Order 14042 and the Safer Federal Workforce Task Force Guidelines

56.     On September 9, 2021, President Biden signed Executive Order 14042, titled *Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors* ("EO 14042"), a true and accurate copy of which is attached as **Exhibit A**.

57.     EO 14042 purports to "promote[] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument . . . ." **Ex. A** at 1.

58.    EO 14042 claims that "ensuring that Federal contractors and subcontractors are adequately protected from COVID-19 will bolster economy and efficiency in Federal procurement." **Ex. A** at 1.

59.    EO 14042 directs executive agencies subject to the Federal Property and Administrative Services Act (the "Procurement Act") to include in *all* federal contracts and "contract-like instruments" a clause that contractors and subcontractors will comply with all future guidance issued by the Task Force.

60.    EO 14042 requires that the Task Force issue specific COVID safety protocols by September 24, 2021.

61.    On September 24, 2021 the Task Force released its first *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (the "First Task Force Guidance") to federal agencies, imposing a vaccine mandate on federal contractors and subcontractors, a true and accurate copy of which is attached as **Exhibit B**.

62.    The First Task Force Guidance has been amended on several occasions, with the most recent amendment having occurred on November 10, 2021 (specifically referred to as the "Current Task Force Guidance" and generally referred to as the "Task Force Guidance"), a true and accurate copy of which is attached as **Exhibit C**.

63.    EO 14042 further required that the Director of OMB publish a determination in the Federal Register as to "whether such Guidance will promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors." **Ex. A** at 2.

64.    On September 28, 2021, Director Young published the OMB's *Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042* (the "First OMB Determination") stating in conclusory fashion "I have determined that compliance by Federal contractors and subcontractors with the COVID-19-workplace safety protocols detailed in that guidance will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." 86 Fed. Reg. 53,691 (Sept. 28, 2021), a true and correct copy of which is  attached as **Exhibit D**.

65.    The First OMB Determination contained no research or data in support of its claims. Moreover, the First OMB Determination underwent no notice-and-comment period.

66.    On November 16, 2021, Director Young issued a second OMB determination, *Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis* (the "Revised OMB Determination").  86 Fed. Reg. 63,418 (Nov. 16, 2021), a true and correct copy of which is attached as **Exhibit E**.

67.    The Revised OMB Determination purports to be immediately effective and provides only a thirty-day notice and comment period through December 16, 2021.  The putative immediate effectiveness of the Revised OMB Determination is based on a waiver of the ordinary sixty-day notice and comment period before the Revised OMB Determination would otherwise become effective.  *Id*.

14

68. Through EO 14042 and without legislative intervention, the President purported to give the Task Force, the OMB Director, and various federal agencies broad authority to impose vaccine mandates on federal contractors.

69. While EO 14042 did not specifically call for a vaccine mandate, it did purport to delegate rulemaking authority to the Task Force, OMB, and the Federal Acquisition and Regulatory Council (the "FAR Council").

70. On September 30, 2021, the FAR Council issued Class Deviation Clause 52.223-99 (the "FAR Deviation Clause") with accompanying guidance, a true and correct copy of which is attached as **Exhibit F**.

71. The FAR Deviation Clause requires federal contractors to follow the Task Force Guidance and any *future* amendments to the Guidance. **Ex. F**.

72. EO 14042, the Task Force Guidance, the FAR Deviation Clause, and the First and Revised OMB Determinations are hereinafter collectively referred to as the "Contractor Mandate."

73. Ultimately, prior to implementing the FAR Deviation Clause, the Task Force Guidance was never published to the Federal Register for the purpose of receiving public comment.

74. Pursuant to the Current Task Force Guidance, "[p]eople are considered fully vaccinated for COVID-19 two weeks after they have received the second dose in a two-dose series, or two weeks after they have received a single-dose vaccine." **Ex. C** at 4.

75.    The First Task Force Guidance established that "covered contractor employees" are to be "fully vaccinated" by December 8, 2021.[3]

76.    The Current Task Force Guidance requires that covered contractor employees be fully vaccinated by January 18, 2022—meaning said employees must obtain the final dose of their vaccine of choice no later than January 4, 2022.

77.    Accordingly, any covered contractor employee inclined to take the Moderna vaccine would have had to receive their first dose by December 7, 2021 in order to comply with the January 18, 2022 deadline.[4]

78.    Covered contractor employees must obtain a Pfizer vaccine by December 14, 2021[5] or a Johnson & Johnson vaccine by January 4, 2022.[6]

79.    Pursuant to the Current Task Force Guidance, "covered contractor employees" refers to "any full-time or part-time employee of a covered contractor working on or *in connection with* a covered contract or working at a covered contractor workplace. *This includes employees of covered contractors who are not themselves working on or in connection with a covered contract*." **Ex. C** at 3 (emphasis added).

80.    For the same reason, the Guidance also specifies that subcontractors working in a covered workplace must also be fully vaccinated. **Ex. C**. at 1.

---

[3] This deadline was first amended on November 4, 2021 by way of a White House press release. Office of Public Engagement, Fact Sheet: Biden Administration Announces Details of Two Major Vaccination Policies (Nov. 4, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/04/fact-sheet-biden-administration-announces-details-of-two-major-vaccination-policies/.

[4] Center for Disease Control, Different COVID-19 Vaccines, (Oct. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines.html.

[5] *Id.*

[6] *Id.*

81.    Pursuant to the Current Task Force Guidance, a covered contractor workplace "means a location controlled by a covered contractor at which any employee of a covered contractor working on or in connection with a covered contract is likely to be present during the period of performance for a covered contract." **Ex. C** at 4.

82.    Pursuant to the First Task Force Guidance and the updated Frequently Asked Questions on the Task Force website, "unless a covered contractor can affirmatively determine that none of its employees on another floor or in separate areas of the building will come into contact with a covered contractor employee during the period of performance," employees in other areas of the building site or facility are also a part of the covered contractor workplace. **Ex. B** at 11, Q9.[7]

83.    Accordingly, the Contractor Mandate mandates vaccination for those who work both directly and indirectly with federal contracts.

84.    For example, pursuant to the Task Force Guidance, if a covered contractor employee is working on a contract for the Department of Defense in a remote office facility and that person merely shares a parking garage with non-contracted employees once a week, those non-contracted employees are subject to the Contractor Mandate.

---

[7] *See* Safer Federal Workforce Task Force, FAQs: Federal Contractors (last visited Nov. 18, 2021), https://www.saferfederalworkforce.gov/faq/contractors/.  The Frequently Asked Questions were previously within the First Task Force Guidance; however, they were removed from the Current Task Force Guidance and are instead located on the Task Force website.  The content published in response to each question remains the same.

85.   In another example, pursuant to the Task Force Guidance, if a covered contractor employee is working on a contract for NASA in a remote office facility and that person merely shares an elevator with non-contracted employees every other Friday, those non-contracted employees are subject to the Contractor Mandate.

86.   The First Task Force Guidance imposed a deadline of October 15, 2021 for federal agencies to include a vaccination mandate clause in new contracts.

87.   EO 14042, in general terms, and the Task Force Guidance, in specific terms, further required that the Federal Acquisition Regulatory Council ("FAR Council") "conduct a rulemaking to amend the [Federal Acquisition Regulation ("FAR")] to include the [Contractor Mandate]." **Ex. B** at 12.

88.   Pursuant to the First Task Force Guidance, by October 8, 2021 and prior to any rulemaking, the FAR Council was required to develop a recommended contract clause to impose the Contractor Mandate for federal agencies to include in their subsequent contracts. **Ex. B** at 12.

89.   The First Task Force Guidance instructed the FAR Council to "recommend that agencies exercise their authority to deviate from the FAR" by using a vaccination mandate clause in contracts prior to the FAR Council actually amending the FAR.  **Ex. B** at 12.

**Development and Implementation of the FAR Deviation Clause**

90.   Before the FAR Deviation Clause was even published on September 30, 2021, the Defense Acquisition Regulations System and the Department of Defense published their intent to comply with EO 14042 via a Notice to the Federal Register

on September 17, 2021 (the "DOD Notice").  A true and correct copy of the DOD Notice

is attached as **Exhibit G**.

91.     In response, there were seventeen letter comments from members of the

public, raising hundreds of key concerns that have yet to be addressed by OMB or the

Task Force.

92.     A few of the DOD Notice comments included concerns such as:

a.      "Are contractors or the government [*sic*] be liable for employee

disability or damage claims (side effects, etc.)?"[8]

b.      "How will DOD monitor and measure any productivity

disruptions?"[9]

c.      "Are contractors expected to violate or undermine collective

bargaining agreements as they comply with these requirements?"[10]

d.      "Implementing a flow down vaccine mandate and/or testing will

likely cause our subcontractors to experience significant employee attrition

and financial hardship, potentially leaving them unable to fulfill their role in

the distribution network."[11]

---

[8] Aerospace Industries Association (AIA), Comment Letter on DOD Implementation
Planning for Executive Order 14042 (Sept. 23, 2021),
https://www.acq.osd.mil/dpap/dars/docs/early_engagement_opportunity/executive_or
der_14042/AIA%20Comments%20-%20EO%2040142%20DARS%20EEO.9-23-
21.pdf.
[9] *Id.*
[10] *Id.*
[11] AmerisourceBergen, Comment Letter on DOD Implementation Planning for
Executive Order 14042 (Sept. 23, 2021),
https://www.acq.osd.mil/dpap/dars/docs/early_engagement_opportunity/executive_or
der_14042/Amerisource%20Bergen%20Comments%20to%20DOD%20Early%20Eng

93.     The DOD Notice comments were never considered prior to issuing the Task Force Guidance. Indeed, the DOD ultimately published the DOD FAR Deviation Memo just one day after the FAR Deviation Clause, with no alterations.

94.     Upon information and belief, even some federal agencies were unable to implement the Task Force Guidance due to the quick turnaround time of just 21 days from the date the Guidance was issued to the October 15, 2021 deadline.

**Many Employees Are Likely to Quit Rather Than Submit to Mandatory Vaccination**

95.     From an employer's perspective, 9 in 10 employers fear significant reductions in their workforce if they had to implement vaccine mandates.[12]

96.     In a recent survey, approximately 70% of unvaccinated workers said they would leave their job before complying with an employer-issued vaccine mandate.[13]

97.     "Just under one in five U.S. adults, 18%, can be described as vaccine-resistant. These Americans say they would not agree to be vaccinated if a COVID-19 vaccine were available to them right now at no cost and that they are unlikely to

---

agement%20Opportunity%20Ensuring%20Adequate%20COVID%20Safety%20Proto cols%20for%20Federal%20Contractors%20EO%2014042%20final.pdf.

[12] Karl Evers-Hillstrom, *9 in 10 Employers Say They Fear They'll Lose Unvaccinated Workers Over Mandate: Survey*, The Hill (Oct. 18, 2021), https://thehill.com/business-a-lobbying/business-a-lobbying/577201-9-in-10-employers-say-they-will-lose-unvaccinated.

[13] Liz Hamel et al., Kaiser Family Found., KFF COVID-19 Vaccine Monitor: October 2021(Oct. 28, 2021), https://www.kff.org/coronavirus-covid-19/poll-finding/kff-covid-19-vaccine-monitor-october-2021/.

change their mind about it. The percentage holding these views has been stable in recent months."[14]

## The Georgia Board of Regents and University System of Georgia

98.    The Board of Regents (the "Board") of the University System of Georgia (the "University System") is composed of 19 members, five of whom are appointed from the state-at-large, and one from each of the state's 14 congressional districts.

99.    The Board oversees the 26 higher education institutions that comprise the University System including four research universities, four comprehensive universities, nine state universities and nine state colleges. It also includes the Georgia Public Library Service, which encompasses approximately 389 facilities within the 61 library systems throughout the State of Georgia. The University System also includes the Georgia Archives which identifies, collects, manages, preserves and provides access to records and information about Georgia.

100.   Every employee of the 26 higher education institutions within the University System is an employee of the Board.

101.   The University System has an annual budget of more than $8.1 billion for fiscal year 2021.

102.   The University System's economic impact on the state was $18.5 billion in fiscal year 2019, according to the most recent study conducted by the Selig Center for Economic Growth.

---

[14] Jeffrey M. Jones, *About One in Five Americans Remain Vaccine Resistant*, Gallup (Aug. 6, 2021), https://news.gallup.com/poll/353081/one-five-americans-remain-vaccine-resistant.aspx (last visited Oct. 26, 2021).

103.    Of the 157,770 jobs noted in a Selig Center for Economic Growth report, 33% are on the campuses while 67% are off campuses.

104.    For every person employed at the University System or a member institution, two people have jobs in the local community that support the presence of the institution.

**The Board and University System's Response to COVID-19**

105.    The University System has provided students with access to COVID-19 vaccination sites on 15 campuses statewide.

106.    Students can schedule their first or second dose at the University System campus closest to them, regardless of whether they are enrolled at that institution.

107.    Since the beginning of the pandemic, the University System has worked closely with the Georgia Department of Public Health and the Governor's Office and Task Force to make sure their students keep learning and stay healthy.

108.    While the University System strongly encourages that all faculty, staff, students, and visitors get vaccinated, it has not mandated vaccination.

109.     The University System has stated publicly that "getting vaccinated is an individual decision and not required to be a part of the USG campuses."[15]

---

[15] *USG Vaccination Locator*, U. Sys. Ga., https://www.usg.edu/vaccination/ (last visited Oct. 26, 2021).

**Impact of the Contractor Mandate on the University System and Other Georgia State Agencies**

110.   Universities and research institutions within the University System maintain hundreds of contracts with various federal agencies.

111.   The University System employees who work on these federal agency contracts work throughout the University System campuses and in remote locations.

112.   Relevant to the University System, a "covered contractor employee" goes beyond the individuals specifically assigned to a contract. Instead, "covered contractor employees" include "any full-time or part-time employee of a covered contractor working on or *in connection with* a covered contract or working at a covered contractor workplace." **Ex. C** at 3–4 (emphasis added).

113.   Moreover, "covered contractor employees," specifically include other employees that come into *minimal* contact directly with contractor employees "unless a covered contractor can affirmatively determine that none of its employees on another floor or in separate areas of the building will come into contact with a covered contractor employee during the period of performance of a covered contract." **Ex. B** at 11, Q9.

114.   The "covered contractor workplace" broadly includes "a location controlled by a covered contractor at which *any employee* of a covered contractor working on or in connection with a covered contract is *likely to be present* during the period of performance for a covered contract." **Ex. C** at 4 (emphasis added).

115.   While a "covered contractor workplace" does not include a covered contractor employee's residence, covered contractors working exclusively from their residence are required to be vaccinated. **Ex. B** at 10, Q8.

116.   Ultimately, the Contractor Mandate extends to all employees that share "common areas such as lobbies, security clearance areas, elevators, stairwells, meeting rooms, kitchens, dining areas, and parking garages." **Ex. B** at 10.

117.   Augusta University has a portfolio of at least 45 federal government agreements and contracts, many concerning the university's healthcare research for the Department of Veterans Affairs and Department of Health and Human Services. Augusta University's health and research arm—Augusta University Health—is Georgia's only public academic health center, where world-class clinicians daily perform lifesaving research and development work under federally funded agreements and contracts.

118.   Many, if not all, of the federal agencies associated Augusta University's contracts have already issued memorandums requiring compliance with the Contractor Mandate.

119.   Over 200 employees of Augusta University work on the approximately 45 government contracts. University employees who are not themselves working on or in connection with these contracts must also abide by the Contractor Mandate if they share elevators, lobbies, and even parking garages with the employees who do work on government contracts.

120. In practice, if Augusta University cannot "affirmatively determine" that employees working on federal contracts will be completely separated from the rest of the university, every employee must be fully vaccinated by January 18, 2022.

121. The total budget for federal contracts at Augusta University is $17.1 million for fiscal year 2021.

122. In the event Augusta University cannot comply with the Contractor Mandate—i.e., if they cannot obtain 100% on-campus employee vaccination—their $17.1 million budget for federal contracts is in jeopardy.

123. Similarly, Georgia Institute of Technology (Georgia Tech) is one of the many University System institutions that will suffer significant harm as a result of the Contractor Mandate.

124. Since the 1940s, Georgia Tech has performed research under federal contracts. Federal funding has been crucial to the development of its applied and fundamental research programs, which have been pivotal to addressing the United States' security and other national priorities.

125. Georgia Tech and its research entities maintain multiple contracts with the Department of Defense, the National Science Foundation, the Department of Health and Human Services, the Department of Energy, NASA, the Department of Commerce, the Department of Transportation, the Center for Disease Control, the General Services Administration, and others, all of which are impacted by the Contractor Mandate. Many, if not all, of these federal agencies have already issued memorandums to Georgia Tech requiring compliance with the Contractor Mandate.

126.   Georgia Tech relies on federal resources and personnel to help define and direct its research activities.

127.   Indeed, for fiscal year 2021, Georgia Tech received $663,868,899.00 in annual revenue from federal contracts. This accounts for 33% of Georgia Tech's annual revenue for fiscal year 2021.

128.   Georgia Tech maintains approximately 1,781 active covered federal contracts with approximately 4,079 employees who work on those contracts. This accounts for almost 20% of all Georgia Tech employees. Another approximately 2,374 employees work in connection with federal contracts and a total of approximately 8,949 employees work in "covered contractor workplaces" as defined by the Task Force Guidance—including some students.

129.   Accordingly, based upon the plain language of the EO 14042 and the Task Force Guidance, nearly 32% of all Georgia Tech employees are directly implicated by the Contractor Mandate. Moreover, if Georgia Tech is unable to "affirmatively determine" that its employees working on government contracts will share no common areas with its remaining employees, nearly all of Georgia Tech's on-campus employees are subject to the Contractor Mandate.

130.   The University of Georgia ("UGA") has approximately 300 federal contracts, subcontracts, and cooperative agreements with federal agencies such as the CDC, NSF, NIH, the FBI, and the Civilian Agency Administration Council.

131.   Work performed under these contracts includes the development of a new, more advanced influenza vaccine designed to protect against multiple strains of

influenza virus in a single dose; the study of influenza virus emergence and infection in humans and animals while also making preparations to combat future outbreaks or pandemics; and sample collection from a variety of avian and mammalian species internationally for the identification and characterization of emerging influenza viruses and to develop predictive models describing the epidemiology of influenza in wild avian species.

132.   In fiscal year 2021, UGA received at least $56 million from federal agency contracts.

133.   Many, if not all, of the federal agencies with which UGA contracts have already issued memorandums to UGA in connection with contracts between such federal agencies and UGA in its role as either a prime or sub-contractor, requiring UGA to accept the FAR Deviation Clause, or a variant of it, and thus comply with the Contractor Mandate.

134.   If UGA is unable to "affirmatively determine" that its contractor employees will share no common areas with its remaining employees, nearly all of UGA's on-campus employees are subject to the Contractor Mandate.

135.   As a direct result of the Contractor Mandate, the impacted University System institutions face loss of funding, increased costs to ensure compliance, and potential employee shortages from resignations, terminations, or unspecified leave.

136.   On information and belief, other University System universities will be similarly impacted by the Contractor Mandate.

137.    Plaintiff, Gary W. Black, in his official capacity as Commissioner of the Georgia Department of Agriculture, oversees personnel on one or more campuses of the University of Georgia who will be directly impacted by the Contractor Mandate and may have other Department personnel and operations impacted by the mandate.

138.    Moreover, within the last few days, other Georgia agencies have been informed by federal agencies that they must also sign new contracts containing the Contractor Mandate.

**Impact of the Contractor Mandate on the State of Alabama and Its Agencies**

139.    The Contractor Mandate will harm the State of Alabama's sovereign and proprietary interests.

140.    On May 24, 2021, Alabama enacted Senate Bill 267 (now Alabama Act 2021-493). The Act prohibits Alabama state entities, their officers, and their agents from "requir[ing] the publication or sharing of immunization records or similar health information for an individual." Ala. Act. 2021-493 § 1(a).

141.    To comply with the federal government's Contractor Mandate, state entities, their officers, and their agents would need to "require the publication or sharing of immunization records or similar health information for an individual" by certifying to the federal government that employees have received the COVID-19 vaccine. Thus, to comply with the Contractor Mandate, state entities, their officers, and their agents will need to violate Alabama law.

142.    If a federal contractor does not or cannot comply with these requirements, the government-contracting funds on which the contractor relies will be jeopardized.

143.    The sums of money Alabama would lose if it were not to comply with the Contractor Mandate are staggering. And the coercive nature of potentially losing these sums is magnified by the fact that the federal government's demands arose only recently and leave almost no time for the state to come into compliance or line up substitute funding.

144.    For example, Alabama public universities stand to lose hundreds of millions of dollars in federal contracts if they do not comply with the Contractor Mandate.

145.    Less than half of Alabamians ages 18 and up are fully vaccinated.

146.    Many employees of Alabama's public universities are unvaccinated and would likely quit their jobs rather than receive the COVID-19 vaccine as a condition of further employment.

147.    Alabama and its public universities will be harmed if the universities lose these federal contract funds, particularly on such short notice. Conversely, Alabama and its public universities will be harmed if the universities lose employees.

148.    Plaintiff Alabama Department of Public Health ("ADPH") is the state agency primarily responsible for serving Alabamians' public health needs. ADPH too stands to lose funds if it does not comply with the Contractor Mandate. ADPH has received conflicting guidance from federal agencies as to whether its contracts are subject to the Contractor Mandate.

149.   ADPH has over 2,600 employees. Many of these employees are unvaccinated, and many are likely to quit their jobs if forced to receive the COVID-19 vaccination as a condition of further employment.

150.   Alabama and ADPH would be harmed if ADPH loses federal contract funds it would have otherwise received were it to comply with the Contractor Mandate. Conversely, Alabama and ADPH would be harmed if ADPH employees quit, particularly because ADPH is already struggling to fill empty positions even before the Contractor Mandate was issued.

151.   Plaintiff Alabama Department of Agriculture and Industries ("ADAI") is a state agency responsible for serving farmers and consumers of agricultural projects. ADAI employs several hundred people. ADAI provides expert regulatory control over products and services and promotes national and international consumption of Alabama products.

152.   ADAI has leased property to the United States Department of Agriculture ("USDA") continuously for the past 26 years. On October 20, 2021, a USDA officer sent ADAI a lease amendment incorporating "the mandatory Executive Order 14042 . . . which needs to be part of every Federal contract now." ADAI requested clarification on October 22, 2021, to which USDA sent the following response:

> [I]t's "encouraged" for the Lessors to sign, BUT if you don't, then [USDA] won't be able to do any future lease actions with you if you don't, as well as anything regarding the current lease, such as an extensions or expansions if needed. So we'd have to move out when the lease expires.

153.   As the federal government's correspondence unequivocally demonstrates—indeed, the scare quotes around "encourage" remove any doubt—if ADAI does not comply with the Contractor Mandate, the federal government will cancel its lease and will refuse to "do any future lease actions" with ADAI going forward, depriving ADAI of the revenues it had relied on for its quarter-century contracting relationship with the federal government.

154.   Plaintiff Alabama Department of Rehabilitation Services ("ADRS") is the state agency primarily responsible for serving Alabamians with disabilities. Through ADRS, Alabama offers these Alabamians state-funded services from birth through every stage their lives.

155.   ADRS seeks to aid legally blind vendors by administering a program through which ADRS matches these vendors with government entities whose buildings have vending machines. These vending agreements ensure economic opportunities for Alabama's blind vendors.

156.   To facilitate its blind-vendor program, Alabama has contracted with the federal government since 1946, when ADRS established the Alabama Business Enterprise Program for the Blind and Visually Impaired ("BEP") with the mission to enable qualified blind individuals to achieve independence through self-employment. Since that time, the BEP program has had contracts with the federal government regarding services on federal properties.

157.   The Department of Homeland Security issued a contract modification for the ADRS contract with FEMA on October 14, 2021.

**Impact of the Contractor Mandate on the State of Idaho and Its Agencies**

158.   The State of Idaho includes agencies and entities affected by the Contractor Mandate.

159.   Idaho's institutions of higher learning maintain covered contracts with numerous federal agencies, including, but not limited to, NSF, NASA, HHS, DOE, and DOD sub-entities.

160.   Additionally, other Idaho agencies maintain contracts with the federal government and will be impacted by the Contractor Mandate. Federal officials are beginning to pressure these Idaho agencies to adopt the Contractor Mandate not only for future contracts, but for existing contracts. For example, on October 22, 2021, CDC sent an email to the Idaho Department of Health and Welfare instructing it to execute a mandatory contract modification for the purpose of adding language implementing the Contractor Mandate in an existing contract. The email stated: "Contractors will sign and return the modification via email to the Contracting Officer of record by November 9, 2021."

161.   Thousands of Idaho employees will be affected by the Contractor Mandate.

162.   The agencies and institutions have worked throughout the pandemic, in consultation and collaboration with other government entities and officials, to develop plans to stop the spread of COVID-19.

163.   On information and belief, there are Idaho employees that have indicated that they will not be vaccinated. Due to policies regarding termination of some employees, if termination is necessary to comply with the Contractor Mandate,

the termination process will take months to complete, and some employees will draw a salary during a portion of the process

**Impact of the Contractor Mandate on the State of Kansas and Its Agencies**

164.   The State of Kansas has multiple contracts with various federal agencies.  These contracts are "covered contracts" under the Contractor Mandate.

165.   Kansas's budget is highly dependent upon federal dollars it receives under its federal contracts.

166.   Kansas employs hundreds of "covered contractor employees" and multiple "contractor or subcontractor workplace locations" as those terms are used in the Contractor Mandate

167.   The Contractor Mandate requires hundreds of Kansas employees to get vaccinated. For the same and similar reasons articulated throughout this Complaint, imposing the Contractor Mandate against Kansas will result in significant and irreparable harm to Kansas.

168.   In addition, the State of Kansas will suffer irreparable harm in its *parens patriae* capacity based on application of the Contractor Mandate to private citizens employed by federal contractors who stand to lose their jobs if they choose not to receive the vaccine.

**Impact of the Contractor Mandate on the State of South Carolina and Its Agencies**

169.   The State of South Carolina has multiple contracts with various federal agencies.  These contracts are "covered contracts" under the Contractor Mandate.

170.   South Carolina's budget relies on the federal dollars it receives under its federal contracts.

171.   South Carolina employs hundreds of "covered contractor employees" and multiple "contractor or subcontractor workplace locations" as those terms are used in the Contractor Mandate

172.   The Contractor Mandate will require hundreds of South Carolina employees to get vaccinated. For the same and similar reasons articulated throughout this Complaint, imposing the Contractor Mandate against South Carolina will result in significant and irreparable harm to South Carolina.

**Impact of the Contractor Mandate on the State of Utah and Its Agencies**

173.   Plaintiff State of Utah is a sovereign State that has many state entities that are federal contractors. Utah employs "covered contractor employees" and maintains "covered contractor workplaces" as defined by the Contractor Mandate.

174.   The contracts that Utah's agencies have with federal agencies are worth millions of dollars, if not more. Many of Utah's current contracts are subject to renewal or the exercise of options. The federal government has presented Utah with contract modifications that incorporate the Contractor Mandate. Utah will face substantial and irreparable harm if forced to comply.

175.   Because Utah's employees are generally not required to be vaccinated, the Contractor Mandate places undue pressure on Utah to create new policies and change existing ones, which threatens Utah with imminent irreparable harm.

176.   The Contractor Mandate will likely cause many Utah employees to resign, causing significant loss to Utah's operations by decreasing institutional

knowledge and human capital. As a result, Utah will incur significant recruitment, on-boarding, and training costs to replace lost employees.

## Impact of the Contractor Mandate on the State of West Virginia and Its Agencies

177.    The State of West Virginia has multiple contracts with various federal agencies.  These contracts are "covered contracts" under the Contractor Mandate.

178.    West Virginia's budget relies on the federal dollars it receives under its federal contracts.

179.    West Virginia employs hundreds of "covered contractor employees" and multiple "contractor or subcontractor workplace locations" as those terms are used in the Contractor Mandate.

180.    The Contractor Mandate will require hundreds of West Virginia employees to get vaccinated. For the same and similar reasons articulated throughout this Complaint, imposing the Contractor Mandate against West Virginia will result in significant and irreparable harm to West Virginia.

## The Contractor Mandate Creates Confusion and Uncertainty

181.    In response to the Contractor Mandate, Plaintiffs have scrambled to comply with the ever-changing Guidelines and amended implementation logistics.

182.    In particular, the Georgia Tech has already expended a vast amount of time and financial resources to create a portal for its employees to submit their vaccination status.

183.    In addition to their specific challenges, all impacted units of the University System will have to overcome the following hurdles in order to comply:

    a.      Track employee vaccination statuses;

    b.      Develop a robust process to review requests for accommodation;

    c.      Identify impacted employees and locations;

    d.      Spend an undetermined amount of money to fund its compliance program; and

    e.      Track data from subcontractors to ensure that they are likewise performing (a), (b), (c), and (d) above.

184.   Upon information and belief, some covered contractor employees will not obtain the vaccine and will not seek an exemption, despite the Contractor Mandate and its allowance for narrowly prescribed exemptions for medical reasons or strongly held religious beliefs.

185.   For context, nearly 50% of Georgians are fully vaccinated while the remaining 50% have yet to obtain one or oppose the vaccine altogether.[16]

186.   With respect to employees who refuse vaccination, the Georgia universities will have no choice but to consider enforcement action up to and including potential termination, lest they lose billions in federal funding.

187.   With national labor shortages crippling the current labor market, losing employees because of the Contractor Mandate will cause significant harm to the University System.

---

[16] Georgia Department of Public Health, Press Release, 50% of Georgians Fully Vaccinated Against COVID-19 (Oct. 25, 2021), https://dph.georgia.gov/press-releases/2021-10-25/50-georgians-fully-vaccinated-against-covid-19.

188.    Equally important, the loss of employees will jeopardize the universities' ability to complete the contracted for work in the contracted for time, thereby materially undermining the very efficiency and economy in contracting that purportedly is the core rationale for implementing the Contractor Mandate in the first place.

189.    The broad application of the Contractor Mandate is expected to substantially impact each Plaintiff in that any of their unvaccinated employees must be terminated or reallocated to uncovered workplaces lest they risk breaching their federal contracts by failing to fully comply with the Contractor Mandate.

190.    The Contractor Mandate, therefore, forces Plaintiffs to choose between two equally problematic outcomes: (1) maintain a fully vaccinated (but reduced) workforce of covered employees by firing those who are unvaccinated and risk breaching the contracts by not satisfactorily performing due to lack of qualified workers; or (2) breach the contract by continuing to employ unvaccinated, covered employees so that they can timely perform and complete the contract requirements. Either way, Plaintiffs face a risk of breach and material noncompliance for reasons totally beyond their control.

## COUNT I – Violation of the Procurement Act

### (Under 40 U.S.C. §§ 101 and 121)

191.    Plaintiffs incorporate each of the Complaint allegations stated above herein.

192.    The purpose of the Procurement Act is to provide the Federal Government with an "economical and efficient system" for, among other things,

procuring and supplying property and nonpersonal services. 40 U.S.C. § 101. The Contractor Mandate, however, will actually and materially undermine the efficient and economical delivery of property and services by disrupting the continuity of the contractor workforce.

193. The purpose of the Procurement Act is *not* to impose a sweeping vaccination mandate on broad swaths of the American people or to use the federal procurement system as a proxy for implementing a nationwide public health mandate.

194. The Procurement Act empowers the President to "prescribe policies and directives that [he] considers necessary to carry out [the Procurement Act.]" 40 U.S.C. § 121(a). Those policies "*must* be consistent with" the Procurement Act's purpose, i.e., promoting economy and efficiency in federal contracting. *Id.* § 121(a) (emphasis added).

195. Defendants have failed to demonstrate a "nexus" between the Contractor Mandate (EO 14042, the Initial and Revised OMB Determinations, the Task Force Guidance, and the FAR Deviation Clause) and the Procurement Act's purpose of promoting an "economical and efficient system" for federal contracting. 40 U.S.C. § 101; *see Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 793 (D.C. Cir. 1979) (explaining that the Procurement Act is violated when the President does not demonstrate a "nexus" between executive action and the Procurement Act's policy). The Procurement Act's text obligates the President to

exercise his statutory authority "consistently with [the Act's] structure and purposes." *Id.*

196.   Instead, EO 14042 exceeds the President's Procurement Act authority by directing the Task Force, without a demonstrable nexus to the Procurement Act's purpose, to prescribe a sweeping public health scheme.

197. Here, the text of the Procurement Act clearly demonstrates that Congress has not authorized the Contractor Mandate, and thus, EO 14042 violates the Procurement Act.

198. Further, before the executive branch may regulate a major policy question of "great and economic and political significance"—such as mandating vaccination for every employee of every federal contractor in the country—Congress must "speak clearly" to assign the authority to implement such a policy. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (citing *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)).

199.   When the federal government intrudes on a traditional state function, it must clearly articulate the scope of the intrusion and the rationale behind its unprecedented action, which it has not done here. *Gregory v. Ashcroft*, 501 U.S. 452, 463–64 (1991).

200.   The Contractor Mandate implicates critical issues of federalism as public health and the regulation of inoculation regimes are traditional state functions.

201.   Because the statutory language that the President relies on to issue EO 14042 does not contain a clear statement affirmatively sanctioning the broad scope of the Contractor Mandate, EO 14042 violates the Procurement Act.

202.   Therefore, under both the plain text of the Procurement Act and the clear statement principle, EO 14042 is unlawful, and thus the Contractor Mandate is unenforceable.

## COUNT II – Violation of Federal Procurement Policy

## (Under 41 U.S.C. § 1707(a))

203.   Plaintiffs incorporate each of the Complaint allegations stated above herein.

204.   Pursuant to 41 U.S.C. § 1707(a)(1), a procurement policy may not take effect until 60 days after it is published for public comment in the Federal Register if it relates to the expenditure of appropriated funds; and has a significant effect beyond the internal operating procedures of the issuing agency; or has a significant cost or administrative impact on contractors or offerors.

205.   The Contractor Mandate will require contractors to develop, implement, and monitor a host of new policies and procedures impacting, for some contractors, their entire workforce. In order to fully comply with the Contractor Mandate, contractors will have to fire any covered employee who refuses to be vaccinated and has not asserted an exemption.

206.   Federal agencies will have to budget for and expend appropriated funds to administratively implement the Contractor Mandate and, thereafter, compensate contractors for their increased cost of compliance in violation of § 1707(a).

207.   Because the Contractor Mandate requires vaccination of hundreds of thousands of Americans, it certainly has "a significant effect beyond internal operating procedures" in violation of § 1707(a).

208.   The Contractor Mandate also has a significant cost or administrative impact on current contractors, future contractors, and offerors in violation of § 1707(a).

209.   In a tacit admission that the First OMB Determination violated the Procurement Policy Act, the Office of Management and Budget issued a Revised OMB Determination on November 16, 2021.  The Revised OMB Determination purports to invoke the waiver provisions of the Procurement Policy Act and again fails to provide for notice and comment prior to the effectiveness of the Updated OMB Determination.

210.   The Procurement Policy Act permits public notice and comment to happen *after* publication only when the procurement policy, regulation, or procedure is effective "on a temporary basis" and "urgent and compelling circumstances make compliance with the [pre-publication notice and comment] requirements impracticable."  41 U.S.C. § 1707 (d).

211.   OMB's statement of purported urgency and compelling circumstances does not satisfy either requirement.  Nothing about the Contractor Mandate is temporary. And, as shown by OMB's decision to push back the deadline for compliance, there are no urgent and compelling circumstances that warrant a departure from normal requirements.

212.   Moreover, Defendants failed to provide the required 60-day comment period before the Task Force Guidance and Contractor Mandate became effective.

213.   Accordingly, Defendants failed to comply with 41 U.S.C. § 1707(a) when issuing the Updated OMB Determination and the Task Force Guidance, making the Contractor Mandate invalid as a matter of law.

### COUNT III – Nondelegation Claim

### (Under Article I, Section 1 of the United States Constitution)

214.   Plaintiffs incorporate each of the Complaint allegations stated above herein.

215.   Pursuant to Article I, Section 1 of the United States Constitution, Congress is vested with all legislative powers.

216.   "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935).

217.   The executive branch can only exercise its own discrete powers reserved by Article II of the United States Constitution and such power that Congress clearly authorizes through statutory command.

218.   Congress gives such authorization when it articulates an intelligible principle to guide the Executive that not only sanctions but also defines and cabins the delegated legislative power.

219.   Under the nondelegation doctrine, Congress cannot simply offer a general policy that is untethered to a delegation of legislative power. For a delegation to be proper, Congress must articulate a clear principle or directive of its

congressional will within the legislative act. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). The principle must be binding, and the delegate must be "directed to conform" to it. *Id.*

220.    The nondelegation doctrine preserves and protects important tenets of our democracy, including individual liberties and states' rights.

221.    The President's direct delegation of authority to the OMB Director and the Task Force gives them unconstitutional and unconstrained rulemaking authority without a statutory directive.

222.    Separately, the President's indirect delegation to the federal agencies of broad authority and discretion to enforce the already unconstitutional Contractor Mandate is unsupported by an explicit statutory directive within the Procurement Act or any other federal law.

223.    Thus, the President's actions lack the requisite congressional direction in two regards:

a.      First, Congress did not articulate clear or sufficient instructions in the Procurement Act directing the President to implement this public health policy scheme by executive order.

b.      Second, even if Congress did clearly authorize a national vaccination schedule for federal contractors, it did not give sufficiently clear instructions to permit the President to delegate legislative judgment to the Task Force or the OMB Director.

224.   EO 14042's reliance on the precatory statement of purpose in the Procurement Act is not a clear directive, and neither the President nor the federal agencies can rely on it to impose an intrusive and sweeping vaccine mandate.

225.   Further, any delegation sanctioning broad and intrusive executive action cannot be sustained without clear and meaningful legislative guidance, especially given the important separation-of-powers and federalism concerns implicated. Under the nondelegation doctrine, the Contractor Mandate is unconstitutional because Congress did not articulate a clear principle by legislative act that directs the Executive to take sweeping action that infringes on state and individual rights.

226.   Here, the Executive Order cuts deeply into the state's sphere of power without articulating the underlying reasons or providing a justification beyond a superficial, unsupported, and pretextual reference to efficiency and economy in federal contracts.

227.   Without *explicit* congressional authorization, the President's delegation of power in EO 14042 through the OMB Determination, the Task Force, and the various executive agencies acting to implement the Contractor Mandate cannot survive constitutional scrutiny.

### COUNT IV – Violation of Separation of Powers and Federalism

### (Under Article I, Section 8 of and Amendment X to the United States Constitution)

228.   Plaintiffs incorporate each of the Complaint allegations stated above herein.

229.    To the extent Defendants argue that the Contractor Mandate is authorized, such authorization would violate the Constitution's nondelegation principles.

230.    The Contractor Mandate exceeds congressional authority.

231.    Pursuant to Article I, Section 1 of the United States Constitution, Congress is vested with all legislative powers, but Congress must act pursuant to the enumerated powers granted to it by Article I.

232.    Pursuant to Article I, Section 8 of the United States Constitution, Congress has authority "to make all Laws which shall be necessary and proper for carrying into Execution" its general powers ("the Necessary and Proper Clause"). The Necessary and Proper Clause does not "license the exercise of any 'great substantive and independent power[s]' beyond those specifically enumerated." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 559 (2012) (citation omitted).

233.    Pursuant to the Tenth Amendment of the United States Constitution, "the powers not delegated by the Constitution to the United States, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.

234.    Nothing in the Constitution authorizes the federal agencies of the executive branch to impose the Contractor Mandate on states because requiring vaccinations for state employees is an exercise of the police power left to the states under the Tenth Amendment.

235.   The Constitution does not empower Congress to require anyone who deals with the federal government to get vaccinated. It is not a "proper" exercise of Congress's authority to mandate that every employee who touches a federal contract or comes in contact with another employee who touches such a contract, has to be vaccinated because the action here falls outside the scope of an Article I enumerated power.

236.   Further, the Commerce Clause does not empower Congress to regulate purely noneconomic inactivity, such as an individual's choice not to receive a vaccination. *BST Holdings*, No. 21-60845, 2021 U.S. App. LEXIS 33698, at *21 (5th Cir. Nov. 12, 2021).

237.   Defendants, through the Contractor Mandate, have exercised power that Congress does not possess under the Constitution and, therefore, cannot delegate to other branches of the federal government.

238.   If Congress intended the Procurement Act to authorize the Contractor Mandate, the Act exceeds Congress's authority, and thus Defendants must be enjoined from taking any action under the Act.

## **COUNT V – Violation of the Tenth Amendment**

### **(Under Amendment X to the United States Constitution)**

239.   Plaintiffs incorporate each of the Complaint allegations stated above herein.

240.   Pursuant to the Tenth Amendment of the United States Constitution, "the powers not delegated by the Constitution to the United States, nor prohibited by

it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

241.    Defendants, through the Contractor Mandate, have exercised power far beyond what was delegated to the federal government by Constitutional mandate or congressional action.

242.    Neither Article II of the U.S. Constitution nor any act of Congress authorizes the federal agencies of the executive branch to implement the Contractor Mandate, which traditionally falls under the police power left to the states under the Tenth Amendment.

243.    The Tenth Amendment explicitly preserves the "residuary and inviolable sovereignty," of the states. *Printz v. United States*, 521 U.S. 898, 918–19 (1997) (quoting The Federalist No. 39, at 245 (J. Madison)).

244.    By interfering with the traditional balance of power between the states and the federal government and by acting pursuant to ultra vires federal action, Defendants violated this "inviolable sovereignty," and thus, the Tenth Amendment.

245.    Therefore, the Contractor Mandate was adopted pursuant to an unconstitutional exercise of authority by Defendants and must be invalidated.

### **COUNT VI – Unconstitutional Exercise of the Spending Clause**

### **(Under Article I, Section 8, Clause 1 of the United States Constitution)**

246.    Plaintiffs incorporate each of the Complaint allegations stated above herein.

247.    The challenged actions are unconstitutional conditions on the states' receipt of federal funds.

248.   Article I, Section 8, Clause 1 of the United States Constitution gives Congress the power to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and the general Welfare of the United States."

249.   While "Congress may attach appropriate conditions to . . . spending programs to preserve its control over the use of federal funds," it cannot wield federal funding to unreasonably constrain state autonomy. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012). "[I]n some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *South Dakota v. Dole*, 483 U.S. 203, 211 (1987).

250.   Federal contracts are an exercise of the Spending Clause, yet the challenged actions ask Plaintiffs to agree to a coercive contract term.

251.   The federal contracts at issue here account for considerable portions of Plaintiffs' budgets for essential research, education, and other necessary programs. The pressure on Plaintiffs to comply with the Contractor Mandate rises to the level of coercion. The challenged actions are invalid for that reason alone.

### COUNT VII – Violation of FAR and Procurement Policy Act's Notice and Comment Requirements

### (Under 41 U.S.C. § 1707 and 48 CFR § 1.105-1, *et seq.*)

252.   Plaintiffs incorporate each of the Complaint allegations stated above herein.

253.   Pursuant to 5 U.S.C. § 553, agencies must publish "a notice of proposed rulemaking in the Federal Register before promulgating a rule that has legal force."

48

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S.Ct. 2367, 2384 (2020); 5 U.S.C. § 553(b).

254.   Pursuant to 48 C.F.R. 1.501, "significant revisions" to the FAR must be made through notice-and-comment procedures. DOD, NASA, and the General Services Administration must jointly conduct the notice-and-comment process. *Id*.

255.   Instead of amending the FAR to implement this significant revision, the FAR Council issued a purported "class deviation" without engaging in the notice-and-comment process. *See* 5 U.S.C. § 553.

256.   Proper "class deviations" must fit within one of the discrete definitions set forth in 48 C.F.R. 1.401.

257.   Here, however, the FAR Deviation Clause fits none of the definitions.

258.   Instead, the FAR Deviation Clause is in the nature of a rule within the meaning of the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

259.   The FAR Council violated the APA by failing to comply with the notice-and-comment requirements for rulemaking.

260.   Good cause does not excuse the FAR Council's failure to comply with the notice-and-comment process.  See 5 U.S.C. § 553(b)(3)(B).

## COUNT VIII – Violation of the APA

### (Under 5 U.S.C. § 706)

261.   Plaintiffs incorporate each of the Complaint allegations stated above herein.

262.   Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

263.   Both OMB Determinations adopting the Task Force guidance are contrary to law for at least four reasons.

264.   First, both OMB Determinations violate 41 U.S.C. § 1303(a) because it is a government-wide procurement regulation, which only the FAR Council may issue.

265.   EO 14042 apparently seeks to circumvent § 1303 by delegating the President's Procurement Act power to the OMB Director.

266.   That attempt is unlawful because the President has no authority to issue regulations under § 1303—only the FAR Council may issue government-wide procurement regulations. *See* Centralizing Border Control Policy Under the Supervision of the Attorney General, 26 Op. OLC 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President.").

267.   Second, and relatedly, the OMB determinations are contrary to law because the Procurement Act does not grant the President the power to issue orders with the force or effect of law. Congress authorized the President to "prescribe policies and directives that the President considers necessary to carry out." 40 U.S.C. § 121(a).

268. "[P]olicies and directives" describe the President's power to direct the exercise of procurement authority throughout the government. It does not authorize the President to issue regulations himself.

269. Congress knows how to confer that power, as it authorized the GSA Administrator, in the same section of the statute, to "prescribe regulations." *Id.* § 121(c); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").

270. And Congress has given the President the power to "prescribe regulations" in other contexts, typically in the realm of foreign affairs and national defense. *See, e.g.*, 18 U.S.C. § 3496 ("The President is authorized to prescribe regulations governing the manner of executing and returning commissions by consular officers."); 32 U.S.C. § 110 ("The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard.").

271. Third, even if the Procurement Act authorized the President to issue orders with the force or effect of law, it would not authorize approval of the Task Force guidance. The President appears to assume that the Procurement Act's prefatory statement of purpose authorizes him to issue any order that he believes promotes "an economical and efficient" procurement system. 40 U.S.C. § 101; *see* **Ex. A** at 1 ("This order promotes economy and efficiency in [f]ederal procurement."). In doing so, the President mistakenly construes the prefatory purpose statement for a grant of authority. *D.C. v. Heller*, 554 U.S. 570, 578 (2008) ("[A]part from [a] clarifying

function, a prefatory clause does not limit or expand the scope of the operative clause.").

272.   And even if the Procurement Act did authorize the President to issue binding procurement orders solely because they may promote economy and efficiency, the OMB Determination does not adequately do so. Providing the federal government with an "economical and efficient system for" procurement is not a broad enough delegation to impose a national-scale vaccine mandate that Congress has not separately authorized.

273.   Further, the executive order is divorced from the practical needs of procurement. In order to maintain a steady and predictable flow of goods and services—and the advancement of science and technology through research and development—the federal procurement system requires a stable and reliable workforce to timely perform work required under tens of thousands of federal contracts and funding agreements. The Contractor Mandate disrupts the stability and reliability of the contractor workforce by forcing contractors to potentially fire unvaccinated and non-exempt covered employees, many of whom are highly skilled and essential to the work.

274.   Because the OMB Determination violates § 1303(a), seeks to exercise a delegated power the President does not possess, and relies on a misreading of the Procurement Act, it is contrary to law.

## COUNT IX – Violation of the APA

### (Under 5 U.S.C. § 706)

275.   Plaintiffs incorporate each of the Complaint allegations stated above herein.

276.   Pursuant to the Administrative Procedure Act, agency action that is "arbitrary [or] capricious" is unlawful and must be set as aside by a court of competent jurisdiction. 5 U.S.C. § 706(2)(A).

277.   Pursuant to 48 C.F.R. 1.402, "[u]nless precluded by law, executive order, or regulation, deviations from the FAR may be granted [] when necessary to meet the specific needs and requirements of each agency."

278.   The Contractor Mandate and the OMB Determinations impose universal and uniform requirements without regard to the particularized needs and circumstances of each federal agency and are therefore arbitrary and capricious in violation of the APA.

## COUNT X - Declaratory Judgment

### (Under 28 U.S.C. § 2201(a))

279.   Plaintiffs incorporate each of the Complaint allegations stated above herein.

280.   For all the forgoing reasons, Plaintiffs request that the Court declare the Contractor Mandate unlawful, unconstitutional, and unenforceable.

## COUNT XI –Injunctive Relief

281.   Plaintiffs incorporate each of the Complaint allegations stated above herein.

282.  The Contractor Mandate threatens immediate and irreparable harm to Plaintiffs, including a loss of highly trained employees, difficulty in completing existing contracts, and significant expenditure of time and resources in ensuring compliance.

283.  Monetary damages or other remedies at law cannot adequately address the injury caused by the Contractor Mandate.

284.  The deadlines imposed in the Contractor Mandate will have widespread and permanent effects that no legal remedy can reverse, such that the only available remedy to redress the harms is injunctive relief.

285.  Balancing the hardships to Plaintiffs relative to the hardships to Defendants, extraordinary equitable relief is warranted.

286.  Specifically, absent an injunction, Plaintiffs' operations will be jeopardized as a result of Defendants' adoption and implementation of the unconstitutional, illegal, and logistically unworkable Contractor Mandate.

287.  On the other hand, the hardship of an injunction to Defendants is minimal; they simply must abide by the Constitution and the laws of the United States.

288.  Permanent injunctive relief would not disserve the public interest, because it would enjoin unconstitutional and illegal executive action.

## Prayer for Relief

Wherefore, Plaintiffs respectfully request that this Court:

1.  Enter judgment in favor of Plaintiffs and against Defendants on all

Counts asserted herein.

2.    Enter a declaratory judgment that Defendants, individually and collectively, have acted to impose a broad-sweeping, unlawful, and unconstitutional COVID-19 vaccine mandate, and that such COVID-19 vaccine mandate is unlawful and unenforceable.

3.    Grant a preliminary and permanent injunction prohibiting Defendants and those acting in concert with them from enforcing this broad-sweeping, unlawful, and unconstitutional mandate.

4.    Grant any additional and different relief to which Plaintiffs may be entitled.

5.    Award Plaintiffs costs of litigation, including reasonable attorneys fees, as allowable by law.

Respectfully submitted this 19th day of November, 2021.

STATE OF GEORGIA
*Georgia Attorney General*
*Christopher M. Carr*

*/s/ Drew F. Waldbeser*
Stephen Petrany
  *Solicitor General*
Drew F. Waldbeser (Admitted Pro Hac Vice)
  *Deputy Solicitor General*
Ross W. Bergethon
  *Deputy Solicitor General*
Office of the Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334
Tel.: (404) 458-3378
Fax: (404) 656-2199
dwaldbeser@law.ga.gov

*Counsel for State of Georgia Plaintiffs*

*/s/ Harold D. Melton*
Harold D. Melton (Ga Bar No. 501570)
Charles E. Peeler (Ga Bar No. 570399)
Misha Tseytlin (Admitted Pro Hac Vice)
  *Special Assistant Attorneys General*
  *for Plaintiffs the State of Georgia,*
  *Governor Brian P. Kemp in his official*
  *capacity, Commissioner Gary W.*
  *Black in his official capacity; and the*
  *Board of Regents of the University*
  *System of Georgia*

Troutman Pepper Hamilton Sanders LLP
Bank of America Plaza, Suite 3000
600 Peachtree Street N.E.
Atlanta, Georgia 30308-2216
Tel.:   (404) 885-3000
Fax:   (404) 962-6515


Harold.Melton@Troutman.com

*Counsel for State of Georgia Plaintiffs*


*/s/ Paul H. Dunbar III*
Paul H. Dunbar III  (233300)
Capers Dunbar Sanders & Bellotti, LLP
2604 Commons Boulevard
Augusta, Georgia 30909
Phone: (706) 722-7542
pauldunbar@bellsouth.net

*Local Counsel for Plaintiff-States and Agencies*

STATE OF ALABAMA
Office of the Attorney General Steve
Marshall

*/s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (Admitted Pro
Hac Vice)
  *Solicitor General*
Thomas A. Wilson (Admitted Pro Hac
Vice)
  *Deputy Solicitor General*
Office of the Attorney General
501 Washington Ave.
Montgomery, AL 36130
Tel.: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Thomas.Wilson@AlabamaAG.gov

*Counsel for Plaintiffs State of Alabama
and Alabama Agencies*

*/s/ William G. Parker, Jr.*
William G. Parker, Jr. ((Admitted Pro
Hac Vice)
  *General Counsel*
Office of the Governor
Alabama State Capitol
600 Dexter Avenue, Room N-203
Montgomery, Alabama 36130
Tel.: (334) 242-7120
Fax: (334) 242-2335
Will.Parker@governor.alabama.gov

*Counsel for Governor Kay Ivey*

STATE OF IDAHO
  *Office of the Attorney General
  Lawrence G. Wasden*

*/s/  W. Scott Zanzig*
W. Scott Zanzig (Admitted Pro Hac
Vice)
  *Deputy Attorney General*
954 W Jefferson, 2nd Floor
P. O. Box 83720
Boise, ID  83720-0010
Tel.: (208) 334-2400
Fax: (208) 854-8073
scott.zanzig@ag.idaho.gov

*Counsel for the State of Idaho*

STATE OF KANSAS
  *Office of Attorney General Derek
  Schmidt*

*/s/ Brant M. Laue*
Brant M. Laue (Pro Hac Vice
forthcoming)
  *Solicitor General*
20 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Tel: (785) 296-2215
Fax: (785) 296-6296
brant.laue@ag.ks.gov

*Counsel for the State of Kansas*

STATE OF SOUTH CAROLINA
  *Office of South Carolina Attorney General Alan Wilson*

*/s/ J. Emory Smith, Jr.*
J. Emory Smith, Jr. (Admitted Pro Hac Vice)
  *Deputy Solicitor General*

Thomas T. Hydrick (Pro Hac Vice forthcoming)
  *Assistant Deputy Attorney General*

Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Tel.: (803) 734-3680
Fax: (803) 734-3677
esmith@scag.gov

*Counsel for the State of South Carolina*


STATE OF WEST VIRGINIA
  *Office of Attorney General Patrick Morrisey*

*/s/ Lindsay See*
Lindsay See (Pro Hac Vice forthcoming)
  *Solicitor General*
Office of the Attorney General
State Capitol Complex
Bldg. 1, Room E-26
Charleston, West Virginia 25305
Tel.: (304) 558-2021
Lindsay.S.See@wvago.gov

*Counsel for the State of West Virginia*


STATE OF SOUTH CAROLINA
*Office of Governor Henry McMaster*

*/s/ Thomas A. Limehouse, Jr.*
Thomas A. Limehouse, Jr. (Admitted Pro Hac Vice)
  *Chief Legal Counsel*
Wm. Grayson Lambert (Admitted Pro Hac Vice)
  *Senior Legal Counsel*
Michael G. Shedd (Admitted Pro Hac Vice)
  *Deputy Legal Counsel*
Office of the Governor
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov

*Counsel for Henry McMaster, in his official capacity as Governor of the State of South Carolina*


STATE OF UTAH
  *Office of the Attorney General Sean Reyes*

*/s/ Melissa A. Holyoak*
Melissa A. Holyoak (Admitted Pro Hac Vice)
*Solicitor General*
Office of the Attorney General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel.: 385.271.2484
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2021, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record

This 19th day of November, 2021.

<u>/s/ Harold D. Melton</u>
Harold D. Melton (Ga Bar No. 501570)
Troutman Pepper Hamilton Sanders LLP
Bank of America Plaza, Suite 3000
600 Peachtree Street N.E.
Atlanta, Georgia 30308-2216
Harold.Melton@Troutman.com
(404) 885-3000
(404) 885-3900