UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| THE STATE OF GEORGIA, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:21-cv-163-RSB-BKE |
| JOSEPH R. BIDEN in his official | ) |
| capacity as President of the United | ) |
| States, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' CONSOLIDATED OPPOSITION TO
PLAINTIFFS' AND ASSOCIATED BUILDERS AND CONTRACTORS'
MOTIONS FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION................................................................................................................. 3

BACKGROUND................................................................................................................... 5

    I.   The COVID-19 Pandemic ......................................................................................... 5

      A.           Vaccine Requirements for Federal Contractors .................................... 5

      B.           Procedural History ................................................................................ 9

LEGAL STANDARD .........................................................................................................10

ARGUMENT .......................................................................................................................10

    I.   Plaintiffs and ABC have failed to meet their burden to show standing for the broad relief that they seek. ...........................................................................................................10

    II.   Neither Plaintiffs nor ABC are likely to succeed on the merits. .....................................12

      A.           The President has authority to direct government procurement policy. ....12

      B.           The Executive Order falls within the nexus required by the FPASA........15

      C.           Neither the OMB Determination nor the FAR Memo violate any applicable notice-and-comment procedures. ......................................................................21

      D.           Contrary to ABC's assertions, EO 14,042 does not violate the APA or the Small Business Regulatory Enforcement Fairness Act. .....................................................24

      E.           Requiring contractor vaccination is constitutional. ...............................27

    III.   Plaintiffs do not face irreparable harm. .......................................................................30

    IV.   The equities and the public interest weigh against injunctive relief. ............................34

    V.   In all events, this court should not enter nationwide relief.............................................37

CONCLUSION.....................................................................................................................38

## INTRODUCTION

Plaintiffs the States of Georgia, Alabama, Idaho, Kansas, South Carolina, Utah, and West Virginia, along with various officials and entities associated with those states (collectively, "Plaintiffs"), have sued the President, the United States, and more than two dozen federal officials and agencies. Aspiring plaintiffs-intervenors, Associated Builders and Contractors of Georgia ("ABC") and its national chapter have done the same. Plaintiffs and ABC challenge Executive Order 14,042, which directs certain federal agencies to include a clause requiring certain COVID safety protocols—including vaccination requirements—in "any new contract," "new solicitation for a contract," "extension or renewal of an existing contract," and "exercise of an option on an existing contract." Executive Order 14,042, 86 FR 50985 (Sept. 9, 2021) ("Executive Order" or "EO").

Plaintiffs and ABC ask this Court to exercise its extraordinary emergency powers to enjoin this EO across the country—even outside the boundaries of Plaintiffs' borders. *See* Pls.' Mot. Prelim. Inj., ECF No. 10 [hereinafter Mot.]. But Plaintiffs have failed to show how they have been (or will be) harmed at all, much less that they face irreparable harm. Although the EO strongly encourages agencies to add the COVID safety protocols to existing contracts, to the extent permitted by law, it does not mandate that agencies add the protocol to existing contracts. And Plaintiffs provide no evidence that they are (1) parties to a federal contract that already has the challenged clause; or (2) parties to an existing covered contract that is up for an option, extension, or renewal that must include the clause. Nor do Plaintiffs identify any specific, covered solicitations that they plan to bid on or contracts that they plan to enter into in the immediate future. For these reasons alone, Plaintiffs' and ABC's motions should be denied.

Because neither Plaintiffs nor ABC have identified any current or future contracts governed

by EO 14,042, or demonstrated that the compliance costs they claim to have incurred are in fact tied to such contracts, they have failed to meet their burden to demonstrate that they have Article III standing. Even if this Court reaches the merits, however, it should reject Plaintiffs' and ABC's argument that the President has no power to direct federal contracting—an argument that conflicts with more than 50 years of precedent. The President's delegation of certain authority to the Director of the Office of Management and Budget ("OMB") is consistent with applicable statutes. Plaintiffs' and ABC's procedural and notice arguments are also meritless. And the constitutional claims raised by Plaintiffs and ABC have been considered and rejected by courts many times over.[1]

When COVID-19 first emerged in the United States, it ravaged the economy and devastated government contractors. No less than private entities, the federal government's operations suffered when its contractors' employees became sick and died. Safe and effective vaccines provide the hope that the government and its contractors can resume full operations. The Federal Government has therefore decided—not as a regulator of the private market but rather as a market participant—to require those with whom it contracts to take precautions to prevent the spread of this virulent, contagious disease. "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). "Those wishing to do business with the Government must meet the Government's terms; others need not." *AFL-CIO v. Kahn*, 618 F.2d 784, 794 (D.C. Cir. 1979) (en banc). The Court should reject Plaintiffs' and ABC's requests to impose its novel view of the ability of the Federal Government to set the terms of its own contracts.

---

[1] As an initial matter, ABC's motion to intervene should be denied. Defs.' Opp'n Mot. to Intervene, ECF No. 61. However, Defendants respond to the substance of their motion for a preliminary injunction in accordance with this Court's November 19, 2021 Order, ECF No. 53.

## BACKGROUND

### I.      The COVID-19 Pandemic

On January 31, 2020, the Secretary of Health and Human Services ("HHS") declared a public health emergency because of COVID-19, a respiratory disease caused by the novel coronavirus, SARS-CoV-2. U.S. Dep't of Health & Human Servs., *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://perma.cc/VZ5X-CT5R.  On March 13, 2020, the President declared the COVID-19 outbreak a national emergency. Declaring a Nat'l Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation No. 9994, 85 FR 15,337 (Mar. 13, 2020). In July 2021, the United States began to experience "a rapid and alarming rise in . . . COVID-19 cases and hospitalization rates," driven by an especially contagious strain. *See* Centers for Disease Control and Prevention ("CDC"), *Delta Variant: What We Know About the Science* (updated Aug. 26, 2021), https://perma.cc/4RW6-7SGB.[2]  To date, more than 49 million Americans have been infected with COVID-19 and more than 764,000 have died from COVID-19.  CDC  COVID  Data  Tracker,  as  of  Nov.  19,  2021, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html  (last  accessed Nov. 26, 2021).

#### A.  Vaccine Requirements for Federal Contractors

On September 9, 2021, President Biden issued EO 14,042 to "promote[] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument." *See* EO 14,042 § 1.

---

[2] The Court may take judicial notice of factual information available on government websites. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007).

The EO explained that new safeguards would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." *Id.* Those safeguards would be set forth in guidance issued by the Safer Federal Workforce Task Force ("Task Force"), *id.* § 2(a), and become binding when the OMB Director, pursuant to a delegation of the President's statutory authority, determined the guidance would "promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors." *Id.* § 2(c) (citing 3 U.S.C. § 301).

The President, as the ultimate manager of federal procurement, directed federal executive departments and agencies, "to the extent permitted by law," to incorporate a clause into certain types of contracts—new contracts, new solicitations for a contract, extensions or renewals of an existing contract, and exercises of an option on an existing contract—if they also fall into one of the following categories (all requirements together, "covered contracts"): (i) a procurement contract for services, construction, or a leasehold interest in real property; (ii) a contract for services covered by the Service Contract Act, 41 U.S.C. § 6701 *et seq.*; (iii) a contract for concessions, including any concessions contract excluded by Department of Labor regulations at 29 C.F.R. § 4.133(b); or (iv) a contract entered into with the Federal government in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public. EO 14,042 § 5(a). The mandatory clause "shall specify that the contractor or subcontractor shall, for the duration of the contract, comply with all guidance for contractor or subcontractor workplace locations published by" the Task Force, provided the guidance is approved by the Acting OMB Director. *Id.* at § 2(a). The mandatory clause also "shall apply to any workplace locations (as specified by the Task Force Guidance) in which an individual is working on or in connection with a Federal Government contract[.]" *Id.*

The EO, however, is targeted and contains exceptions. Its mandate does not apply to grants, or to most contracts for procurement of goods (as opposed to services). *See id.* § 5(a)(i), (b)(i), (b)(v). Nor does the EO mandate apply to "contracts or subcontracts whose value is equal to or less than the simplified acquisition threshold" ("SAT"), essentially $250,000. *Id.* at § 5(a)(iii). *See also* 48 C.F.R. § 2.101. Although "agencies are strongly encouraged, to the extent permitted by law, to ensure that the safety protocols required under [existing] contracts . . . are consistent with" the Task Force's guidance, the EO does not require agencies to do so. EO 14,042 at § 6(c).

The Task Force issued guidance under EO 14,042 on September 24, 2021. Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors (September Contractor Guidance), https://perma.cc/H2MY-K8RT. Exercising the authority delegated to her by the President, the Acting OMB Director made the statutorily required determination that the Task Force Guidance would promote economy and efficiency in federal contracting. *See* Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14,042, 86 FR 63,691, 53,691–92 (Sept. 28, 2021). The Task Force Guidance concluded that covered contractor and subcontractor employees should be vaccinated against COVID-19, except insofar as any such employee was legally entitled to an accommodation. *See* September Guidance at 5–6. The Task Force Guidance also required covered contractor employees to be fully vaccinated by December 8, 2021. September Guidance at 5. The FAR Council then issued guidance on September 30, 2021, providing initial direction for the incorporation of the COVID-19 safety clause. Memo. from FAR Council to Chief Acquisition Officers, et al., re: Issuance of Agency Deviations to Implement Executive Order 14,042 (Sept. 30, 2021), https://perma.cc/9BQ8-XBT6 [hereinafter "FAR Memo"]. It also provided a sample COVID-19 safety clause. Far Memo at 4.

On November 10, 2021, the Task Force issued updated guidance, *see* Determination of the OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis (Nov. 16, 2021), and the Acting OMB Director issued a revised Determination ("November OMB Determination"). The November OMB Determination rescinded and superseded the prior Determination and formally confirmed the extension of the compliance date to January 18, 2022. The November OMB Determination also provided a detailed economic analysis of the Task Force Guidance's impact on the economy and efficiency of government contracting. *See* Determination of the OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, *Id*. at 63418. The November OMB Determination, effective as of November 10, 2021, provides for a public comment period through December 16, 2021. *Id*.[3]

The updated Task Force Guidance requires federal contractors that are party to a covered contract to "ensure that all covered contractor employees are fully vaccinated for COVID-19, unless the employee is legally entitled to an accommodation." *Id*. at 63,420. "Covered contractor employees means any full-time or part-time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor workplace." *Id*. at 63,419. A covered contractor workplace is "a location controlled by a covered contractor at which any employee of a covered contractor working on or in connection with a covered contract is likely to

---

[3] Contrary to Plaintiffs' assertions, Mot. at 4, the Task Force Guidance has not changed multiple times. While the Task Force has issued additional FAQs to assist contractors, it has only revised the substantive guidance for Federal contractors and subcontractors once, and OMB issued a new determination with explanation for why the revised guidance would promote economy and efficiency in Federal procurement. 86 FR at 63418. Any new or revised Task Force guidance for Federal contractors and subcontractors requires an economy and efficiency analysis and determination by the OMB Director before being made effective. *See* EO § 2(a) (citing Federal Property and Administrative Services Act, 40 U.S.C. § 102(4)(A)).

be present during the period of performance for a covered contract." *Id.*

Covered contractor employees subject to the requirement must be fully vaccinated no later than January 18, 2022. *Id.* at 63,420. After that date, covered contractor employees not subject to the requirement "must be fully vaccinated by the first day of the period of performance on a newly awarded covered contract, and by the first day of the period of performance on an exercised option or extended or renewed contract when the clause has been incorporated into the covered contract." *Id.* Covered contractors oversee compliance with the Task Force Guidance. Covered contractor employers also may have legal obligations to provide accommodations to contractor employees "who communicate to the covered contractor that they are not vaccinated against COVID-19 because of a disability (which would include medical conditions) or because of a sincerely held religious belief, practice, or observance." *Id.*

The EO further directs the Federal Acquisition Regulatory Council ("FAR Council") to make corresponding amendments to the Federal Acquisition Regulation ("FAR") providing for inclusion of this clause in future covered contracts. Because that amendment process takes time, the EO also directs the FAR Council to issue interim guidance to federal agencies on how to incorporate this clause into new covered contracts until the FAR Amendment takes effect. EO 14,042 § 3(a).

### B. Procedural History

On October 29, 2021, Plaintiffs sued more than two dozen federal agencies and officers. Compl., ECF No. 1. Plaintiffs brought twelve claims: one claim challenging the President's authority to issue the Executive Order, three claims challenging OMB's determination adopting the Task Force Guidance, three claims challenging the interim guidance provided by the FAR Council, two claims alleging that the Executive Order and related implementation are unconstitutional, and one request for a declaratory judgment. *See generally id.* Plaintiffs moved

for a preliminary injunction on November 6, 2021.

On November 18, ABC moved to intervene as a plaintiff, ECF No. 48, and also moved for a preliminary injunction, ECF No. 50 (ABC Mot.). The next day, Plaintiffs filed an Amended Complaint and an amended motion for a preliminary injunction. ECF Nos. 54, 55. The Amended Complaint and amended preliminary-injunction motion bring the same substantive claims but are updated to remove references to certain state-held contracts and to challenge OMB's November Determination. This Court ordered the parties to respond to ABC's motion to intervene and Defendants to respond to Plaintiffs' and ABC's motions for a preliminary injunction on November 26. Nov. 19, 2021 Order, ECF No. 53. Defendants oppose the preliminary-injunction motions for the reasons set forth below.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). To justify this "drastic remedy," the movants must "clearly establish[]" (1) that they have a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm without an injunction; (3) that the balance of equities tips in their favor; and (4) that preliminary relief serves the public interest. *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001). "Failure to show any of the [] factors is fatal." *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

## ARGUMENT

### I. Plaintiffs and ABC have failed to meet their burden to show standing for the broad relief that they seek.

As the party seeking to invoke Article III jurisdiction, Plaintiffs bear the burden to demonstrate that jurisdiction is proper. Because "the Constitution extends the 'judicial power' of

the United States only to 'cases' and 'controversies,'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998), this Court "cannot proceed at all" unless Plaintiffs establish the "irreducible constitutional minimum of standing." *Id.*; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Although Plaintiffs spill much ink showing that they collectively have billions of dollars of federal contracts, *see* Mot. at 5 n.3 & 26, standing does not turn on the size of federal contracts to which Plaintiffs are a party. Rather, Plaintiffs must show a "concrete and particularized" injury caused by EO 14,042 that would be remedied by a favorable determination. *Lujan*, 504 U.S. at 560.

Plaintiffs have not done so. EO 14,042's mandate applies only to (1) a subset of contracts or contract-like instruments (e.g., above the simplified acquisition threshold), as explained above and (2) even within that subset, new contracts or contract-like instruments awarded on or after November 14 and changes to existing contracts or contract-like instruments made on or after October 15. *See supra* at 5. Accordingly Plaintiffs bear the burden to identify a contract that meets these criteria given that they seek to enjoin EO 14,042. Yet none of the current or future contracts that Plaintiffs identify fall within EO 14,042's ambit: All of the six current contracts that Plaintiffs identify in their filings predate EO 14,042, and Plaintiffs do not claim that any of them have been modified to include a COVID-19 safety clause. Additionally, several of them are also below the simplified acquisition threshold. The single future contract that Plaintiffs identify—a hypothetical lease renewal that would occur in 2030—is also below the SAT. And although Plaintiffs assert that they have expended money and resources in an effort to begin to implement EO 14,042, *see* Mot. at 17, they have failed to show the requisite nexus between these costs and any contract actually subject to EO 14,042.[4] *Accord Hollis et al., v. Biden et al.*, 1:21-cv-0163 (N.D. Miss.)

---

[4] Similarly, ABC does not show or otherwise allege that any member is (or will soon be) a party to a covered contract—i.e., a contract including a COVID-19 safety clause—or is seeking to bid on such a contract. There is thus no indication that ABC's members have been injured by the challenged actions, or that such an injury is imminent. *See* Defs.' Opp'n to Mot to Intervene at 6, ECF No. 61.

(ECF No. 27) (Mem. Order. Dated Nov. 23, 2021) (dismissing Complaint challenging EO 14,042 for lack of standing because plaintiffs failed to establish an actual or imminent injury from the EO).

That Plaintiffs seek the "extraordinary and drastic" relief of a preliminary injunction, *Mazurek v. Armstrong*, 520 U.S. 960, 972 (1997), is all the more reason that this Court must hold them to their burden to "clearly allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016) (citations and alterations omitted). Because Plaintiffs' factual allegations and evidentiary support here—even having sought and been granted an opportunity to amend—fail to "raise a right to relief above the speculative level," Plaintiffs have failed to carry their burden to show Article III standing for the relief they seek. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## II.     Neither Plaintiffs nor ABC are likely to succeed on the merits.

The Eleventh Circuit considers a movant's likelihood of success on the merits to be "the most important" factor when considering requests for preliminary relief. *Garcia-Mir v. Meese*, 781 F. 2d 1450, 1453 (11th Cir. 1986). Here, Plaintiffs and ABC advance various theories; none establish a substantial likelihood of success.

### A.  The President has authority to direct government procurement policy.

Plaintiffs first argue that the President lacks authority to issue binding guidance for government contracts. Mot. at 13–14. This argument ignores that Congress specifically authorized the President to direct federal procurement in the Federal Property and Administrative Services Act ("FPASA"). 40 U.S.C. § 121(a). While Plaintiffs claim that the FPASA does not grant the President such authority, they cite no opinions interpreting the FPASA in this novel manner. Indeed, Plaintiffs' position ignores more than half-a-century of precedent from all three branches of our constitutional system.

Since the 1960s, federal appellate courts have routinely held that the FPASA authorizes the President—acting not as a regulator but as Chief Executive Officer of the Executive Branch—to direct government contracting through executive orders. *See, e.g.*, *Farmer v. Phila. Elec. Co.*, 329 F.2d 3, 7 (3d Cir. 1964); *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 (5th Cir. 1967). Courts have concluded, for example, that FPASA authorizes the President to require government contractors to comply with wage and price controls, *Khan*, 618 F.2d 784, to post notices at all of their facilities informing employees that they cannot be forced to join a union or to pay mandatory dues for costs unrelated to representational activities, *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003), and to require contractors to confirm employee's immigration status through e-Verify, *Chamber of Com. of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 729 (D. Md. 2009). *See also City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901 (10th Cir. 2004) (urban renewal); *AFGE v. Carmen*, 669 F.2d 815 (D.C. Cir. 1981) (conservation of gasoline during an oil crisis). Indeed, even cases relied on by Plaintiffs confirm that "the Procurement Act does vest broad discretion in the President." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330, 1334 (D.C. Cir. 1996) (affirming the "President's authority to pursue 'efficient and economic' procurement" through EOs, but holding the challenged order conflicted with another statute).

Plaintiffs ask the Court to adopt their cramped interpretation of FPASA by purportedly relying on the text of the statute. But the text is actually quite broad—the FPASA authorizes the President to "prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act." *Chao*, 325 F.3d at 366 (quoting 40 U.S.C. § 486(a) (2000) (now codified as amended at 40 U.S.C. § 121). The President is given broad discretion to supervise government contracting "as he shall deem necessary" so long as the President does not act "inconsistent[ly] with the provisions" of the

FPASA. Courts have accordingly read FPASA's authority "as requiring that the executive order have a 'sufficiently close nexus' to the values of providing the government an 'economical and efficient system for . . . procurement and supply.'" *Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (internal citation omitted); *see also Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981) (citing 40 U.S.C. § 101).

In light of this broad and flexible authority, Plaintiffs' characterization of the Executive Order as falling outside the scope of the statute because it is not a "policy" or "directive" within the meaning of 40 US.C. § 121, Mot. at 14, not runs headlong into the well-established case law setting forth the wide parameters of Presidential authority in this area. The characterization also contradicts the terms of the Executive Order, which plainly sets out a government wide contracting policy. *See generally* EO 14,042.

Plaintiffs' argument that the President lacks authority to direct government contracting is further undermined by Congress's implicit endorsement of an expansive view of the President's power under FPASA. Presidents have regularly exercised their authority under the FPASA since it was enacted. *See Kahn*, 618 F.2d at 790–91 ("Since 1941, though, the most prominent use of the President's authority under the FPASA has been a series of anti-discrimination requirements for Government contractors"); *see also, e.g.*, Exec. Order No. 12,072, 43 FR 36,869 (Aug. 16, 1978); EO 13,465, 73 FR 33,285 (June 11, 2008); EO 13,950, 85 FR 60,683 (Sept. 22, 2020). "Past [Presidential] practice does not, by itself, create power, but 'long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent.'" *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981). "[T]he President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting Congressional reversal, it is entitled to

great respect." *Kahn*, 618 F.2d at 790 (footnote omitted).

Congress, likewise, has long understood and accepted that FPASA granted broad authority to the President. While Congress has revised the FPASA since 1949, including a complete recodification in 2002, none of those amendments modified or restricted the power being used by the President here.[5] "If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536-37 (2015) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)).

### B. The Executive Order falls within the nexus required by the FPASA.

#### 1. EO 14,042 reasonably relates to economy and efficiency.

The President's authority to direct government procurement is consistent with the Congressional grant of authority in the FPASA, so long as those policies are "reasonably related to the Procurement Act's purpose of ensuring efficiency and economy in government procurement." *Liberty Mut. Ins. Co.*, 639 F.2d at 170. Courts have "emphasized the necessary flexibility and 'broad-ranging authority'" that FPASA provides. *Chao*, 325 F.3d at 366. The standard is "lenient" and can be satisfied even when "the order might in fact increase procurement costs" in the short run. *Id.* at 366–67. Courts find a nexus even when "[t]he link may seem attenuated" and even if one can "advance an argument claiming opposite effects or no effects at all." *Id.* "[T]his close nexus requirement [] mean[s] little more than that President's explanation for how an Executive Order promotes efficiency and economy must be reasonable and rational."

---

[5] *See, e.g.*, Pub. L. No. 99-500, §101(m) [title VIII, §832], 100 Stat. 1783-345 (1986); Pub. L. No. 99-591, §101(m) [title VIII, §832] , 100 Stat. 3341-45 (1986); Pub. L. No. 104-208 § 101(f) [Title VI, § 611], 110 Stat. 3009-355 (1996); Pub. L. No. 107-217, 116 Stat. 1062, 1068 (2002).

*Napolitano*, 648 F. Supp. 2d at 738 (one sentence explanation sufficient); *see also Reich*, 74 F.3d at 1333 ("The President's authority to pursue 'efficient and economic' procurement . . . certainly reach[es] beyond any narrow concept of efficiency and economy in procurement.") (collecting examples).

Executive Order 14,042 easily satisfies this lenient standard. The President explained in Section 1 of the EO:

> This order promotes economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract . . . . These safeguards will decrease the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government.

To anyone who has lived through the COVID-19 pandemic and its resulting economic turmoil, the nexus between reducing the spread of COVID-19 and economy and efficiency is self-evident. While Plaintiffs may disagree with the President's policy or consider it unwise or overbroad, the EO's explanation is sufficient to show the required nexus between the policy and promoting economy and efficiency. *Compare* EO 14,042 § 1 *with Chao*, 325 F.3d at 366–67 (holding sufficiently close nexus to efficient and economic procurement based on two sentences: "When workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced. The availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts.").

EO 14,042 and the Acting OMB Director's related efficiency-and-economy determination clear this "lenient" standard with plenty of room to spare. *Chao*, 325 F.3d at 367. COVID-19 hobbled the economy for months and continues to disrupt American life. Federal procurement is no exception. The President, as the ultimate manager of procurement operations, determined that workplace safeguards aimed at preventing COVID-19's spread will "decrease worker absence,

reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." EO 14,042 § 1. Slowing COVID-19's spread promotes efficiency and economy because federal procurement—like any business endeavor—suffers when people contracting with the federal government get sick and miss work.[6]

Plaintiffs and ABC argue that the standards set forth in the Task Force Guidance "makes clear that the President made a *public health policy*," not an economic contracting decision. Mot. at 16; ABC Mot. at 12. But the connection between the EO and its economy-and-efficiency goal is far from tenuous. As recently as August 2021, unvaccinated persons had a 6.1-times greater risk of testing positive for COVID-19 infection than did persons who were fully vaccinated, and an 11.3-times greater risk of dying from COVID-19. CDC, Rates of COVID-19 Cases and Deaths by Vaccination Status, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status. And with the highly transmissible Delta variant, contractors providing essential services to the Government could be crippled if a substantial number of their unvaccinated employees get sick.

Executive action under FPASA has been upheld even where, unlike here, where the nexus to economy and efficiency "may seem attenuated." *See Chao* at 366 (discussing *Kahn*, 618 F.2d 784); *Nat'l Ass'n of Mfrs. v. Perez*, 103 F. Supp. 3d 7, 19–20 (D.D.C. 2015). Indeed, courts have upheld executive action under FPASA involving a wide array of requirements covering the services for which the government has contracted. *See, e.g.*, *Kahn*, 618 F.2d at 790 (collecting

---

[6] Plaintiffs claim that the President, acting through the OMB Acting Director "made no attempt to show any link at all between the scope of the Mandate and efficiency and economy in federal procurement" in EO 14,042, focusing in particular the Determination's approval of the Task Force Guidance's requirement that employees who share a workplace with an employee working on a covered contract be vaccinated. Mot. at 16. But the Acting Director fully explained why this policy decision promoted efficiency and economy in federal contracting" "because employees working at a single workplace will regularly come into contact, safety protocols applied to all employees in a workplace can meaningfully reduce the spread of COVID–19." 86 FR at 63,421–22.

cases for the proposition that FPASA has been "most prominent[ly]" used to impose "a series of anti-discrimination requirements for Government contractors"); *City of Albuquerque*, 379 F.3d 901 (urban renewal); *Chao*, 325 F.3d 360 (rights of union members); *Carmen*, 669 F.2d 815 (D.C. Cir. 1981) (conservation of gasoline during an oil crisis); *Napolitano*, 648 F. Supp. at 729 (immigration status through e-Verify).[7]

### 2. *The Fifth Circuit's decision in* **BST Holdings** *is inapposite.*

Plaintiffs next conflate the effect of and authority for EO 14,042 with a recent Emergency Temporary Standard ("ETS") issued by the Department of Labor's Occupational Safety and Health Administration ("OSHA"), which the Fifth Circuit recently enjoined, *BST v. OSHA*, — F. 4th —, No. 21-60845, 2021 WL 5279381 (5th Cir. Nov. 12, 2021). But the OSHA requirement at issue in *BST* involves a different statute, concerns different Constitutional authority, implicates different federal agency defendants, centers on a different type of Executive action, and affects a different (though overlapping) set of employers.[8] *Compare id. with* EO 14,042 *and* Protecting the Federal Workforce and Requiring Mask-Wearing, Exec. Order No. 13,991 (EO 13,991), 86 FR 7045, § 4(a) (Jan. 20, 2021) (establishing the Task Force).

At bottom, unlike in *BST*, EO 14,042 concerns the Executive Branch's role as a player in the commercial marketplace: federal agencies, just like other contracting parties, can elect to

---

[7] Pre-FPASA practice provides additional support. In 1941, President Franklin Roosevelt issued an executive order instructing that "[a]ll contracting agencies of the Government of the United States shall include in all defense contracts hereafter negotiated by them a provision obligating the contractor not to discriminate against any worker because of race, creed, color, or national origin." Executive Order 8802, 6 FR 3109 (June 27, 1941).

[8] *BST* involved a challenge by "a diverse group of petitioners" to the OSHA ETS, which requires employees of private employers with more than 100 employees to undergo COVID-19 vaccination or take weekly COVID-19 tests and wear a mask. 2021 WL 5279381, at *2. *See also* COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 FR 61,402 (Nov. 5, 2021). OSHA issues ETSs pursuant to the Occupational Safety and Health Act ("OSH Act"), 29 U.S.C. § 651 *et seq.*, and pursuant to Executive Branch authorities derivative of the Commerce Clause, *BST*, 2021 WL 5279381, at *3, 7. Neither the OSH Act nor the Commerce Clause are at issue in this case.

contract with others on terms of their own choosing. "It has long been recognized that the government, like private individuals and businesses, has the power 'to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases.'" *Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696 (5th Cir. 1973) (quoting *Perkins*, 310 U.S. at 127); *Kahn*, 618 F.2d at 794 ("Those wishing to do business with the Government must meet the Government's terms; others need not"); *cf. Arbitraje Casa de Cambio, S.A. de CV. v. United States*, 79 Fed. Cl. 235, 240–41 (Fed. Cl. 2007) (noting that when contracting with other parties, "the sovereign steps off the throne and engages . . . as private parties, individuals or corporations also engage in among themselves"). The Executive Branch's right to contract, and its relationship to those with whom it contracts, places the issues here on vastly different footing from the OSHA workplace-safety requirement at issue in *BST*, which does not involve direct commercial exchanges with the government. *See BST*, 2021 WL 5279381, at *7 (charging that the vaccine requirement "commandeers U.S. employers").

Further, while OSHA issues emergency standards rarely, Presidential directives under FPASA are frequently issued and frequently upheld. This makes sense, given that the OSH Act empowers OSHA to issue emergency standards only in the rare circumstance where it finds that doing so is "necessary to protect employees" from a "grave danger" in the workplace. 29 U.S.C. § 655(c). That stands in marked contrast to the "necessary flexibility and 'broad-ranging authority'" Congress gave the President in FPASA. *Chao*, 325 F.3d at 366 (quoting *Kahn*, 618 F.2d at 789).

### 3. Neither the EO nor the OMB Determination are pre-textual or consists of post hoc rationalization.

Plaintiffs finally characterizes the EO's stated rationale as "'pretextual,'" Mot. at 16, and the new OMB Director Determination as an impermissible *post hoc* rationalization, *id*. Plaintiffs

rely on inapplicable case law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, for these arguments in support of their Procurement Act claim, Mot. at 16 (citing *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020)). Regardless, the challenged executive actions are neither pretextual nor consist of *post hoc* rationalization.

*First*, Plaintiffs fail to establish that the November OMB Determination and attendant explanation are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com.*, 139 S. Ct. at 2575–76. As OMB reasonably concluded, slowing the spread of COVID-19 has an economically beneficial impact on federal operations, since federal contractors incur significant labor costs when workers fall sick from COVID-19 and spread it to others in the workplace. *See* 86 FR at 63,421–23. While imposing such a contractual requirement may also have salutary public health effects, that result does not undermine the reasoning or legitimacy of the Acting OMB Director's determination. A Presidential exercise of FPASA authority does not "become[] illegitimate if, in design and operation, the President's prescription, in addition to promoting economy and efficiency, serves other, not impermissible, ends as well." *Carmen*, 669 F.2d at 821; *see also id.* (collecting cases).

Nor can Plaintiffs succeed in complaining that the November OMB Determination contains post hoc rationalizations. *See* Mot. at 22. No principle of law prevents the Executive Branch from "'deal[ing] with [a] problem afresh' by taking new agency action." *Regents*, 140 S. Ct. at 1907–08 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)). The Acting OMB Director took that route here: rather than merely providing a fuller explanation of her prior Determination, the November OMB Determination "rescinds and supersedes [her] prior notice." 86 FR at 63,418. And the Acting OMB Director set a new date for contractor compliance, further underscoring the

superseding nature of her action. An entirely new agency action does not equate to mere "litigation affidavits." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971). And although the Acting OMB Director ultimately reached the same efficiency-and-economy conclusion, she again properly rested that new conclusion on evidence and justifications. *See Regents*, 140 S. Ct. at 1908 ("An agency taking [the new-agency-action] route is not limited to its prior reasons."). The November OMB Determination simply provides information about "the grounds that the agency invoked when it took the action." *Id.* at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).

In short, Plaintiffs provide no compelling reason why this Court should radically depart from the way FPASA has been interpreted for more than 70 years.

## C. Neither the OMB Determination nor the FAR Memo violate any applicable notice-and-comment procedures.

### 1. The November OMB Determination fully complies with § 1707's procedural requirements.

Plaintiffs fault the EO and the previous OMB Determination for not complying with the notice-and-comment requirements of 41 U.S.C. § 1707. But § 1707 does not apply to exercises of Presidential authority like the EO and OMB Determination. Section 1707 applies only to an "executive agency," a defined term in the statute. 41 U.S.C. § 133. That definition does not include the President or the White House. *See id*. Because the President is not an agency under the statute, and because the Acting OMB Director acted through a delegation from the President, § 1707's procedural requirements do not apply to either EO 14,042 or to the Acting OMB Director's Determinations. *Cf. Nat'l Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009) (explaining that presidential action is not subject to judicial review under the APA) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992); *Dalton v. Specter*, 511 U.S. 462, 470 (1994)).

Further, the new Determination invokes § 1707(d)'s waiver for "urgent and compelling

circumstances." Those circumstances exist for multiple reasons. As an initial matter, "[t]he pandemic continues to present an imminent threat to the health and safety of the American people." 86 FR 63,423. More particularly, an "important purpose of the [revised] Task Force Guidance" was to "align[] the vaccination deadline for Federal contractors with the vaccination deadline for private companies under recent regulatory actions," which is January 8, 2020, to "make it easier for private employers to administer successful vaccination policies across their workforce." *Id*.

Plaintiffs claim that § 1707's waiver does not apply because the Task Force Guidance is not "temporary." Mot. at 19. But the November OMB Determination makes clear that its approval is indeed temporary, 86 FR 63,424, even if no certain endpoint has yet been identified.

Plaintiffs also claim that no "urgent and compelling circumstances" exist to merit the OMB Director's expedited determination. Mot. at 20–21. That contention is meritless. "This is a once in a generation pandemic" that "continues to present an imminent threat to the health and safety of the American people." 86 FR 63,423. An expeditious determination on the Task Force Guidance thus "promotes the most important, urgent public health measure to slow the spread of COVID–19 among Federal contractors and subcontractors." *Id*. Plaintiffs' complaint that this explanation is untethered to the economy-and-efficiency standard required under FPASA and the Procurement Act, Mot. at 19–20, is also unsupported. OMB explained that waiving the notice requirements in Section 1707 and slowing the spread of COVID-19 "is critical to avoiding worker absence and unnecessary labor costs that could hinder the efficiency of federal contracting." 86 FR at 63,423.

Plaintiffs also argue that delaying the vaccination for covered contractor employees undermines the "urgent and compelling" nature of the November Determination. Mot. at 20. But the opposite is true. "If the determination implementing this change were required to comply with subsections (a) and (b) of 41 U.S.C. 1707 (requiring 30 days for comment, and another 30 days to

become effective), the earliest possible effective date for this determination would be January 9, 2022. But waiting until January for this determination to become effective would prevent the change in deadlines from having practical effect." *Id.* at 63,423.

### 2. The FAR Memo is nonbinding guidance not subject to Section 1707.

As an initial matter, Plaintiffs lack standing to challenge the FAR Memo because they (1) have not alleged that they are a party to a contract with the recommended clause, (2) have not identified any potential contracts that have the proposed provision, and (3) have not identified any injury that would be redressed by enjoining the FAR Memo. *See Transp. Workers Union of Am, AFL-CIO v. Transp. Sec. Admin.*, 492 F.3d 471, 477 (D.C. Cir. 2007) (no injury from guidance because "the change caused nothing" to happen to the claimant). The FAR Memo suggests a sample clause that agencies and contracting officers might use to implement the policies announced in the Executive Order. Memorandum from Lesley A. Field, et al. 3 (Sept. 30, 2021), https://perma.cc/77L7-8TM8 [hereinafter FAR Memo]. The FAR Memo has no independent effect and none of its guidance is operational unless an agency chooses to incorporate it into a procurement contract. And, importantly, agencies have the authority to include a verbatim clause in contracts and solicitations even without the FAR Memo. Therefore, the FAR Memo itself does not affect the authority of agencies to include a COVID-19 safety clause in their contracts.

Section 1707's procedural notice requirements also do not apply to the FAR Memo because it is, at most, nonbinding guidance, and not "a procurement policy, regulation, procedure, or form" with "a significant effect beyond" the FAR Council's operating procedures. *See* 41 U.S.C. § 17071(a)(1). The FAR Council issued the memo to develop a template COVID-19 safety clause "to *support* agencies in meeting the applicability requirements and deadlines set forth in [EO 14,042]" and to "encourage[]" agencies to "exercise their authority" to temporarily deviate from the FAR by including similar clauses in their procurement contracts. FAR Memo at 2–3. The FAR

Memo has no independent effect, however, and none of its guidance is operational unless an agency chooses to incorporate it into a procurement contract. And the FAR Memo does not direct an agency to take any specific action, but instead encourages contracting officers to "follow the direction[s] … issued by their respective agencies" for how to utilize the memo's guidance. *Id.*

Plaintiffs and ABC characterize the template deviation clause at the end of the FAR Memo as some sort of permanent, binding requirement on Plaintiffs, Mot. at 21–22; ABC Mot. at 16–17, but that is far from the case. The memo applies to agencies, and those agencies "are encouraged to make their deviations effective until the FAR is amended or the deviation is otherwise rescinded by the agency." FAR Memo at 3. The conclusion of the regulatory process set forth in the EO—the FAR Council's amendment to the FAR by providing the contract clause "for inclusion in Federal procurement solicitation and contracts" subject to the EO—has yet to occur. EO 14,042 § 3(a); *see also* FAR Open Cases Report" at 2, available at https://www.acq.osd.mil/dpap/dars/opencases/farcasenum/far.pdf (indicating that on September 29, 2021, the FAR Council opened a case to implement EO 14,042 by drafting a proposed rule).

### D.  Contrary to ABC's assertions, EO 14,042 does not violate the APA or the Small Business Regulatory Enforcement Fairness Act.

#### 1.  *EO 14,042 and the ensuing executive actions are unreviewable under the APA and the SBREFA.*

ABC argues in perfunctory fashion that the EO is (1) "arbitrary and capricious" in violation of the APA, 5 U.S.C. § 706; and (2) violates the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), 5 U.S.C. § 604. Yet 5 U.S.C. § 706 only applies to final agency actions. *See* 5 U.S.C. § 704. The SBREFA provision that ABC cites, meanwhile, applies only to agency final rules issued under the APA. *See* 5 U.S.C. § 604(a); *Nat'l Tel. Co-op. Ass'n v. F.C.C.*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The Regulatory Flexibility Act requires that agencies issuing rules

under the Administrative Procedure Act publish a final regulatory flexibility analysis.") (citing 5 U.S.C. § 604).

As a threshold matter, neither statute applies to these actions. The APA and the SBREFA do not apply to the EO or the OMB Determination because the EO was issued by the President and the Acting OMB Director promulgated the determination pursuant to delegated presidential authority. "Presidential action is not subject to judicial review under [the APA]." *NRDC*, 658 F. Supp. 2d at 109 (citing *Franklin*, 505 U.S. at 800–01; *Dalton v. Specter*, 511 U.S. 462, 470 (1994)). The EO delegated to the OMB Director the President's existing authority to determine whether the Task Force Guidance "will promote economy and efficiency in Federal contracting." *See* EO 14,042, § 2(c). It did so pursuant to 3 U.S.C. § 301, which authorizes the President "to designate and empower the head of any department or agency in the executive branch, . . . to perform without approval, ratification, or other action by the President [] any function which is vested in the President by law," including the President's power to direct government contracting under FPASA. When exercising delegated authority, the official "stands in the President's shoes" and "cannot be subject to judicial review under the APA," or, by extension, under 5 U.S.C. § 604, which only encompasses final agency rules. *NRDC*, 658 F. Supp. 2d at 109 & n.5, 111; *see also Tulare Cnty.. v. Bush*, 185 F. Supp. 2d 18, 28–29 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016).

The FAR Memo, meanwhile, is not a final agency action or a final agency rule because the memo is not the FAR Council's final word on the COVID-19 safety clause. This guidance was issued in accordance with the EO's instructions for the FAR Council to "take *initial* steps to implement" the contract clause described in the EO, while ultimately pursuing a final rulemaking to fully implement the clause across applicable federal contracts. EO 14,042 § 3(a) (emphasis

added). The FAR Memo suggests a COVID-19 safety clause for contracting officers to use in the *interim*, subject to agency- and contract-specific deviations to be developed by each agency. FAR Memo at 4–5.

Moreover, agencies can implement the EO without the FAR Memo, so it is not a decision from which "legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (citation omitted). Plaintiffs cannot challenge guidance when they fail to show "any risk of future harm traceable to the . . . Guidance itself, as opposed to the preexisting federal laws it describes." *Klayman v. President of the United States*, 689 F. App'x 921, 924 (11th Cir. 2017). The language of the FAR Memo makes clear that the legal consequences here emanate from the EO, rather than the non-binding FAR guidance. As the memo explains, the FAR Council developed the suggested COVID-19 safety clause "pursuant to section 3(a) of the executive order" and to "support agencies in meeting the applicability requirements and deadlines set forth in the order," FAR Memo at 2, not because of any independent legal obligation imposed by the Council.

### 2. *ABC's APA claim is also meritless.*

Even if ABC's APA claim were cognizable, it lacks merit. ABC argues that because the administration did not explain why it decided that covered contract employees should be vaccinated when it hadn't made that determination earlier in the pandemic. ABC Mot. at 18–19. But neither the EO nor the OMB determination changed a longstanding position. Only a few months separate the time that COVID-19 vaccines became widely available in the United States from when the President issued the EO in September. *Compare with Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) (examining an agency departure from "decades-old practice"). Further, ABC identifies no significant reliance interests the EO should have accounted for, or harm accruing from any such reliance interests. *Id.* at 212 (concluding that an explanation was required

26

"in light of the Department's change in position *and* the significant reliance interests involved") (emphasis added).[9]

### E.  Requiring contractor vaccination is constitutional.

#### 1.  *The challenged actions do not violate the nondelegation doctrine.*

Plaintiffs and ABC contend that the Procurement Act violates the Constitution's nondelegation doctrine if it authorizes the President to issue EO 14,042. Mot. at 22–24; ABC Mot. at 20–21. To the contrary, the Procurement Act's delegation of authority fits comfortably within the bounds of constitutionally permissible delegations. Congress may lawfully delegate decision-making authority so long as it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (citation omitted). A delegation is "constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority." *Id.* at 372–73 (citation omitted); *accord Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality op.) ("[A] delegation is permissible if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of his authority.'" (cleaned up)).

The intelligible-principle standard is so deferential that the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001) (quoting *Mistretta*, 488 U.S at 416 (Scalia, J., dissenting)). In fact, the

---

[9] The November OMB determination also makes clear that it did consider the costs to covered contractors, including small-business contractors, and determined that "[b]ecause vaccines are widely available for free, the cost of implementing a vaccine mandate is largely limited to administrative costs associated with distributing information about the mandate and tracking employees' vaccination status. Such costs are likely to be small." 86 FR at 63,422.

Supreme Court has struck down congressional delegations only twice in United States history—both in 1935—and only because "Congress had failed to articulate *any* policy or standard" to confine discretion. *Gundy*, 139 S. Ct. at 2129. Over the last eighty years, the Court "has countenanced as intelligible seemingly vague principles in statutory text such as whether something would 'unduly or unnecessarily complicate,' … be 'generally fair and equitable,' in the 'public interest,' . . . [or] authoriz[es] the recovery of excessive profits." *In re Nat'l Sec. Agency Telecomms. Recs. Litig.*, 671 F.3d 881, 896 (9th Cir. 2011) (citing multiple cases); *see also, e.g.*, *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (upholding delegation to determine what constituted a "safe" place of employment); *Gundy*, 139 S. Ct. at 2129 (noting that the Supreme Court has, on multiple occasions, "approved delegations to various agencies to regulate in the 'public interest'" (citing *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943), and *N.Y. Cent. Secs. Corp. v. United States*, 287 U.S. 12, 24 (1932))); *Gundy*, 139 S.Ct. at 2130–31 (Alito, J., concurring in the judgment) ("[S]ince 1935, the Court has uniformly rejected nondelegation arguments and has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards.").

In light of this longstanding precedent, the statute at issue here reflects an intelligible principle that falls well within permissible bounds. This is not a regulation that binds the general public; it only applies to contractors. The Procurement Act sets forth a general policy—the promotion of economy and efficiency in the federal government's procurement of property and services, *see* 40 U.S.C. § 101—and authorizes the President to issue orders designed to further those specific statutory goals in that narrow, definable context, *see id.* § 121(a). The statute's criteria thus establish a clear boundary for the President's actions, and compares favorably to other congressional delegations that have been sustained against challenges under the nondelegation

doctrine. *See, e.g.*, *Whitman*, 531 U.S. at 474–75 (listing cases). Indeed, every court to consider the question has held that the Congressional grant of contracting authority to the President passes constitutional muste. *See Kahn*, 618 F.2d at 785–86, 793 n.51 ("[The Procurement Act] requires the President to make procurement policy decisions based on considerations of economy and efficiency. Although broad, this standard can be applied generally to the President's actions to determine whether those actions are within the legislative delegation."); *City of Albuquerque*, 379 F.3d at 914–15 (finding the Procurement Act's limit that the President "establish 'an economical and efficient system for . . . the procurement and supply' of property" provided an "'intelligible principle' to guide the exercise" of the "relatively broad delegation of authority" in the statute (citations omitted); *Liberty Mut.*, 639 F.2d at 166; *Napolitano*, 648 F. Supp. 2d at 739.

Plaintiffs cite no authority to the contrary. Instead, they claim that if "the Procurement Act is so capacious as to permit the President to adopt the Contractor Mandate, the Act would violate the nondelegation doctrine." *See* Mot. at 25. But that is not the standard. "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Touby v. United States*, 500 U.S. 160, 165 (1991). As the Supreme Court has acknowledged, "Congress simply [could not] do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372. In sum, only if this Court "could say that there is an *absence* of standards for the guidance of the [President's] action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would [the Court] be justified in overriding [Congress's] choice of means for effecting its declared purpose" in the Procurement Act. *See Yakus v. United States*, 321 U.S. 414, 426 (1944) (emphasis added). That is not the case here.[10]

---

[10] ABC's reliance on *BST*, ABC Mot. at 20, is inapposite, as discussed *supra* Arg.II.B.2.

## 2. The challenged actions do not exceed Congress's authority under the Commerce Clause.

Plaintiffs next claim that imposing requirements on their federal contracting workforce exceeds Congress's authority under the Commerce Clause. Mot. at 24–26 (citing *NFIB v. Sebelius*, 567 U.S. 519, 555 (2012)). But *NFIB* involved a challenge to a general mandate requiring most Americans to purchase health insurance, and the Court held that requirement exceeded Congress's power to regulate commerce. Here, by contrast, the government is not using its Commerce Clause authority to regulate anything. Instead, the government has set conditions on who the government does business with—something private-sector business leaders do all the time. *Cf. Arbitraje Casa de Cambio, S.A. de CV. v. United States*, 79 Fed. Cl. 235, 240–41 (Fed. Cl. 2007) (noting that when contracting with other parties, "the sovereign steps off the throne and engage . . . as private parties, individuals or corporations also engage in among themselves"). "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). "Those wishing to do business with the Government must meet the Government's terms; others need not." *Kahn*, 618 F.2d at 794. The policies at issue in this case are not generally applicable regulations, and they do not implicate the Commerce Clause.

## III. Plaintiffs do not face irreparable harm.

Noting that Plaintiffs "receive billions of dollars under federal contracts," Plaintiffs argue that they face "staggering" economic harm "[a]bsent immediate relief." Mot. At 5. Although Plaintiffs would have this Court believe that they face the imminent cancellation of any and all federal contracts to the extent they (or their subagencies) refuse to enter into contracts with the

clause required by EO 14,042, this is not the case.[11] EO 14,042 is not self-executing: COVID-19 safety protocols do not become a requirement until they are incorporated into a given contract, either by modification of an existing contract or by requiring the inclusion of a COVID-19 safety clause in a new contract award or contract renewal. To meet their burden to show "actual and imminent" harm, Plaintiffs must demonstrate as a threshold matter that the United States (i) has improperly modified or terminated an existing contract because that contract did not contain a COVID-19 safety clause; or (ii) has indicated that for a contract expiring soon, or for a contract to be awarded imminently, renewal/award would be contingent on incorporation of a COVID-19 safety clause.[12] *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

Plaintiffs do neither. Although Plaintiffs note that they have "contracts collectively worth billions of dollars," Mot. at 27, they fail to identify any existing contract that the United States has threatened to terminate absent modification. Nor do Plaintiffs identify any new or existing contracts that are up for bid/rebid, and for which the solicitation/renewed contractual terms require a COVID-19 safety clause. ABC similarly fails to identify any particular covered contract subject to harm from the EO. *See generally* ABC Mot.; Decl. of Bill Anderson, ECF No. 50-1.

---

[11] In substantial respect, Plaintiffs frame their harm in competitive disadvantage terms—namely, educational institutions that fail to comply with EO 14,042 will lose out on federal contracts, which will lessen their ability to recruit and retain top students, faculty, and staff, and therefore diminish their standing as research institutions and universities. *See* ECF Nos. 55-1, 55-2, 55-3, 55-13. But it is not obvious why Plaintiffs' feared talent migration would occur. Under Plaintiffs' theory of harm, all institutions would face the same issues, so it is hard to see how EO 14,042 would alter the competitive landscape in relative terms.

[12] Consistent with the EO, the Task Force Guidance set forth a phase-in period for the new requirements to be added to federal contracts, generally keyed to new contracts awarded on or after November 14 and any changes to existing contracts made on or after October 15. *See September Contractor Guidance* at 12. The White House later announced it would apply a January 4, 2022 deadline for receipt of a final vaccine shot for federal contractors subject to a contract in-scope of EO 14,042. *Compare id.* at 5 (setting compliance date of December 8, 2021), *with* White House, Fact Sheet: Biden Administration Announces Details of Two Major Vaccination Policies (Nov. 4, 2021), https://perma.cc/7FPV-PA2N (modifying this date to January 4, 2022).

Although Plaintiffs identify six[13] agreements that they claim will be subject to the inclusion of a COVID-19 safety clause, none of them is subject to EO 14,042's express terms. As noted, the mandatory provisions of EO 14,042 do not apply to "contracts or subcontracts whose value is equal to or less than the SAT," EO 14,042 § 5(b)(iii), including most of the contracts on which Plaintiffs' rely. Decl. of Julio Lopez ¶¶ 6-8, Ex. A (CDC contracts); Decl. of Howard Price ¶¶ 11–12, Ex. B (USDA contract).

Furthermore, all of the contracts that Plaintiffs identify predate EO 14,042 and therefore are excluded from the express scope of its mandate. *See supra* note 10; *see also* ECF No. 55-4 & Lopez Decl. ¶ 9 (CDC contracts); ECF No. 55-5 & Price Decl. ¶ 12 (USDA contract). Even though it was not required to modify these contracts by EO 14,042, the United States did seek a bilateral modification of these contracts. As Plaintiffs have not assented to these modification requests, no changes have been made to any of these contracts and performance has continued, unchanged. Lopez Decl. ¶ 10; Price Decl. ¶¶ 9, 13. Plaintiffs therefore cannot show that they have been harmed at all, let alone irreparably so, with respect to these contracts.

Regarding all allegations of potential economic harm arising from amendments to existing contracts, as explained above, even the certainty of losing a contract would not be irreparable harm. In any event, as explained above, even the certainty of losing a contract would not be irreparable harm. Plaintiffs would have ample opportunity under the Contract Disputes Act to seek monetary redress. 28 U.S.C. § 1491(b)(1)–(2); *see Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). For these separate and independent reasons,

---

[13] Five of these contracts involve CDC, and one involves USDA. *See* ECF No. 55-4, ¶ 6 (two CDC contracts with GA agencies); ECF No. 55-4, ¶ 12 (two CDC contracts and one purchase order between CDC and ID agencies); ECF No. 55-14, ¶¶ 12, 16-17) (USDA lease with AL agency).

Plaintiffs have failed to carry their burden to demonstrate irreparable harm. *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1983) ("The possibility [that] adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

With respect to future contracts, the sole award that Plaintiffs identify is the renewal of the USDA lease noted above. Plaintiffs allege that USDA has stated that it will not renew its lease for office space with the Alabama Department of Agriculture and Industries ("ADAI") absent the inclusion of a COVID-19 safety clause. Mot. at 12. Inasmuch as the current lease is scheduled to run through October 2030, Price Decl. at ¶ 9, ADAI cannot credibly claim that it faces "actual and imminent" harm for a putative non-renewal of a lease that, if it happens at all, would not occur for almost nine years. Furthermore, and as noted *supra* at 11, because the lease is below the Simplified Acquisition Threshold, were USDA to require the inclusion of a COVID-19 safety clause as a condition of any renewal, that determination would not be traceable to EO 14,042. Price Decl. at ¶¶ 10–11.[14]

Plaintiffs also assert that they will suffer an array of non-monetary harm—"loss of personnel, loss of institutional knowledge vested in [lost] employees, loss of specialized workers,

---

[14] Georgia's reliance on money expended to comply with EO 14,042 does not suffice to show imminent harm. *See, e.g.*, *Freedom Holdings v. Spitzer*, 408 F. 3d 112, 115 (2d Cir. 2005) ("[O]rdinary compliance costs are typically insufficient to constitute irreparable harm."); *A.O. Smith v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976) ("Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such injury, alone, would satisfy the requisite for a preliminary injunction."); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980)("[I]njury resulting from attempted compliance with government regulation is ordinarily not irreparable harm."). Under a contrary determination, virtually any challenge to a government regulation would be able to show imminent harm, essentially removing the "the *sina qua non* of injunctive relief," *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990), and thus rendering routine the award of the "extraordinary and drastic" relief Plaintiffs seek. *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000).

damage to reputation, damage to good will and inability to carry out their respective institutional missions." Mot. at 30 (internal numbering omitted). These assertions are so generalized as to preclude meaningful scrutiny. That alone is sufficient basis to reject them. *See, e.g.*, *Dongguan Prestige Sporting Products, Co., Ltd. v. Merits Co., Ltd.*, 2014 WL 12573534, *1 (N.D. Ga. 2014) (rejecting assertions based on "loss of goodwill, damage to reputation, and loss of business opportunity" as "far too conclusory, speculative, and preliminary in nature to meet the rigorous standard for establishing irreparable harm"). More fundamentally, these putative harms all derive from Plaintiffs' mistaken assertion that they face the summary invalidation of every federal contract to which they (or their subagencies) are a party—an assertion unsupported in this record and belied by the (few) contracts for which Plaintiffs have presented specific evidence.

## IV.    The equities and the public interest weigh against injunctive relief.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these considerations tilt decisively in Defendants' favor.

*First*, enjoining EO 14,042 would harm the public interest in slowing the spread of COVID-19 among millions of federal contractors and the members of the public with whom they interact. As the Supreme Court has recognized, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). Accordingly, numerous courts reviewing "executive action designed to slow the spread of COVID-19" have concluded that "[t]he public interest in protecting human life—particularly in the face of a global and unpredictable pandemic—would not be served by" an injunction. *Tigges v. Northam*, 473 F. Supp. 3d 559, 573–74 (E.D. Va. 2020); *see also, e.g.*, *Am.'s Frontline Drs. v. Wilcox*, No. EDCV 21-1243, 2021 WL 4546923, at *8 (C.D. Cal. July 30, 2021); *Valdez v.*

*Grisham*, ---F. Supp. 3d---, No. 21-cv-783, 2021 WL 4145746, at *13 (D.N.M. Sept. 13, 2021), *appeal filed*, No. 21-2105 (10th Cir. Sept. 15, 2021); *Harris v. Univ. of Mass., Lowell*, ---F. Supp. 3d---, No. 21-cv-11244, 2021 WL 3848012, at *8 (D. Mass. Aug. 27, 2021), *appeal filed,* No. 21-1770 (1st Cir. Sept. 28, 2021); *Williams v. Brown*, ---F. Supp. 3d---, No. 6:21-cv-01332, 2021 WL 4894264, at *10-11 (D. Or. Oct. 19, 2021); *Wise v. Inslee*, No. 2:21-cv-0288, 2021 WL 4951571, at *6-7 (E.D. Wash. Oct. 25, 2021); *Mass. Corr. Officers Federated Union v. Baker*, ---F. Supp. 3d---, No. 21-cv-11599, 2021 WL 4822154, at *7-8 (D. Mass. Oct. 15, 2021); *Johnson v. Brown*, --- F. Supp. 3d---, No. 3:21-cv-1494, 2021 WL 4846060, at *26-27 (D. Or. Oct. 18, 2021); *TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 840–41 (W.D. Tenn. 2020); *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 543 (E.D.N.C. 2020); *Brnovich v. Biden,* 2:21-cv-01568 (D. Az.) (denying preliminary injunction regarding federal government contractor vaccine requirement).

*Second*, enjoining EO 14,042 would harm the public interest by hampering the efficiency of the contractors on which the federal government relies. The COVID-19 pandemic has interfered with numerous aspects of the government's work, *e.g.*, by forcing office closures; interfering with employees' access to paper-based or sensitive records; limiting official travel; and causing staffing shortages. *See generally* Pandemic Response Accountability Committee, Top Challenges Facing Federal Agencies (June 2020), https://perma.cc/GGF4-F4FV. These disruptions have affected the work of federal employees and federal contractors alike. Requiring federal covered contractor employees to become fully vaccinated against COVID-19, with exceptions only as required by law, reduces disruptions caused by worker absences associated with illness or exposure to the virus, generating meaningful gains in contracting efficiency. Enjoining EO 14,042 would prevent these gains and would likely interfere with the government's ability to resume normal, pre-pandemic operations.

Moreover, granting the requested injunction against Defendants would not preserve the relative positions of the parties since entering the requested relief would upend the status quo by (1) preventing further implementation of EO 14,042, which has been in effect for over two months; and (2) interfering with the federal government's ability to determine the terms on which it will enter into contracts. *See, e.g.*, *Nken*, 556 U.S. at 428–29 (explaining that enjoining a government policy is an act of "judicial intervention" that "*alter[s]* the legal status quo"). Further, granting the relief sought against Defendants would generate the absurd result of allowing challengers to obtain a preliminary injunction against *any* new government policy, in order to maintain the prior "status quo" until a decision on the merits. *But see Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right."); *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers) (explaining that "an injunction against the enforcement of a presumptively valid" enactment should only be granted in extraordinary circumstances).

Against these weighty and substantial federal interests, Plaintiffs—like ABC—have presented what amounts to a mirage of impending economic calamity. While Plaintiffs would have this Court believe that EO 14,042 portends a summary, across-the-board invalidation of numerous federal contracts worth billions of dollars, the reality bears no resemblance to that characterization. As noted, Plaintiffs have identified no current contracts that Defendants have threatened to terminate on pain of accepting a vaccine clause to which Plaintiffs object. Save a building lease contract that (i) is not up for rebid until 2030; and (ii) is not subject to EO 14,042 in any event, Plaintiffs have not identified any future contracts that will include a COVID-19 safety clause. While Plaintiffs unquestionably disagree with the policy determinations that undergird EO 14,042, the harm to Federal Defendants to allowing Plaintiffs (or any state) to dictate federal contract

policy far outstrips the harm to Plaintiffs from allowing the United States to supervise and direct the terms on which it will enter contracts.

In sum, granting the pending motion would harm the public interest far more than denying the motion would harm Plaintiffs, and the motion should therefore be denied.

## V.        In all events, this court should not enter nationwide relief.

Although preliminary relief is unjustified here, at a minimum, any such relief should be no broader than necessary to redress Plaintiffs'[15] alleged injuries. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018) (citation omitted). Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). EO 14,042 and its implementing guidance have been challenged in numerous other cases, underscoring why this Court should not attempt to decide its legality for all parties. *See e.g.*, *Brnovich v. Biden*, 2:21-cv-01568 (D. Az.) (denying preliminary injunction regarding government contractor vaccine mandate); *Smith v. Biden*, No. 1:21-cv-19457, 2021 WL 5195688, at *8 (D.N.J. Nov. 8, 2021), *appeal filed*, No.21-3091 (3d Cir. Nov. 10, 2021) (same); *Hollis v. Biden*, 1:21-cv-163 (N.D. Miss.) (same); *Texas v. Biden*, 3:21-cv-00309 (S.D. Tex.); *Georgia v. Biden*, 1:21-cv-163 (S.D. Ga.); *Missouri v. Biden*, 4:21-cv-1300 (E.D. Mo.); *Oklahoma v. Biden*, 5:21-cv-01069 (W.D. Okla.); *Louisiana v. Biden*, 1:21-cv-3867 (W.D. La.); *Navy Seal 1 v. Biden*, No. 21-2429 (M.D. Fla.).

---

[15] Including ABC, if intervention is allowed.

Here, the only potential new contract that Plaintiffs have identified is a future USDA lease renewal for an office building in Montgomery, Alabama. Even assuming this contract gives Plaintiffs standing to challenge (and this Court jurisdiction to consider) the EO, any relief should be tailored to this contract and limited to the state of Alabama (where the performance of this contract is occurring). Moreover, that relief should merely block enforcement—not inclusion—of a COVID-19 safety clause. Allowing COVID-19 safety clauses to be included but not enforced in any relevant contracts during the pendency of this litigation best preserves the legal status quo: As long as the injunction remains in place, contractors within its scope need not be vaccinated. But if EO 14,042 and its implementing guidance are ultimately upheld, the policy can be put into effect without further delay.[16]

## CONCLUSION

For the foregoing reasons, Plaintiffs' and ABC's motions for a preliminary injunction should be denied.

Dated: November 26, 2021                          Respectfully submitted,

                                                  BRIAN M. BOYNTON
                                                  Acting Assistant Attorney General

                                                  DAVID ESTES
                                                  Acting United States Attorney

                                                  BRAD P. ROSENBERG
                                                  Assistant Branch Director
                                                  Civil Division

---

[16] Allowing COVID safety clauses to be included but not enforced will not precipitate lay-offs or a rush to vaccination if the injunction is dissolved. Covered contractor employers have flexibility to "determine the appropriate means of enforcement" and to craft "polic[ies] that encourage[] compliance." Safer Federal Workforce, Federal Contractor FAQs, availabile at https://perma.cc/RGR9-ZTES. In other words, covered contractors would not need to immediately fire unvaccinated employees once the injunction is dissolved. Rather, covered contractors should provide for a "period of counseling and education, followed by additional disciplinary measures if necessary," before terminating an employee or putting them on leave. *Id.*

/s/ *Vinita B. Andrapalliyal*
VINITA B. ANDRAPALLIYAL
LEE REEVES
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-0845
Fax: (202) 616-8470
E-mail:  vinita.b.andrapalliyal@usdoj.gov

*/s/ Matthew A. Josephson*
Matthew A. Josephson
Assistant United States Attorney
Georgia Bar. No. 367216
Post Office Box 8970
Savannah, Georgia 31412
Telephone: (912) 652-4422
Email:  Matthew.Josephson@usdoj.gov


*Attorneys for Defendants*