**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

THE STATE OF GEORGIA, et al.,

        Plaintiffs,

      v.

JOSEPH R. BIDEN, in his official capacity as
President of the United States, et al.,

        Defendants.

CIVIL ACTION NO.: 1:21-cv-163

**O R D E R**

Plaintiffs, comprised of the States of Georgia, Alabama, Idaho, Kansas, South Carolina, Utah and West Virginia; the governors of several of those states; and various state agencies, including the Board of Regents of the University System of Georgia, filed this suit seeking declaratory and injunctive relief against enforcement of Executive Order 14042, which requires, *inter alia*, that contractors and subcontractors performing work on certain federal contracts ensure that their employees and others working in connection with the federal contracts are fully vaccinated against COVID-19.  (Docs. 1, 54.)  Upon filing the lawsuit, Plaintiffs requested that this Court issue a preliminary injunction.  (Docs. 19, 55.)  Additionally, Associated Builders and Contractors, Inc. (hereinafter, "ABC"), a trade organization, and one of its chapters, Associated Builders and Contractors of Georgia, Inc. (hereinafter, "ABC-Georgia"), (hereinafter, collectively, "Proposed Intervenors")) filed a Motion to Intervene in the action, (doc. 48), and also filed their own Motion for Preliminary Injunction, (doc. 50).  The Court established an expedited briefing schedule and, following the submission of responses by the Defendants to all motions, (docs. 61,

63), and the submission of replies by Plaintiffs and by the Proposed Intervenors, (docs. 76–78), the Court conducted a hearing on the Motions on December 3, 2021.

As another Court that has preliminarily enjoined the same measure at issue in this case has stated, "[t]his case is not about whether vaccines are effective.  They are."  Kentucky v. Biden, No. 3:21-cv-55, 2021 WL 5587446, at *9 (E.D. Ky. Nov. 30, 2021).   Moreover, the Court acknowledges the tragic toll that the COVID-19 pandemic has wrought throughout the nation and the globe.   However, even in times of crisis this Court must preserve the rule of law and ensure that all branches of government act within the bounds of their constitutionally granted authorities. Indeed, the United States Supreme Court has recognized that, while the public indisputably "has a strong interest in combating the spread of [COVID-19]," that interest does not permit the government to "act unlawfully even in pursuit of desirable ends."  Ala. Ass'n of Realtors v. HHS, 141 S. Ct. 2485, 2490 (2021) (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 582, 585–86 (1952)).   In this case, Plaintiffs will likely succeed in their claim that the President exceeded the authorization given to him by Congress through the Federal Property and Administrative Services Act when issuing Executive Order 14042.   Accordingly, after due consideration of the motions, supporting briefs, responsive briefing, and the evidence and argument presented at the hearing,[1] the Court **GRANTS IN PART and DENIES IN PART** the Motion to Intervene, (doc. 48), **GRANTS** ABC's Motion for Preliminary Injunction, (doc. 50), and **GRANTS** Plaintiffs' Amended Motion for Preliminary Injunction, (doc. 55).

---

[1]  On December 2, 2021, the American Medical Association, which is not a party to this case, was granted leave of Court to file an *amicus curiae* brief in opposition to Plaintiffs' Amended Motion for Preliminary Injunction.  (Doc. 86.)

**BACKGROUND**

On January 20, 2021, President Biden signed Executive Order 13991, establishing the "Safer Federal Workforce Task Force" (hereinafter, the "Task Force"). 86 Fed. Reg. 7,045–48 (Jan. 20, 2021). The Task Force's stated mission is to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic." Id. at 7,046.

On September 9, 2021, President Biden signed Executive Order 14042 (hereinafter, "EO 14042"). 86 Fed. Reg. 50,985–88 (Sept. 9, 2021). Therein, the President stated that his order would "promote[] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument," which would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." Id. at § 1. EO 14042 mandated that the Task Force provide, by September 24, 2021, guidance regarding "adequate COVID-19 safeguards," which must be complied with by federal contractors and subcontractors. Id. at 50,985. This executive order specified that the Task Force's guidance would be mandatory at all "contractor or subcontractor workplace locations" so long as the Director of the Office of Management and Budget (hereinafter, the "OMB") approved the guidance and determined that it would "promote economy and efficiency in Federal contracting." Id. EO 14042 states that it applies, with some specified exceptions, to "any new contract; new contract-like instrument; new solicitation for a contract or contract-like instrument;

extension or renewal of an existing contract or contract-like instrument; and exercise of an option on an existing contract or contract-like instrument." Id.

On September 24, the Task Force issued its Guidance for Federal Contractors and Subcontractors (hereinafter, the "Task Force Guidance") pursuant to EO 14042. See Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors*, available at

https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20guidance%20doc_20 210922.pdf (last visited Dec. 4, 2021). The Task Force Guidance requires all "covered contractors"[2] to be fully vaccinated by January 18, 2022,[3] unless they are "legally entitled to an accommodation." Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (Updated November 10, 2021), at p. 5, available at

https://www.saferfederalworkforce.gov/downloads/Guidance%20for%20Federal%20Contractors _Safer%20Federal%20Workforce%20Task%20Force_20211110.pdf (last visited December 4, 2021). The Task Force Guidance applies to all "newly awarded covered contract[s]" at any

---

[2] "Covered contractor" means "a prime contractor or subcontractor at any tier who is party to a covered contract." Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors*, at p. 3.

[3] While the initial Task Force Guidance announced a deadline of December 8, 2021, on November 10, 2021, an updated version was issued which pushed the deadline for full vaccination to January 18, 2022. See Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (Updated November 10, 2021), available at https://www.saferfederalworkforce.gov/downloads/Guidance%20for%20Federal%20Contractors_Safer% 20Federal%20Workforce%20Task%20Force_20211110.pdf (last visited December 4, 2021). This means that covered contractors' employees would need to receive their Johnson & Johnson vaccine or the second dose of a Pfizer or Moderna vaccine by January 4 to be fully vaccinated by the deadline. See The White House, Fact Sheet: Biden Administration Announces Details of Two Major Vaccination Policies, https://www.whitehouse.gov/briefing-room/statementsreleases/2021/11/04/fact-sheet-biden-administration-announces-details-of-two-major-vaccination-policies/ (last visited Dec. 4, 2021).

location where covered contract employees work and it covers "any full-time or part-time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor workplace." Id. at pp. 3–5.

On September 28, the Director of the OMB issued a notice of her determination "that compliance by [f]ederal contractors and subcontractors with the COVID-19 workplace safety protocols detailed in th[e] [Task Force G]uidance will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." 86 Fed. Reg. 53,691–92.

In order to implement the policies and requirements it established, EO 14042 directed the Federal Acquisition Regulatory Council (hereinafter, the "FAR Council") to "amend the Federal Acquisition Regulation to provide for inclusion in Federal procurement solicitations and contracts subject to this order [a] clause" requiring compliance with the Task Force Guidance (including the vaccination requirements). 86 Fed. Reg. 50,986. The Federal Acquisition Regulation (hereinafter, the "FAR") is the set of policies and procedures that governs the drafting and procurement processes of contracts for all executive agencies; it also contains standard solicitation provisions and contract clauses. See United States General Services Administration, Federal Acquisition Regulation (FAR), https://www.gsa.gov/policy-regulations/regulations/federal-acquisition-regulation-far (last visited Dec. 4, 2021).

On September 30, 2021, the FAR Council issued a memo to various agencies, providing direction on when and how to use the new clause, (hereinafter, the "FAR Memo"). See FAR Council Guidance, https://www.whitehouse.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf (last visited Dec. 4,

2021).  The FAR Memo explains that EO 14042 directed the FAR Council to "develop a contract clause requiring contractors and subcontractors . . . to comply with [the Task Force Guidance] and to provide initial policy direction to acquisition offices for use of the clause by recommending that agencies exercise their authority under FAR subpart 1.4, Deviations from the FAR."  Id. at p. 2. According to the FAR Memo, "[t]he FAR Council has opened a case (FAR Case 2021-021, Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors) to make appropriate amendments in the FAR to reflect the requirements of [EO 14042]," id. at p. 3, and it has "developed [a] clause"—which it included as an attachment to the memo—"pursuant to section 3(a) of the order to support agencies in meeting the applicability requirements and deadlines set forth in [EO 14042]," id. at p. 2.  The attachment is entitled "FAR Deviation Clause . . . [52.223-99 Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors . . .]," and it states, inter alia:

> (c) Compliance. The Contractor shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https:/www.saferfederalworkforce.gov/contractors/.

> (d) Subcontracts. The Contractor shall include the substance of this clause, including this paragraph (d), in subcontracts at any tier that exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation 2.101 on the date of subcontract award, and are for services, including construction, performed in whole or in part within the United States or its outlying areas.

Id. at pp. 4–5.  The FAR Memo lists the types of solicitations and contracts in which the agencies "are required to include" the new clause, id. at p. 2 (emphasis added), but it also states that, "[t]o maximize the goal of getting more people vaccinated and decrease the spread of COVID-19, the Task Force strongly encourages agencies to apply the requirements of its guidance broadly,

consistent with applicable law, by including the clause in" other types of contracts that are not otherwise covered by EO 14042, id. at p. 3 (emphasis added).

Plaintiffs filed their Complaint initiating this action on October 29, 2021, (doc. 1), and they filed their initial Motion for Preliminary Injunction on November 5, 2021, (doc. 19).   On November 10, 2021, the OMB Director issued a revised Determination that (1) revoked the prior OMB Determination; (2) provided additional reasoning and support for how the Task Force Guidance will promote economy and efficiency in government contracting; (3) gave covered contractors additional time to comply with the vaccination requirement; and (4) provided a public comment period through December 16, 2021.   See 86 Fed. Reg. 63,418.   In light of the revised OMB Determination, Plaintiffs filed an Amended Complaint, (doc. 54), and an Amended Motion for Preliminary Injunction, (doc. 55).   Meanwhile, the Proposed Intervenors filed their Motion to Intervene as Plaintiffs, (doc. 48), and their Motion for Preliminary Injunction, (doc. 50).   All parties were given an opportunity to file responsive briefs and to present evidence and argument during the hearing on December 3, 2021.

During the hearing, Plaintiffs presented testimony from representatives of three universities within the University System of Georgia: Augusta University, Georgia Institute of Technology (hereinafter, "Georgia Tech"), and the University of Georgia (hereinafter, "UGA"). (See also doc. 55-12, p. 4 (these three institutions' federal contracts generated approximately $736,968,899.00 in revenue in fiscal year 2021).)   These witnesses each testified generally about their respective research institution's participation in and reliance on federal contracting, and they provided data regarding the number of employees who work on federal contracts at their institution and the amount of funds received by their institution as a result of its various federal contracts.

(See, e.g., Transcript of Dec. 3, 2021 Hearing (hereinafter, "Tr."), pp. 22–27 (testimony of Michael Shannon, Vice President and Deputy Chief Business Officer at Georgia Tech, that Georgia Tech has roughly 16,000 employees who work on contracts with the Department of Defense, the Department of Commerce, the Department of Transportation, the Department of Health and Human Services, the National Aeronautics and Space Administration (hereinafter "NASA"), the Centers for Disease Control, and other agencies, and, in fiscal year 2021, it received approximately $664 million in federal contracts, which constitutes approximately 68% of its externally sponsored revenue); id. at pp. 67–70 (testimony of Jason Guilbeault, Director of Post-Award Services at Augusta University, that his institution receives over $17 million per year on federal contracts, which represents about 10% of its total sponsored programs funding, and that it has roughly 5,802 employees working on federal contracts, which represents about 95% of its workforce); id. at p. 93 (testimony of Sige Burden, Senior Managing Director for Workforce Engagement at UGA, that UGA has 14,728 employees working on or in connection with federal contracts.)  They also each provided even more detailed testimony about the laborious undertakings they have had to perform to comply with the mandate, particularly with the impending January 18 deadline.  (See, e.g., id. at pp. 24–27 (testimony of Shannon that Georgia Tech had to "shift a tremendous amount of resources" in order to build a "team comprised of [members of the] information technology [department], [the human resources department], . . . medical and health services folks, [Georgia Tech's] legal team, [and its] emergency services folks" to "very, very rapidly" work to "create something that didn't exist"—a portal to "marry [human resources] data and medical data together"); id. at pp. 70 (testimony of Guilbeault about the data analytics he performed to identify the wide variety of employees who are covered by the mandate, and the software program he has

helped implement to permit employees to log in and enter their vaccination information and a scan of their vaccine card or to log in and submit questions).)  Finally, they testified to having a number of employees who have not yet provided proof they are vaccinated or are in the process of becoming vaccinated, and the concern it causes them that many employees will ultimately decline to be vaccinated, meaning the institution will ultimately be non-compliant and may lose valuable employees.  (See, e.g., id. at pp. 30–33 (about 20% of Georgia Tech's employees who may be covered have not provided proof they are vaccinated); id. at pp. 71–72 (about 39% of Augusta State employees who may be covered have not provided proof); id. at pp. 92–93 (fewer than half of the University of Georgia's employees who may be covered have provided proof of vaccination).)  The Court, which heard testimony from each of these witnesses about their background and job experience and was able to observe them during both direct and cross-examination, found these witnesses to be credible.

## LEGAL AUTHORITY & DISCUSSION

### I.  <u>Motion to Intervene</u>

Pursuant to Federal Rule of Civil Procedure 24(a)(2), a party is permitted to intervene as of right if (1) its application to intervene is timely; (2) it has an interest relating to the property or transaction which is the subject of the action; (3) it is so situated that disposition of the action, as a practical matter, may impede or impair its ability to protect that interest; and (4) its interest is represented inadequately by the existing parties to the suit.  Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship, 874 F.3d 692, 695–96 (11th Cir. 2017).  Where a party is not entitled to intervene as of right, subsection (b) of Federal Rule of Civil Procedure 24 gives a court discretion to nonetheless permit the party to intervene, on timely motion, "when a statute of the United States

confers a conditional right to intervene," or "when [the] applicant's claim or defense and the main action have a question of law or fact in common."  Fed. R. Civ. P. 24(b).  Accordingly, when there is no right to intervene under Rule 24(a), it is wholly within the Court's discretion to allow permissive intervention under Rule 24(b).  Worlds v. Dep't of Health & Rehab. Servs., 929 F.2d 591, 595 (11th Cir. 1991).  Subsection (b) of Rule 24 instructs only that the Court must "consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).

First, the Court finds that ABC, a trade organization representing tens of thousands of contractors and subcontractors that regularly bid on and work on federal contracts for services, (doc. 49-1, pp. 2–3), has an interest relating to the transaction which is the subject of the action.  See N.Y. Pub. Interest Research Grp. v. Regents of Univ. of N.Y., 516 F.2d 350, 352 (2d Cir. 1975) (intervening organizations may properly assert the interests of their members).  That interest is described in detail in Discussion Section II, infra, where the Court explains its conclusion that ABC has standing.  Next, the Court finds that ABC's ability to protect its interests would be impaired without intervention.  In ABC's own words, "in the event that the Proposed Intervenors cannot intervene[,] and this Court issues an adverse decision, the Proposed Intervenors will have no further recourse" and it members will have to comply with EO 14042, (doc. 49, p. 16), which— as explained throughout this Order—the Court finds costly, laborious and likely to result in a reduction in available members of the workforce.  See Huff v. Comm'r of IRS, 743 F.3d 790, 800 (11th Cir. 2014) ("All that is required under Rule 24(a)(2) is that the would-be intervenor be practically disadvantaged by his exclusion from the proceedings.").  Additionally, the Motion to Intervene was timely.  ABC filed its Motion to Intervene roughly twenty days after Plaintiffs filed

suit and prior to any substantive decisions having been made by the Court.  At the time the Motion

to Intervene was filed, Defendants had not yet responded (or been required to respond) to any

substantive requests for relief in the case.  Indeed, the day after ABC filed its Motion to Intervene,

Plaintiffs filed their Amended Complaint (and Amended Motion for Preliminary Injunction),

superseding their prior pleadings.  Finally, the Court finds that ABC's interests are represented

inadequately by the existing Plaintiffs.  ABC represents private entities, many of whom are

considered small businesses, while the Plaintiffs are all governmental officials, entities, and

agencies.  ABC seeks to assert a clam for violation of the Small Business Regulatory Enforcement

Fairness Act, which the existing Plaintiffs have not asserted (and may not be able to assert even if

they desired to do so).  (See doc. 48-1, p. 40.)  Additionally, the evidence presented to the Court

indicates that ABC's members generally bid on and perform different types of contracts as

compared to the wider-ranging types of contracts the Plaintiffs typically bid on and perform, and

Plaintiffs and ABC also have different administrative systems and costs when it comes to

managing their employees and workforce.  Accordingly, ABC's members (as private entities) have

economic interests and concerns that differ from those of the Plaintiffs.[4]  See, e.g., Kleissler v.

United States Forest Serv., 157 F.3d 964, 973–74 (3d Cir. 1988) ("[T]he government represents

numerous complex and conflicting interests in matters of this nature.  The straightforward business

interests asserted by intervenors here may become lost in the thicket of sometimes inconsistent

governmental policies."); W. Energy Alliance v. Zinke, 877 F.3d 1157, 1168 (10th Cir. 2017)

---

[4] As a specific example, one differing interest and strategy that was readily apparent during oral argument
concerned the scope of any preliminary injunction.  The existing Plaintiffs indicated they would be satisfied
if the Court issued a preliminary injunction only effective in Georgia, Alabama, Idaho, Kansas, South
Carolina, Utah and West Virginia, while ABC, whose members work on contracts throughout the country,
urged that any preliminary injunction would need to be nationwide in order to afford it adequate relief.

("Also, we have held that the government cannot adequately represent the interests of a private intervenor and the interests of the public.").

ABC-Georgia, however, has failed to show that it has standing to bring the claims it seeks to assert in its proposed complaint. No evidence was presented to show that any specific member of the chapter would have standing (i.e., no evidence was presented showing that any member regularly bids on or performs contracts that would be covered under EO 14042, much less that any member wishes to bid on any upcoming contracts that would be covered by EO 14042 but believes it cannot feasibly do so due to the vaccine requirement).

In light of the foregoing, the Court finds that ABC is entitled to intervene as of right in this case pursuant to Federal Rule of Civil Procedure 24(a). Even if it were not permitted to intervene as of right, the Court would exercise its discretion pursuant to subsection (b) of Rule 24 to permit it to intervene because, for the reasons described above, its claims and the main action "have a question of law or fact in common," Fed. R. Civ. P. 24(b), and its intervention will not result in any undue delay or prejudice to the adjudication of the original parties' rights. The Court, however, finds that ABC-Georgia lacks standing to assert its claims and thus is not entitled to intervene. Accordingly, the Court **GRANTS IN PART and DENIES IN PART** the Motion to Intervene. (Doc. 48.)

## II.   <u>Standing</u>

"[The] standing doctrine . . . requir[es] plaintiffs to 'alleg[e] such a personal stake in the outcome of the controversy as to . . . justify [the] exercise of the court's remedial powers on [their] behalf.'" <u>Town of Chester, N.Y. v. Laroe Estates, Inc.</u>, 137 S. Ct. 1645, 1650 (2017) (quoting <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 38 (1976)). To establish Article III standing a

plaintiff must show that it: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo v. Robins, 578 U.S. 330, 338 (2016).

Defendants have focused much of their standing challenge on arguing that Plaintiffs have not "provide[d] [any] evidence that they are (1) parties to a federal contract that already has the challenged clause; or (2) parties to an existing covered contract that is up for an option, extension, or renewal that must include the clause," and that they have not "identif[ied] any specific, covered solicitations that they plan to bid on or contracts that they plan to enter into in the immediate future." (Doc. 63, p. 3.) Notably, however, prior to the hearing, Plaintiffs filed the "Supplemental Declaration of Michael Shannon," which shows that Georgia Tech is a finalist in response to a solicitation, in excess of $250,000, issued by NASA. (Hearing Exhibit (hereinafter, "Exh.") P-22 (also available at doc. 76-1).) According to the Declaration (and as confirmed during Mr. Shannon's live testimony at the hearing and supported by exhibits to his Supplemental Declaration), in October 2021, "the solicitation was amended to include Federal Acquisition Regulation (FAR) clause 52.223-99" and "Georgia Tech was required to agree to FAR clause 52.223-99 to maintain its eligibility for the contract award pursuant to the NASA solicitation." (Id.; see also Tr., pp. 23–24, 43) Accordingly, Plaintiff Board of Regents of the University System of Georgia has standing because it has shown that one of its institutions (Georgia Tech) is a finalist for a contract with NASA and it has been advised that, if it is awarded the contract, the at-issue clause must be included in the contract.[5]

---

[5] At the hearing, counsel for Defendants conceded that this bestows at least limited standing to certain Plaintiff(s), but she argued that the standing is "limited to that particular contract." (Tr., pp. 17–18.)

Additionally, ABC, which the Court permits, through this Order, to intervene as a Plaintiff, has standing.  An organization may sue "on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Greater Birmingham Ministries v. Sec'y of Ala., 992 F.3d 1299 (11th Cir. 2021).  ABC, a construction industry trade association, has provided sworn declarations showing that at least two of its members "intended to bid" on specified upcoming federal construction projects, but, following EO 14042, have concluded that it is not practical for them to do so because they likely will not have sufficient employees to perform the job if they enter into a contract that requires all of the covered employees to be vaccinated.  (See Exh. ABC-3 (declaration of President of McKelvey Mechanical, Inc., explaining that his company, which is a member of ABC, "traditionally bids many federal projects per year and usually performs 4–6 per year," but a majority of his employees are not vaccinated and many unvaccinated employees have stated that they will quit if they are required to be vaccinated); see also Exh. ABC-2 (declaration of Executive Vice President of Cajun Industries Holdings, LLC, explaining that there are "a number of forthcoming solicitations by the Army for construction projects of the type that Cajun would normally bid upon and perform, and which [it] desire[s] to bid for" but because the projects would fall under EO 14042, it will likely be unable to bid because it has reason to believe that many of its unvaccinated workers (over half its total workforce) will quit if they are required to be vaccinated).)  ABC also provided evidence—using information gathered from the General Services Administration's Website for federal contracts—that the federal government frequently and routinely issues solicitations and pre-solicitations for bids on

construction contracts (which ABC's members would normally bid on and be qualified to perform) that would be covered by EO 14042. (Exh. ABC-4.) Coupling that evidence with the sworn testimony provided by ABC, the Court finds that ABC has members that would otherwise have standing to sue in their own right. The Court also concludes that, as a trade association for thousands of contractors, the interests ABC seeks to protect in this lawsuit are germane to its purpose. The Court also finds that neither the claims asserted nor the relief requested (declaratory and injunctive relief) require the participation of individual members in the lawsuit. Greater Birmingham Ministries, 992 F.3d at 1316 n.29 ("[P]rospective relief weigh[s] in favor of finding that associational standing exists."). Accordingly, ABC has standing.

It is well-established that, where there are multiple parties petitioning for injunctive relief, "[o]nly one petitioner needs to have standing to authorize review." Massachusetts v. E. P.A., 549 U.S. 497, 498 (2007); see also Town of Chester, 137 S. Ct. at 1650. Here, two parties petitioning for declaratory and injunctive relief (ABC and the Board of Regents of the University System of Georgia) have standing; accordingly, Defendants' challenge to the lawsuit on this ground fails.

Even without these showings about specific bids and/or contracts, the Court would be inclined to find that Article III standing exists based on the ample evidence (including declarations and live testimony presented at the hearing) showing that the State Plaintiffs (including many of their agencies) and members of ABC (as described in the preceding paragraph) routinely enter into contracts that would be covered by EO 14042,[6] have current contracts that could easily fall under

---

[6] According to the Declaration of Bill Anderson, the President and CEO of ABC's Georgia chapter, "[a]ccording to recent data posted on the government website www.usaspending.gov, ABC member general contractors compose a crucial segment of the construction industry's federal contracting base as ABC members won 57% of the $118 billion in direct federal U.S. construction contracts exceeding $25 million

the requirements of EO 14042 (if, for instance, they are renewed, modified, or have options that are exercised), and have shown that they would typically continue to seek out contract opportunities with the federal government that now will be covered by EO 14042. (See, e.g., doc. 55-6 (University of Idaho has federal contracts totaling approximately $22 million per year, based on average of last three years); doc. 55-10 (Utah Department of Health has federal contracts totaling $811,000); doc. 55-14 (Alabama Department of Agriculture and Industries has federal contracts and has leased land to the United States Department of Agriculture continuously for the past 26 years).) See Adarand Contractors, Inc. v. Pena, 515 U.S. 200, 211 (1995) (When a claim involves a challenge to a future contracting opportunity, the pertinent question for determining whether an alleged injury is sufficiently imminent is whether Plaintiffs "ha[ve] made an adequate showing that sometime in the relatively near future [they]will bid on another Government contract [of the type at issue in the case].").

Based on all the foregoing, the Court concludes that Plaintiffs have standing. The Court addresses the parties' debate over whether Plaintiffs have shown a sufficient injury-in-fact at length in Discussion Section III.C, infra, and, for the reasons provided therein, concludes that a sufficient injury has been shown.

## III.   **Motions for Preliminary Injunction**

### A.     **Standard of Review**

To be entitled to a preliminary injunction, Plaintiffs must show: (1) a substantial likelihood of ultimate success on the merits; (2) an injunction or protective order is necessary to prevent

---

awarded during fiscal years 2009–2020."  (Doc. 49-1, p. 4 (citing USASpending.gov data (accessed Dec. 22, 2020) cross-referenced with ABC membership).)

irreparable injury; (3) the threatened injury outweighs the harm the injunction would inflict on the non-movant; and (4) the injunction or protective order would not be adverse to the public interest. Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225–26 (11th Cir. 2005).  In the Eleventh Circuit, an "injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites."  Horton v. City of Augustine, 272 F.3d 1318, 1326 (11th Cir. 2001).  If a plaintiff succeeds in making such a showing, then "the court may grant injunctive relief, but the relief must be no broader than necessary to remedy the constitutional violation." Newman v. Alabama, 683 F.2d 1312, 1319 (11th Cir. 1982).

### B.   Likelihood of Success on the Merits

The likelihood of success on the merits is generally considered the most important of the four factors.  Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986).  If Plaintiffs cannot satisfy their burden with respect to this factor, the Court need not consider the other three factors. GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs, 788 F.3d 1318, 1329 (11th Cir. 2015). Although Plaintiffs raise multiple claims against Defendants, Plaintiffs need only show a substantial likelihood of success on the merits on one claim.  See Schiavo, 357 F. Supp. 2d at 1383, *aff'd* 403 F.3d 1223 (11th Cir. 2005) (noting that "[t]o obtain temporary injunctive relief, [the plaintiffs] must show a substantial likelihood of success on at least one claim").

### 1.   Whether the Procurement Act Authorized the President to Issue EO 14042

The President expressly relied on the Federal Property and Administrative Services Act, 40 U.S.C. § 101 et seq. (hereinafter, the "Procurement Act"), for his authority to issue EO 14042 "in order to promote economy and efficiency in procurement by contracting with sources that provide adequate COVID-19 safeguards for their workforce."  86 Fed. Reg. 50,985–88.  The

Procurement Act was "designed to centralize Government property management and to introduce into the public procurement process the same flexibility that characterizes such transactions in the private sector.  These goals can be found in the terms 'economy' and 'efficiency' which appear in the statute and dominate the sparse record of the congressional deliberations." Am. Fed'n of Labor and Congress of Indus. Orgs. v. Kahn, 618 F.2d 784, 787–88 (D.C. Cir. 1979).[7]  In Khan, the Court of Appeals for the District of Columbia Circuit examined the history of and apparent congressional intent behind the Procurement Act, and stated its belief that, "by emphasizing the leadership role of the President in setting Government-wide procurement policy on matters common to all agencies, Congress intended that the President play a direct and active part in supervising the Government's management functions." Id. at 788.  The court acknowledged that, "To define the President's powers under Section 205(a) [(40 U.S.C. § 121(a))], some content must be injected into the general phrases 'not inconsistent with' the [Procurement Act] and 'to effectuate the provisions' of the Act." Id.   After considering the Procurement Act's emphasis on promoting "economy" and "efficiency" and ensuring contracts are awarded on terms that are "most advantageous to the Government, price and other factors considered," the Kahn court stated that the Procurement Act "grants the President particularly direct and broad-ranging authority over those larger administrative and management issues that involve the Government as a whole.  And that direct presidential authority should be used in order to achieve a flexible management system capable of making sophisticated judgments in pursuit of economy and efficiency." Id. at 789.

---

[7]  The Court has been unable to find—and the parties have not pointed to—any relevant case law from the Court of Appeals for the Eleventh Circuit grappling with the scope of the authority granted to the President in the Procurement Act.

While the Procurement Act explicitly and unquestionably bestows some authority upon the President, the Court is unconvinced, at this stage of the litigation, that it authorized him to direct the type of actions by agencies that are contained in EO 14042.  Pursuant to clear United States Supreme Court precedent, Congress is expected to "speak clearly" when authorizing the exercise of powers of "vast economic and political significance."  <u>Ala. Ass'n of Realtors v. HHS</u>, 141 S. Ct. 2485, 2489 (2021) (quotations omitted); <u>see also</u> <u>Utility Air Regul. Grp. v. E.P.A.</u>, 573 U.S. 302, 324 (2014).  The Court has already described in detail the extreme economic burden the Plaintiffs have suffered and will continue to suffer in endeavoring to comply with EO 14042 (not to mention the impediment it will likely pose to some Plaintiffs' (in particular, ABC's members') ability to continue to perform federal contract work).  Additionally, the direct impact of EO 14042 goes beyond the administration and management of procurement and contracting; in its practical application (requiring a significant number of individuals across the country working in a broad range of positions and in numerous different industries to be vaccinated or face a serious risk of losing their job), it operates as a regulation of public health.  It will also have a major impact on the economy at large, as it limits contractors' and members of the workforce's ability to perform work on federal contracts.  Accordingly, it appears to have vast economic and political significance.

The issue, then, is whether Congress, through the Procurement Act, has "clearly" authorized the President to issue the directives contained in EO 14042, or whether, instead, EO 14042 "bring[s] about an enormous and transformative expansion in . . . regulatory authority without clear congressional authorization," <u>Utility Air Regul. Grp.</u>, 573 U.S. at 324.  Looking to the <u>Kahn</u> court for guidance, the Court considers whether EO 14042 fits within Congress's grant

to the President, through the Procurement Act, of "particularly direct and broad-ranging authority over those larger *administrative and management issues . . . that . . .* should be used in order *to achieve a flexible management system* capable of making sophisticated judgments in pursuit of economy and efficiency." Kahn, 618 F.2d at 789 (emphases added).  The Court finds that Plaintiffs have a likelihood of proving that Congress, through the language it used, did not clearly authorize the President to issue the kind of mandate contained in EO 14042, as EO 14042 goes far beyond addressing administrative and management issues in order to promote efficiency and economy in procurement and contracting, and instead, in application, works as a regulation of public health,[8] which is not clearly authorized under the Procurement Act.[9]

---

[8]  During oral argument, counsel for Defendants urged that vaccine mandates are needed in order to "efficiently manage our way out of this pandemic."  (Tr., p. 153.)  However, the issue here is far more nuanced and requires a finding that *Congress* clearly gave the *President* authority to require all individuals who work on or in connection with a federal contract (valued over $250,000) to be fully vaccinated against COVID-19.

[9]  The Court acknowledges that, one day prior to the entry of this Order, the Eleventh Circuit Court of Appeals issued an opinion, in a separate case, refusing to preliminarily enjoin enforcement of an interim rule issued by the Secretary of Health and Human Services requiring facilities that provide health care to Medicare and Medicaid beneficiaries to ensure that their staff are fully vaccinated  against  COVID-19. See Florida v. Dep't of Health and Human Servs, No. 21-14098-JJ, 2021 WL 5768796, at *1 (11th Cir. Dec. 6, 2021), available at .  Defendants in this case notified the Court that the Florida opinion "supplements their merits arguments" (though they neglected to elaborate as to how), but the Court finds the case at hand to be materially different, in numerous ways, from the case before the Eleventh Circuit.  First, in the Florida opinion, the court addressed very different statutory and regulatory schemes, the Medicare and Medicaid statutes and the regulations governing conditions for facilities to participate in those programs. Id. at *1– 2.  Nothing in the Florida case bears on whether the President is authorized, under his authority pursuant to the Procurement Act, to require private companies that enter into federal contracts to, in turn, require virtually all of their employees to be vaccinated.  Additionally, in the Florida case and unlike in the case at hand, the challenged directive is similar to the authorizing statutes, because they "both directly relate to efforts to prevent the spread of disease at facilities treating Medicare or Medicaid patients to protect the health and safety of those patients." Id. at *13; see also id. at *1–2 ("For both the Medicare and Medicaid programs, Congress charged the Secretary with ensuring that participating facilities protect the health and safety of their patients," and the at-issue interim rule issued by the Secretary "amend[ed] the infection-control regulations for facilities that participate in Medicare or Medicaid . . . [to] require[] that facilities certified to participate in Medicare or Medicaid ensure their staff are fully vaccinated against COVID-19, unless an employee is exempt . . . .").  By contrast, here, while EO 14042 relates to efforts to prevent the spread of disease in any place an individual is working on or in connection with a federal contract, the at-issue claimed authorizing statute relates to the President's authority to take actions to "achieve a flexible

Even if, however, EO 14042 did not trigger the specific requirement that Congress "speak clearly" in authorizing the challenged executive action, the Court additionally finds that Plaintiffs have a likelihood of proving that EO 14042 does not have a sufficient nexus to the purposes of the Procurement Act and thus does not fall within the authority actually granted to the President in that Act.

For essentially the same reasons recited in the preceding subsection, the Court finds that the directives contained within EO 14042 were not authorized by the Procurement Act. Defendants claim that, "[t]o anyone who has lived through the COVID-19 pandemic and its resulting economic turmoil, the nexus between reducing the spread of COVID-19 and economy and efficiency is self-evident." (Doc. 63, p. 16.) They emphasize EO 14042's explanation that "[the] safeguards [in the Task Force Guidance] will decrease the spread of COVID-19, which will decrease work absence, reduce labor costs, and improve the efficiency of contractors and subcontractors" and they argue that this "easily satisfies [the] lenient standard" of a sufficiently close nexus between the executive order and the purpose of the Procurement Act. (Id. (quoting 86 Fed. Reg. 50,985–88).) Defendants are correct that the President has typically been afforded deference when courts review executive orders issued pursuant to the Procurement Act. See, e.g., Chamber of Com. v. Reich, 74 F.3d 1322, 1333 (D.C. Cir. 1996) ("The President's authority to pursue 'efficient and economic' procurement . . . certainly reach[es] beyond any narrow concept

---

management system capable of making sophisticated judgments in pursuit of economy and efficiency" in government procurement and contracting, see Kahn, 618 F.2d at 789. Put simply, the authorizing statute in the Florida case authorized the executive to implement a health and safety measure while the relied upon statute in this case does not. The differing results in this case, the Florida case, and other cases challenging governmental actions to address the COVID-19 pandemic underscore the point that the focus of these cases is not on the effectiveness of vaccines and other measures but rather the legality of the Government's actions.

of efficiency and economy in procurement.") (collecting examples).  However, that deference was

expressly *not* intended to operate as "a blank check for the President to fill in at his will."  Kahn,

618 F.2d at 793.  The President's directives still must be "*reasonably* related" to the purposes of

the Procurement Act, Liberty Mut. Ins. Co. v. Friedman, 639 F.2d 164, 170 (4th Cir. 1981)

(emphasis added), and Defendants have not cited to a case upholding the use of the Procurement

Act "to promulgate such a wide and sweeping public health regulation as mandatory vaccination

for all federal contractors and subcontractors," Kentucky v. Biden, 2021 WL 5587446, at *9.  Nor

have Defendants cited to a case upholding some action or requirement undertaken pursuant to the

Procurement Act that the Court finds analogous to the mandates in EO 14042.  While the Court is

aware of cases where courts have held that a variety of types of executive orders were authorized

under the Procurement Act, none have involved measures aimed at public health and none have

involved the level of burdens implicated by EO 14042, which has already required and will

continue to require extensive and costly administrative work by employers and will force at least

some individuals to choose between getting medical treatment that they do not want or losing their

job (and facing limited job replacement options due to the mandate).  Cf. UAW-Labor Emp. &

Training Corp. v. Chao, 325 F.3d 360, 366–67 (D.C. Cir. 2003) (sufficiently close nexus between

Procurement Act and executive order requiring federal contractors to post notices at all of their

facilities informing employees of rights under federal labor law that protect employees from being

forced to join a union or to pay mandatory dues for costs unrelated to representational activities);

Kahn, 618 F.2d at 786–87 (sufficiently close nexus between Procurement Act and executive order

that required certain federal contractors to comply with wage and price controls).  Following the

Defendants' logic and reasoning, the Procurement Act would be construed to give the President

the right to impose virtually any kind of requirement on businesses that wish to contract with the Government (and, thereby, on those businesses' employees) so long as he determines it could lead to a healthier and thus more efficient workforce or it could reduce absenteeism.  Simply put, EO 14042's directives and resulting impact radiate too far beyond the purposes of the Procurement Act and the authority it grants to the President.  Accordingly, the Court concludes, based on the limited record before it, that Plaintiffs are more likely than Defendants to succeed on the issue of whether there is a sufficiently close nexus between EO 14042 and the purposes of the Procurement Act.

## 2.    Other Grounds Upon Which Plaintiffs Challenge EO 14042

In further support of their request for a preliminary injunction, Plaintiffs also claim that Defendants issued the Task Force Guidance and the FAR Deviation Clause, which they claim constitute final agency action, without complying with the Administrative Procedure Act's notice-and-comment requirements.  (Doc. 55, pp. 17–22.)  The Court declines to wade into this issue given its determination that Plaintiffs have a likelihood of success on the merits on other grounds.

Additionally, Plaintiffs allege that, if the Procurement Act does indeed authorize the directives issued in EO 14042, then the Procurement Act and EO 14042 are unconstitutional under the non-delegation doctrine and because they exceed Congress's authority and intrude on state sovereignty.  This Court need not and does not issue any determination as to those challenges to resolve the motions before it.  However, it is worth noting that other Courts have either expressed agreement with or at least concern about these arguments, see, e.g., BST Holdings, LLC v. Occupational Safety and Health Admin., 17 F.4th 604, 616–18 (5th Cir. 2021); Kentucky, 2021 WL 5587446, at *9.

C.      **Irreparable Injury Requirement**

In order to satisfy the irreparable injury requirement, a party must show that the threat of injury is "neither remote nor speculative, but actual and imminent." Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 973 (2d Cir. 1989)); see also Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir. 1994) (In order to obtain injunctive relief, a plaintiff must show "a real and immediate—as opposed to a merely conjectural or hypothetical— threat of future injury.").

Defendants argue that losing contracts would not be irreparable harm—because there are administrative processes through which Plaintiffs can seek to challenge the contractual provision and to recover losses on contracts—and they claim that Plaintiffs have not "demonstrated that the compliance costs they claim to have incurred are in fact tied to such contracts."  (Doc. 63, p. 4.) As referenced previously in this Order, the Court heard from three witnesses who described the incredibly time-consuming processes they have undertaken (typically requiring major input and assistance from numerous other departments across their institution) to identify the employees covered by the mandate and to implement software and technology to ensure that those employees have been fully vaccinated (or have requested and been granted an accommodation or exemption) by the deadline in January.  Not only must Plaintiffs ensure that their own employees satisfy the mandate, but they also must require that any subcontractors' employees working on or in connection with a covered contract are in compliance.  The declarations of representatives of ABC members Cajun Contracting and McKelvey show similar administrative burdens and costs— though on a smaller scale.  (See Exhs. ABC-2, ABC-3.)  Moreover, "complying with a regulation

later held invalid almost always produces the irreparable harm of nonrecoverable compliance." BST Holdings, 17 F.4th at 618 (citing Texas v. EPA, 829 F.3d 405, 433 (5th Cir. 2016)). The Court finds that the time and effort spent on these measures in the past—and going forward—constitute compliance costs resulting from EO 14042, which appear to be irreparable. See id. ("[T]he companies seeking a stay in this case will also be irreparably harmed in the absence of a stay, whether by the business and financial effects of a lost or suspended employee, compliance and monitoring costs associated with the Mandate, [or] the diversion of resources necessitated by the Mandate . . . ."); see also Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d at 1289 ("[N]umerous courts have held that the inability to recover monetary damages . . . renders the harm suffered irreparable.").

**D.   Balancing of the Harms**

Defendants contend that, even assuming Plaintiffs have shown a risk of irreparable injury, no injunction should issue because more harm would result from enjoining EO 14042 and further delaying the vaccination of the thousands of currently-unvaccinated individuals working on federal contracts (thereby permitting the continued spread of COVID-19). The Court disagrees. Enjoining EO 14042 would, essentially, do nothing more than maintain the status quo; entities will still be free to encourage their employees to get vaccinated, and the employees will still be free to choose to be vaccinated. In contrast, declining to issue a preliminary injunction would force Plaintiffs to comply with the mandate, requiring them to make decisions which would significantly alter their ability to perform federal contract work which is critical to their operations. Indeed, it appears that not granting an injunction could imperil the financial viability of many of ABC's members. Additionally, requiring compliance with EO 14042 would likely be life altering for many of

Plaintiffs' employees as Plaintiffs would be required to decide whether an employee who refuses to be vaccinated can, in practicality, be reassigned to another office or another task or whether the employee instead must be terminated.  "[A]ny abstract 'harm' a stay might cause . . . pales in comparison and importance to the harms the absence of a stay threatens to cause countless individuals and companies." BST Holdings, 17 F.4th at 618.  Accordingly, the Court finds that the balancing of the harms weighs heavily in favor of enjoining the enforcement of EO 14042.

### E.   Public Interest

"For similar reasons, a stay is firmly in the public interest.  From economic uncertainty to workplace strife, the mere specter of [EO 14042] has contributed to untold economic upheaval in recent months" and "the principles at stake when it comes to [EO 14042] are not reducible to dollars and cents." Id. at 619.

### F.   Scope of Injunctive Relief

The Court now must determine the appropriate scope of the injunctive relief.  Generally, the Court treads lightly when issuing injunctive relief and resists the entry of "universal" or "nationwide" injunctions, and recognizes the need to "allow legal questions to percolate through the federal court system," Kentucky, 2021 WL 5587446, at *14 (citing Trump v. Hawaii, 138 S. Ct. 2392, 2424 (2018) (Thomas, J., concurring) and Dep't of Homeland Sec. v. New York, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring)).  While the original Plaintiffs to this case are (or are based in) a limited number of states, the Court has, in this Order, permitted ABC, a trade association with members "all over the country," (doc. 50-1, p. 3), to intervene as a Plaintiff.  Not only is the geographic scope of ABC's membership broad, their involvement in federal contracts is as well.  As noted above, they were awarded 57% of federal contracts exceeding $25 million

during fiscal years 2009–2020.  Accordingly, if the Court were to enjoin the enforcement of the mandate only in the Southern District of Georgia or only in Georgia, Alabama, Idaho, Kansas, South Carolina, Utah and West Virginia, then ABC's members would not have injunctive relief as to covered contracts in other states.[10]  Furthermore, given the breadth of ABC's membership, the number of contracts Plaintiffs will be involved with, and the fact that EO 14042 applies to subcontractors and others, limiting the relief to only those before the Court would prove unwieldy and would only cause more confusion.  Thus, on the unique facts before it, the Court finds it necessary, in order to truly afford injunctive relief to the parties before it, to issue an injunction with nationwide applicability.

## CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART and DENIES IN PART** the Motion to Intervene, (doc. 48), **GRANTS** ABC's Motion for Preliminary Injunction, (doc. 50), and **GRANTS** Plaintiffs' Amended Motion for Preliminary Injunction, (doc. 55).[11]  Accordingly, the Court **ORDERS** that Defendants are **ENJOINED**, during the pendency of this action or until further order of this Court, from enforcing the vaccine mandate for federal contractors and subcontractors in all covered contracts in any state or territory of the United States of America. The Court further **DIRECTS** the Clerk of Court to **UPDATE** the docket to reflect the addition of Associated Builders and Contractors, Inc., as a Plaintiff in this case.  Because the proposed

---

[10] The Court is mindful of the fact that at least some of ABC's members are already able to benefit from the injunctive relief recently afforded by the District Court for the Eastern District of Kentucky as to covered contracts in Kentucky, Ohio, and Tennessee.  See Kentucky, 2021 WL 5587446, at *14.

[11] Plaintiffs' initial Motion for Preliminary Injunction, which was superseded by the Amended Motion for Preliminary Injunction that they later filed, is **DENIED AS MOOT**.  (Doc. 19.)

Complaint filed on the docket includes ABC-Georgia (which has not been allowed to intervene) as a plaintiff, the Court **ORDERS** Associated Builders and Contractors, Inc., to file a revised version of its Complaint within **SEVEN (7) DAYS**.

      **SO ORDERED**, this 7th day of December, 2021.

 

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA