# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| THE STATE OF GEORGIA, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ASSOCIATED BUILDERS AND | ) | |
| CONTRACTORS, INC., | ) | |
| | ) | Case 1:21-cv-00163-RSB-BKE |
| *Plaintiff-Intervenor,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH R. BIDEN in his official capacity | ) | |
| as President of the United States; | ) | |
| et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## PLAINTIFF-INTERVENOR'S
## COMPLAINT FOR DECLARATORY AND
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

1.      "The Occupational Safety and Health Administration (OSHA) "reasonably determined" in June 2020 that an emergency temporary standard (ETS) was "not necessary" to "protect working people from occupational exposure to infectious disease, including COVID-19." In re AFL-CIO, 2020 U.S. App. LEXIS 18562, 2020 WL 3125324, at *1 (D.C. Cir. June 11, 2020)." *BST Holdings, L.L.C. v. OSHA*, 2021 U.S. App. LEXIS 33698, *4-5.

2.     "After the President voiced his displeasure with the country's vaccination rate in September, the Administration pored over the U.S. Code in search of authority, or a "work-around," for imposing a national vaccine mandate." *Id* at * 12 -13 (cleaned up).

3.     One of the "work-arounds" is an executive order that required federal departments and agencies to mandate all of their federal contractors to fully vaccinate their workforce. Without any direct legislation from Congress to impose a mandatory COVID 19 vaccine, the President turned to the Federal Property and Administrative Services Act (the "Procurement Act") as a basis to impose a mandatory vaccine on as many individuals by issuance of the Executive Order 14042.

4.     For construction companies that work on federal contracts, this situation is untenable. This mandate puts billions of contracting dollars in peril. During the period of fiscal years 2009 – 2020, direct federal U.S. construction contracts exceeding $25 million totaled approximately $118 billion. (Declaration of Bill Anderson Para. 8; Doc. 49-01.) The number and amount of such contracts is continuing in nature and is expected to expand in the coming fiscal year due to recent enactment of the Infrastructure Bill. (Id. at Para. 9.) Absent judicial relief, all of the new contracts, and many existing contracts, will imminently be required to include FAR Clauses implementing the vaccination mandate for federal contractors and their subcontractors at every tier.

5.     At its core, the mandate forces federal contractors to make an impossible choice: either (1) take enforcement action that may include termination or resignation

of a substantial percentage of unvaccinated employees, and extremely burdensome compliance costs; or (2) collectively face losing billions of dollars in federal contracting opportunities, or else risk being found to be in breach or default of contractual obligations.

6.      Plaintiff-Intervenor, Associated Builders and Contractors, Inc. ("ABC") has intervened in this action to stop this unprecedented and unconstitutional use of power by the federal government, and to end the nationwide confusion and disruption that the mandate will cause if it is allowed to take effect.

## PARTIES

7.      Plaintiff State of Georgia is a sovereign state with many agencies that are federal contractors.

8.      Plaintiff State of Alabama is a sovereign state with many agencies that are federal contractors.

9.      Plaintiff State of Idaho is a sovereign state with many agencies that are federal contractors.

10.     Plaintiff State of Kansas is a sovereign state with many agencies that are federal contractors.

11.     Plaintiff State of South Carolina is a sovereign state with many agencies that are federal contractors.

12.     Plaintiff State of Utah is a sovereign state with many agencies that are federal contractors.

3

13.     Plaintiff State of West Virginia is a sovereign state with many agencies that are federal contractors.

14.     Plaintiff Brian P. Kemp is named in his official capacity as Governor of the State of Georgia and appears on behalf of the State of Georgia.

15.     Plaintiff Kay Ivey is named in her official capacity as Governor of the State of Alabama and appears on behalf of the State of Alabama.

16.     Plaintiff Brad Little, in his official capacity as Governor of the State of Idaho, has an interest in preventing the loss of federal funding that will result as a direct consequence of the Contractor Mandate. Additionally, the Governor has an interest in ensuring that all State laws, including the Idaho Constitution and Idaho Statutes, are executed, rather than subverted through federal overreach.

17.     Plaintiff Henry McMaster is named in his official capacity as Governor of the State of South Carolina and appears on behalf of the State of South Carolina.

18.     Plaintiff Board of Regents of the University System of Georgia was established in 1931 as a part of a reorganization of Georgia's state government. The Georgia Constitution grants to the Board of Regents the exclusive right to govern, control, and manage the University System of Georgia, an educational system comprised of twenty-six institutions of higher learning including universities with extensive research institutions such as Augusta University, the Georgia Institute of Technology, Georgia State University, and the University of Georgia.

19.     Plaintiff Gary W. Black is named in his official capacity as Commissioner of the Georgia Department of Agriculture.

20.    Plaintiff Alabama Department of Agriculture and Industries is a state agency responsible for serving farmers and consumers of agricultural projects.

21.    Plaintiff Alabama Department of Rehabilitation Services is the state agency primarily responsible for serving Alabamians with disabilities.

22.    Plaintiff Alabama Department of Public Health is the state agency primarily responsible for serving Alabamians' public health needs.

23.    Plaintiff Idaho State Board of Education appears in its capacity as Regents of the University of Idaho, Board of Trustees of Boise State University, Board of Trustees of Idaho State University, and Board of Trustees of Lewis-Clark State College.

24.    Plaintiff-Intervenor Associated Builders and Contractors, Inc. ("ABC"), is a nationwide construction industry trade association representing more than 21,000 members performing work throughout the United States, many of whom regularly perform federal contracts covered by the new mandate. ABC's membership represents most specialties within the construction industry and is comprised primarily of firms that perform work in the industrial and commercial sectors. ABC as a whole represents many private businesses that regularly bid on and are awarded federal government contracts of the type covered by the unprecedented vaccination mandates imposed by Executive Order 14042, as implemented by the Safer Federal Workforce Task Force Guidance, the Office of Management and Budget, and the Federal Acquisition Regulatory Council, all of which are being challenged in the above-captioned litigation. (Dec. Anderson Paras. 2 – 4; Doc. 49-01.)

25.     ABC has standing to pursue this action on behalf of its federal contractor members under the three-part test of *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), because (1) ABC's federal contractor members would otherwise have standing to sue in their own right as they are directly and irreparably injured in their ability to be awarded and perform federal contracts by the challenged mandate Anderson Dec. Doc. 49-01; see also Graugnard Dec. Doc. 78-1 and McKelvey Dec. Doc. 78-2, representative of the direct and irreparable harms which many more ABC members throughout the country will suffer if the Federal Contractor Mandate is allowed to take effect; (2) the interests at stake in this case are germane to ABC's organizational purposes which include the support of fair and open competition in the construction industry, which is plainly injured by the challenged mandate; and (3) neither the claims asserted nor the relief requested requires the participation of ABC's federal contractor members.

26.     ABC members won 57% of the $118 billion in direct federal U.S. construction contracts exceeding $25 million awarded during fiscal years 2009 – 2020. It is undisputed that innumerable government construction contracts of the same or similar nature have been or are imminently about to be solicited and awarded with the new Mandate imposed via the FAR clauses at issue in this case. If ABC's member contractors are forced to comply with the challenged mandate in order to be awarded such covered federal contracts, many of them will be unable to perform the awarded contracts because a significant percentage of their vaccine-resistant workers will quit

or have to be terminated or placed on extended leaves of absence rather than be vaccinated.

27.     According to published reports, there is already a shortage of 430,000 construction workers needed to fulfill existing demands for construction in the U.S. The shortage is expected to grow larger as a result of the recently passed Infrastructure Bill. If even a small percentage of the existing construction workforce ceases employment due to the vaccine mandate, exacerbating the existing shortage, then the much-needed construction projects of the federal government will be greatly impaired in their performance due to the greatly reduced number of fully staffed contractors and subcontractors able to compete for and perform such projects.

28.     It is also well known that construction industry workforces are uniquely transitory and temporary, compared to other industries. Anderson Dec. No. 49-1. Any vaccine-resistant worker who wants to avoid vaccination as a condition of employment by a government contractor, can readily obtain employment with a contractor who does not perform government contracts, and/or is not covered by the OSHA ETS mandate or test policy, particularly during the current labor shortage.

29.     OMB speculates that the number of workers who will quit rather than become vaccinated will be less than predicted, based on isolated experiences of businesses in industries other than construction, and ignoring public reports of large numbers of employees who have already resigned or been terminated from employment in both the private and public sector. But ABC's members have no need to speculate. Many of them have been informed by significant percentages of their

employees in no uncertain terms that the employees will resign or be terminated rather than be vaccinated. Graugnard Dec. at 6, Doc. 78-1; McKelvey Dec. at 5, Doc. 78-2; See also Anderson Dec. 49-1. The Mandate will also impose unrecoverable compliance costs ABC member contractors relating to recordkeeping, tracking, testing, and accommodation requirements.

30.     For each of these reasons, the challenged federal contractor mandate will cause irreparable harm to ABC's members and will increase costs and undermine economy and efficiency in federal contracting. An August 2021 ABC survey of its federal contractor members found that 77 of survey respondents said vaccine mandates will increase costs on federal construction projects. Just 1.2% of respondents said vaccine mandates will decrease costs. In addition, the survey results indicated that a vaccine mandate on federal contractor employees would decrease competition for government contracts, with 49% of survey participants saying they would be less likely to bid on federal contracts subjected to vaccine requirements.

31.     Defendant Joseph R. Biden is the 46th President of the United States who, on September 9, 2021, signed Executive Order 14042, titled Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors ("EO 14042").

32.     Defendant Safer Federal Workforce Task Force (the "Task Force") was established pursuant to President Biden's Executive Order 13991 (86 Fed. Reg. 7045 (Jan. 25, 2021)).

33.     Director of the Office of Personnel Management ("OPM"); (2) the Administrator of the General Services Administration ("GSA"); and (3) the COVID–19 Response Coordinator. The Director of OPM is also a member of the Task Force.

34.     Defendant Office of Personnel Management Director, Kiran Ahuja ("Director Ahuja"), is a co-chair and member of the Task Force and represents the federal agency responsible for managing human resources for civil service of the federal government.

35.     Defendant Administrator of General Services, Robin Carnahan (the "GSA Administrator"), is a co-chair and member of the Task Force and represents the federal agency responsible for managing and supporting the basic functioning of federal agencies.

36.     Defendant COVID–19 Response Coordinator, Jeffrey Zients (the "COVID-19 Response Coordinator"), is a co-chair and member of the Task Force.

37.     Defendant Office of Management and Budget Director, Shalanda Young (the "OMB Director"), is a member of the Task Force and represents the federal agency with delegated authority, by President Biden, to publish determinations relevant to EO 14042 and the Task Force Guidance to the Federal Register.

38.     Defendant Director of the Federal Protective Service, L. Eric Patterson (the "FPS Director"), is a member of the Task Force.

39.     Defendant Director of the United States Secret Service, James M. Murray (the "Secret Service Director"), is a member of the Task Force.

40.     Defendant Director of the Federal Emergency Management Agency, Deanne Criswell (the "FEMA Director"), is a member of the Task Force.

41.     Defendant Director of the Center for Disease Control, Rochelle Walensky (the "CDC Director"), is a member of the Task Force.

42.     Defendant Office of Management and Budget ("OMB") is an agency of the United States government.

43.     Defendant Office of Personnel Management ("OPM") is an agency of the United States government.

44.     Defendant United States Department of Health and Human Services ("DHHS") is an agency of the United States government.

45.     Defendant General Services Administration ("GSA") is an agency of the United States government, located within DHHS.

46.     Defendant United States Department of Defense ("DOD") is an agency of the United States government.

47.     Defendant United States Secretary of Defense, Lloyd Austin, is named in his official capacity as the United States Secretary of Defense.

48.     Defendant United States Department of Health and Human Services ("DHHS") is an agency of the United States government.

49.     Defendant United States Secretary of Health and Human Services, Xavier Becerra, is named in his official capacity as the United States Secretary of Health and Human Services.

50. Defendant National Institutes of Health ("NIH") is an agency of the United States government, located within DHHS.

51. Defendant NIH Director, Francis S. Collins, is named in his official capacity as the Director of the NIH.

52. Defendant United States Department of Veterans Affairs ("DVA") is an agency of the United States government.

53. Defendant United States Secretary of Veterans Affairs, Denis McDonough, is named in his official capacity as the United States Secretary of Veterans Affairs.

54. Defendant National Science Foundation ("NSF") is an agency of the United States government.

55. Defendant Director of the NSF, Sethuraman Panchanathan, is named in his official capacity as the Director of the NSF.

56. Defendant United States Department of Commerce ("DOC") is an agency of the United States government.

57. Defendant United States Secretary of Commerce, Gina Raimondo, is named in her official capacity as the United States Secretary of Commerce.

58. Defendant National Aeronautics and Space Administration ("NASA") is an agency of the United States government.

59. Defendant Administrator of the NASA, Bill Nelson, is named in his official capacity as the Director of the NASA.

60.    Defendant United States Department of Transportation ("DOT") is an agency of the United States government.

61.    Defendant Director of the DOT, Richard Chávez, is named in his official capacity as the Director of the DOT.

62.    Defendant United States Department of Energy ("DOE") is an agency of the United States government.

63.    Defendant United States Secretary of Energy, Jennifer Granholm, is named in her official capacity as the United States Secretary of Energy.

## STATEMENT OF JURISDICTION AND VENUE

64.    This Court has exclusive jurisdiction over this case under 28 U.S.C. §§ 1331 and 1346 because Plaintiff-Intervenor's claims arise under the Administrative Procedure Act, 5 U.S.C. §§ 702–703, and the UNITED STATES CONSTITUTION, U.S. CONST. Art. III, § 2.

65.    This Court is authorized to grant the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, and 28 U.S.C. §§ 2201–02.

66.    Venue is proper within this District pursuant to 28 U.S.C. § 1391(e)(1) because (1) Defendants are Officers, Employees and Agencies of the United States, see *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018), and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

## FACTUAL ALLEGATIONS

### Executive Order 14042 and the
### Safer Federal Workforce Task Force Guidelines

67.     On September 9, 2021, President Biden signed Executive Order 14042,

titled Executive Order on Ensuring Adequate COVID Safety Protocols for Federal

Contractors ("EO 14042"), a true and accurate copy is found at Doc. 1-1, (Exhibit A).

68.     EO 14042 purports to "promote economy and efficiency in Federal

procurement by ensuring that the parties that contract with the Federal Government

provides adequate COVID-19 safeguards to their workers performing on or in

connection with a Federal Government contract or contract-like instrument." Doc. 1-

1 at 1.

69.     EO 14042 claims that "ensuring that Federal contractors and

subcontractors are adequately protected from COVID-19 will bolster economy and

efficiency in Federal procurement." Doc. 1-1 at 1.

70.     EO 14042 directs executive agencies subject to the Federal Property and

Administrative Services Act (the "Procurement Act") to include in all federal

contracts and "contract-like instruments" a clause that contractors and

subcontractors will comply with all future guidance issued by the Task Force.

71.     EO 14042 requires that the Task Force issue specific COVID safety

protocols by September 24, 2021.

72.     On September 24, 2021, the Task Force released its COVID-19

Workplace Safety: Guidance for Federal Contractors and Subcontractors (the "Task

Force Guidance") to federal agencies, imposing a vaccine mandate on federal

13

contractors and subcontractors, a true and accurate copy is found at Doc. 1-2, (Exhibit B).

73.     The September 24, 2021 Task Force Guidance, was amended on November 10, 2021 (Nov. Task Force Guidance). Doc. 54-3 (Exhibit C).

74.     EO 14042 further required that the Director of OMB publish a determination in the Federal Register as to "whether such Guidance will promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors." Doc. 1-1 at 2.

75.     On September 28, 2021, Director Young published the OMB's Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042 (the "September OMB Determination") stating in conclusory fashion "I have determined that compliance by Federal contractors and subcontractors with the COVID-19-workplace safety protocols detailed in that guidance will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." 86 Fed. Reg. 53,691 (Sept. 28, 2021), a true and correct copy is found at Doc. 1-3, (Exhibit C).

76.     The September OMB Determination contained no research or data in support of its claims. Moreover, the September OMB Determination underwent no notice-and-comment period.

77.     A second OMB Determination was issued on November 16, 2021, 86 Fed. Reg. 63,418 (Nov. 16, 2021) (Nov. OMB Determination) (Doc. 54-5, Exhibit E). The

Nov. OMB Determination purports to be effective immediately and provides a thirty-day notice and comment period. The OMB Director purported to make the Nov. OMB Determination effective immediately based on a waiver of the ordinary sixty-day notice and comment period.

78.     Through EO 14042 and without legislative intervention, the President purported to give the Task Force, the OMB Director, and various federal agencies broad authority to impose vaccine mandates on federal contractors.

79.     While EO 14042 did not specifically call for a vaccine mandate, it did purport to delegate rulemaking authority to the Task Force, OMB, and the Federal Acquisition and Regulatory Council (the "FAR Council").

80.     On September 30, 2021, the FAR Council issued Class Deviation Clause 252.223-7999 (the "FAR Deviation Clause") with accompanying guidance, a true and correct copy is found at Doc. 1-4, (Exhibit D).

81.     The FAR Deviation Clause requires federal contractors to follow the Task Force Guidance and any future amendments to the Guidance.

82.     EO 14042, the Task Force Guidances, the FAR Deviation Clause, and the OMB Determinations are hereinafter collectively referred to as the "Contractor Mandate."

83.     Ultimately, prior to implementing the FAD Deviation Clause, the Task Force Guidance was never published to the Federal Register for the purpose of receiving public comment.

84.     Pursuant to the Task Force Guidance, "[p]eople are considered fully vaccinated for COVID-19 two weeks after they have received the second dose in a two-dose series, or two weeks after they have received a single-dose vaccine." Doc. 1-2 at 4.

85.     The Guidance further establishes that "covered contractor employees" are to be "fully vaccinated" by December 8, 2021—meaning said employees must obtain the final dose of their vaccine of choice no later than November 24, 2021. The Nov. Task Force Guidance changed that deadline to January 18, 2022, which moved the last date to obtain the final dose to December 2, 2021.

86.     Accordingly, any covered contractor employee inclined to take the Moderna vaccine would have had to receive their first dose by December 7, 2021, in order to comply with the January 18, 2022, deadline.[1] Defendants notified the Court that it was extending the deadline to January 18, 2022. Doc. 39 at 3.

87.     Covered contractor employees must obtain a Pfizer vaccine by December 14, 2021[2] or a Johnson and Johnson vaccine by January 4, 2022.[3] With the new deadline, the last date that an employee can take Pfizer or Moderna is January 4, 2022.

88.     Pursuant to the Task Force Guidances, "covered contractor employees" refer to "any full-time or part-time employee of a covered contractor working on or in

---

[1] Center for Disease Control, Different COVID-19 Vaccines, (Oct. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines.html.

[2] Id.

[3] Id.

connection with a covered contract or working at a covered contractor workplace. This includes employees of covered contractors who are not themselves working on or in connection with a covered contract." Doc. 1-1 at 3–4.

89.    For the same reason, the Guidances also specify that subcontractors working in a covered workplace must also be fully vaccinated. Doc. 1-2 at 1.

90.    Pursuant to the Task Force Guidances, a contractor or subcontractor workplace location "means a location where covered contract employees work, including a covered contractor workplace or Federal workplace." Doc. 1-2 at 3.

91.    Pursuant to the Task Force Guidances, "unless a covered contractor can affirmatively determine that none of its employees on another floor or in separate areas of the building will come into contact with a covered contractor employee during the period of performance," employees in other areas of the building site or facility are also a part of the covered contractor workplace.

92.    Accordingly, the Contractor Mandate mandates vaccination for those who work both directly and indirectly with federal contracts.

93.    For example, pursuant to the Task Force Guidances, if a covered contractor employee is working on a contract for the Department of Defense in a remote office facility and that person merely shares a parking garage with non-contracted employees once a week, those non-contracted employees are subject to the Contractor Mandate.

94.    In another example, pursuant to the Task Force Guidances, if a covered contractor employee is working on a contract for NASA in a remote office facility and

that person merely shares an elevator with non-contracted employees every other Friday, those non-contracted employees are subject to the Contractor Mandate.

95.    The Task Force Guidance imposed a deadline of October 15, 2021, for federal agencies to include a vaccination mandate clause in new contracts.

96.    EO 14042, in general terms, and the Task Force Guidances, in specific terms, further required that the Federal Acquisition Regulatory Council ("FAR Council") "conduct a rulemaking to amend the [Federal Acquisition Regulation ("FAR")] to include the [Contractor Mandate]." Doc. 1-2 at 12.

97.    Pursuant to the Task Force Guidance, by October 8, 2021, and prior to any rulemaking, the FAR Council was required to develop a recommended contract clause to impose the Contractor Mandate for federal agencies to include in their subsequent contracts. Doc. 1-2 at 12.

98.    The Task Force Guidance instructed the FAR Council to "recommend that agencies exercise their authority to deviate from the FAR" by using a vaccination mandate clause in contracts prior to the FAR Council actually amending the FAR. Doc. 1-2 at 12.

**Development and Implementation of the FAR Deviation Clause**

99.    Before the FAR Deviation Clause was even published on September 30, 2021, the Defense Acquisition Regulations System and the Department of Defense published their intent to comply with EO 14042 via a Notice to the Federal Register on September 17, 2021 (the "DOD Notice"). A true and correct copy of the DOD Notice is found at Doc. 1-5, (Exhibit E).

18

100.    In response, there were seventeen letter comments from members of the public, raising hundreds of key concerns that have yet to be addressed by OMB or the Task Force.

101.    A few of the DOD Notice comments included concerns such as:

a.    "Are contractors or the government [sic] be liable for employee disability or damage claims (side effects, etc.)?"[4]

b.    "How will DOD monitor and measure any productivity disruptions?"[5]

c.    "Are contractors expected to violate or undermine collective bargaining agreements as they comply with these requirements?"[6]

d.    "Implementing a flow down vaccine mandate and/or testing will likely cause our subcontractors to experience significant employee attrition and financial hardship, potentially leaving them unable to fulfill their role in the distribution network."[7]

---

[4] Aerospace Industries Association (AIA), Comment Letter on DOD Implementation Planning for Executive Order 14042 (Sept. 23, 2021), https://www.acq.osd.mil/dpap/dars/docs/early_engagement_opportunity/executive_order_14042/ AIA%20Comments%20-%20EO%2040142%20DARS%20EEO.9-23-21.pdf.

[5] Id.

[6] Id.

[7] AmerisourceBergen, Comment Letter on DOD Implementation Planning for Executive Order 14042 (Sept. 23, 2021), https://www.acq.osd.mil/dpap/dars/docs/early_engagement_opportunity/executive_order_14042/Amerisource%20Bergen%20Comments%20to%20DOD%20Early%20Engagement%20Opportu nity%20Ensuring%20Adequate%20COVID%20Safety%20Protocols%20for%20Federal%20Con tractors%20EO%2014042%20final.pdf.

102.    The DOD Notice comments were never considered prior to issuing the Task Force Guidance. Indeed, the DOD ultimately published the DOD FAR Deviation Memo just one day after the FAR Deviation Clause, with no alterations.

103.    Upon information and belief, even some federal agencies were unable to implement the Task Force Guidance due to the quick turnaround time of just 21 days from the date the Guidance was issued to the October 15, 2021, deadline.

### Many Employees Are Likely to Quit Rather Than Submit to Mandatory Vaccination

104.    In addition to the declarations already cited above by Messrs. Anderson, Graugnard, and McKelvey, a considerable body of published data supports the likelihood of imminent disruption of many federal contractor workforces if the Mandate is allowed to take effect. For this reason, 9 in 10 employers fear significant reductions in their workforce if they had to implement vaccine mandates.[8]

105.    In a recent survey, approximately 70% of unvaccinated workers said they would leave their job before complying with an employer-issued vaccine mandate.[9]

106.    "Just under one in five U.S. adults, 18%, can be described as vaccine-resistant. These Americans say they would not agree to be vaccinated if a COVID- 19

---

[8] Karl Evers-Hillstrom, 9 in 10 Employers Say They Fear They'll Lose Unvaccinated Workers Over Mandate: Survey, The Hill (Oct. 18, 2021), https://thehill.com/business-a-lobbying/business-a-lobbying/577201-9-in-10-employers-say-they-will-lose-unvaccinated; Declaration of Milton Graugnard, Doc. 78-01; Declaration of James Lynn McKelvey, Doc. 78-02.

[9] Liz Hamel et al., Kaiser Family Found., KFF COVID-19 Vaccine Monitor: October 2021(Oct. 28, 2021), https://www.kff.org/coronavirus-covid-19/poll-finding/kff-covid-19-vaccine-monitor-october-2021/.

vaccine were available to them right now at no cost and that they are unlikely to change their mind about it. The percentage holding these views has been stable in recent months."[10]

107.    Moreover, "covered contractor employees," specifically include other employees that come into minimal contact directly with contractor employees "unless a covered contractor can affirmatively determine that none of its employees on another floor or in separate areas of the building will come into contact with a covered contractor employee during the period of performance of a covered contract." Doc. 1-2 at 10.

108.    The "covered contractor workplace" broadly includes "a location controlled by a covered contractor at which any employee of a covered contractor working on or in connection with a covered contract is likely to be present during the period of performance for a covered contract." Doc. 1-2 at 4.

109.    While a "covered contractor workplace" does not include a covered contractor employee's residence, covered contractors working exclusively from their residence are required to be vaccinated. Doc. 1-2 at 11, Q11.

110.    Ultimately, the Contractor Mandate extends to all employees that share "common areas such as lobbies, security clearance areas, elevators, stairwells, meeting rooms, kitchens, dining areas, and parking garages." Doc. 1-2 at 10.

---

[10] Jeffrey M. Jones, About One in Five Americans Remain Vaccine Resistant, Gallup (Aug. 6, 2021), https://news.gallup.com/poll/353081/one-five-americans-remain-vaccine-resistant.aspx (last visited Oct. 26, 2021).

## Impact of the Contractor Mandate on ABC and Its Members

111.    Associated Builders and Contractors, Inc. ("ABC") is a national construction industry trade association, representing more than 21,000 member contractors and related firms all over the country.

112.    ABC as a whole represent many private businesses that regularly bid on and are awarded federal government contracts of the type covered by the unprecedented vaccination mandates imposed by Executive Order 14042, as implemented by the Safer Federal Workforce Task Force Guidance, the Office of Management and Budget, and the Federal Acquisition Regulatory Council.

113.    ABC as a whole strongly supports and encourages vaccination of construction workers, and many ABC member companies have made significant efforts through outreach and incentives to get as many workers as possible vaccinated.

114.    But a sizable percentage of construction workers, as with the population as a whole, resist compulsory vaccination and have indicated they will quit their employment rather than submit to mandatory vaccination. See Dec. Graugnard Para. 6; Dec. McKelvey Para. 5.

115.    If contractors are forced to comply with the challenged mandate in order to be awarded covered federal contracts, many of them will be unable to perform the awarded contracts because a significant percentage of their vaccine-resistant workers will quit or have to be placed on extended leaves of absence rather than be vaccinated. See Dec. Graugnard Para. 7; Dec. McKelvey Para. 6.

116. As noted above, there is already a significant shortage of construction workers needed to fulfill existing demands for construction in the U.S, and the shortage is expected to grow larger as a result of the recently passed Infrastructure Bill.

117. Because of the transitory and temporary nature of the construction industry workforce, any vaccine-resistant worker who wants to avoid vaccination as a condition of employment by a government contractor, can readily obtain employment by a contractor who does not perform government contracts, and/or is not covered by the OSHA ETS mandate or test policy, particularly during the current labor shortage.

118. In addition, the administrative requirements of the Vaccine Mandate exceed the administrative capacities of many large and small employers. See Dec. Graugnard Para. 9; Dec. McKelvey Para. 7.

119. A review of the General Services Administration's Website for federal contracts sam.gov demonstrates that numerous contracts are being solicited. ABC Exhibit 4 reflects a search of the website for federal construction solicitations and pre-solicitations for the period of November 14, 2021 through November 30, 2021 and reflects 85 solicitations and pre-solicitations for just that short period, all of which contain the unlawful FAR Clauses purporting to impose the Mandate. It is undisputed that the number of such contracts will inevitably proliferate in the coming months, absent judicial relief, directly injuring ABC's member federal contractors and undermining the economy and efficiency of government contracting.

### The Contractor Mandate
### Creates Confusion and Uncertainty

120.    In response to the Contractor Mandate, ABC member companies have scrambled to comply.

121.    In addition to their specific challenges, ABC member companies will have to overcome the following hurdles in order to comply:

a.    Track employee vaccination statuses;

b.    Develop a robust process to review requests for accommodation;

c.    Identify impacted employees and locations;

d.    Spend an undetermined amount of money to fund its compliance program; and

e.    Track data from subcontractors to ensure they are likewise performing (a), (b), (c), and (d) above.

122.    Upon information and belief, many covered contractor employees will not obtain the vaccine and will not seek an exemption, despite the Contractor Mandate and its allowance for narrowly prescribed exemptions for medical reasons or strongly held religious beliefs.

123.    For additional context, nearly 50% of Georgians are fully vaccinated while the remaining 50% have yet to obtain one or oppose the vaccine altogether.[11]

---

[11] Georgia Department of Public Health, Press Release, 50% of Georgians Fully Vaccinated Against COVID-19 (Oct. 25, 2021), https://dph.georgia.gov/press-releases/2021-10-25/50-georgians-fully-vaccinated-against-covid-19.

Similar data from around the country establishes that millions of employees have continued to resist vaccination.

124.    With respect to such employees who refuse vaccination, ABC member companies in Georgia and throughout the country will have no choice but to consider enforcement action up to and including potential termination, and/or suffer significant numbers of resignations or burdensome demands for exemption from the Mandate, as a condition of bidding on and performing numerous contracts that are being solicited and awarded now and in the coming months. With national labor shortages crippling the current labor market, losing employees because of the Contractor Mandate will cause significant harm to ABC member companies.

125.    Equally important, the loss of employees will jeopardize ABC member companies' ability to complete the contracted for work in the contracted for time, thereby materially undermining the very efficiency and economy in contracting that purportedly is the core rationale for implementing the Contractor Mandate in the first place.

126.    The broad application of the Contractor Mandate is expected to substantially impact each Plaintiff-Intervenor's affected member companies in that any of their unvaccinated employees must be terminated or reallocated to uncovered workplaces lest they risk breaching their federal contracts by failing to fully comply with the Contractor Mandate.

127.    The Contractor Mandate, therefore, forces ABC affected member companies to choose between two equally problematic outcomes: (1) maintain a fully

vaccinated (but reduced) workforce of covered employees by firing or suffering the resignation of those who are unvaccinated and risk breaching the contracts by not satisfactorily performing due to lack of qualified workers; or (2) breach the contract by continuing to employ unvaccinated, covered employees so that they can timely perform and complete the contract requirements. Either way, Plaintiff-Intervenor's affected member companies face a risk of breach and material noncompliance for reasons totally beyond their control.

## COUNT I
## Violation of the Procurement Act
## (Under 40 U.S.C. §§ 101 and 121)

128.    ABC incorporates each of the Complaint allegations stated above herein.

129.    The purpose of the Procurement Act is to provide the Federal Government with an "economical and efficient system" for, among other things, procuring and supplying property and nonpersonal services. 40 U.S.C. § 101. The Contractor Mandate, however, will actually and materially undermine the efficient and economical delivery of property and services by disrupting the continuity of the contractor workforce.

130.    The purpose of the Procurement Act is not to impose a sweeping vaccination mandate on broad swaths of the American people or to use the federal procurement system as a proxy for implementing a nationwide public health mandate.

131.    The Procurement Act empowers the President to "prescribe policies and directives that [he] considers necessary to carry out [the Procurement Act.]" 40 U.S.C.

§ 121(a). Those policies "must be consistent with" the Procurement Act's purpose, i.e., promoting economy and efficiency in federal contracting. Id. § 121(a).

132. Defendants have failed to demonstrate a "nexus" between the Contractor Mandate (EO 14042, the OMB Determination, the Task Force Guidance, and the FAR Deviation Clause) and the Procurement Act's purpose of promoting an "economical and efficient system" for federal contracting. 40 U.S.C. § 101; *see Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 793 (D.C. Cir. 1979) (explaining that the Procurement Act is violated when the President does not demonstrate a "nexus" between executive action and the Procurement Act's policy). The Procurement Act's text obligates the President to exercise his statutory authority "consistently with [the Act's] structure and purposes." *Id.*

133. Instead, EO 14042 exceeds the President's Procurement Act authority by directing the Task Force, without a demonstrable nexus to the Procurement Act's purpose, to prescribe a sweeping public health scheme.

134. Here, the text of the Procurement Act clearly demonstrates that Congress has not authorized the Contractor Mandate, and thus, EO 14042 violates the Procurement Act.

135. Further, before the executive branch may regulate a major policy question of "great and economic and political significance"—such as mandating vaccination for every employee of every federal contractor in the country—Congress must "speak clearly" to assign the authority to implement such a policy. *Ala. Ass'n of*

*Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (citing *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)).

136.    When the federal government intrudes on a traditional state function, it must clearly articulate the scope of the intrusion and the rationale behind its unprecedented action, which it has not done here. *Gregory v. Ashcroft*, 501 U.S. 452, 463–64 (1991).

137.    The Contractor Mandate implicates critical issues of federalism as public health, and the regulation of inoculation regimes are traditional state functions.

138.    Because the statutory language that the President relies on to issue EO 14042 does not contain a clear statement affirmatively sanctioning the broad scope of the Contractor Mandate, EO 14042 violates the Procurement Act.

139.    Therefore, under both the plain text of the Procurement Act and the clear statement principle, EO 14042 is unlawful, and thus the Contractor Mandate is unenforceable.

## COUNT II
## Violation of Federal Procurement Policy
## (Under 41 U.S.C. § 1707(a))

140.    ABC incorporates each of the Complaint allegations stated above herein.

141.    Pursuant to 41 U.S.C. § 1707(a)(1), a procurement policy may not take effect until 60 days after it is published for public comment in the Federal Register if it relates to the expenditure of appropriated funds; and has a significant effect beyond the internal operating procedures of the issuing agency; or has a significant cost or administrative impact on contractors or offerors.

142.    The Contractor Mandate will require contractors to develop, implement, and monitor a host of new policies and procedures impacting, for some contractors, their entire workforce. In order to fully comply with the Contractor Mandate, contractors will have to fire any covered employee who refuses to be vaccinated and has not asserted an exemption.

143.    Federal agencies will have to budget for and expend appropriated funds to administratively implement the Contractor Mandate and, thereafter, compensate contractors for their increased cost of compliance in violation of § 1707(a).

144.    Because the Contractor Mandate requires vaccination of hundreds of thousands of Americans, it certainly has "a significant effect beyond internal operating procedures" in violation of § 1707(a).

145.    The Contractor Mandate also has a significant cost or administrative impact on current contractors, future contractors, and offerors in violation of § 1707(a).

146.    Despite being required to be published for public comment in the Federal Register, Defendants failed to publish the Task Force Guidance containing the Contractor Mandate in the Federal Register as required by 41 U.S.C. § 1707(a)(1).

147.    Moreover, Defendants failed to provide the required 60-day comment period before the Task Force Guidance and Contractor Mandate became effective.

148.    Further, the requirements of 41 U.S.C. § 1707(a) were never waived with regard to the Task Force Guidance and Contractor Mandate.

149. Accordingly, Defendants failed to comply with 41 U.S.C. § 1707(a) when issuing the OMB Determination and the Task Force Guidance, making the Contractor Mandate invalid as a matter of law.

### COUNT III
### Nondelegation Claim
### (Article I, Section 1 of The UNITED STATES CONSTITUTION)

150. ABC incorporates each of the Complaint allegations stated above herein.

151. Pursuant to Article I, Section 1 of the UNITED STATES CONSTITUTION, Congress is vested with all legislative powers.

152. "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935).

153. The executive branch can only exercise its own discrete powers reserved by Article II of the UNITED STATES CONSTITUTION and such power that Congress clearly authorizes through statutory command.

154. Congress gives such authorization when it articulates an intelligible principle to guide the Executive that not only sanctions but also defines and cabins the delegated legislative power.

155. Under the nondelegation doctrine, Congress cannot simply offer a general policy that is untethered to a delegation of legislative power. For a delegation to be proper, Congress must articulate a clear principle or directive of its congressional will within the legislative act. See *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). The principle must be binding, and the delegate must be "directed to conform" to it. *Id*.

156.     The nondelegation doctrine preserves and protects important tenets of our democracy, including individual liberties and states' rights.

157.     The President's direct delegation of authority to the OMB Director and the Task Force gives them unconstitutional and unconstrained rulemaking authority without a statutory directive.

158.     Separately, the President's indirect delegation to the federal agencies of broad authority and discretion to enforce the already unconstitutional Contractor Mandate is unsupported by an explicit statutory directive within the Procurement Act or any other federal law.

159.     Thus, the President's actions lack the requisite congressional direction in two regards:

a.     First, Congress did not articulate clear or sufficient instructions in the Procurement Act directing the President to implement this public health policy scheme by executive order.

b.     Second, even if Congress did clearly authorize a national vaccination schedule for federal contractors, it did not give sufficiently clear instructions to permit the President to delegate legislative judgment to the Task Force or the OMB Director.

160.     EO 14042's reliance on the precatory statement of purpose in the Procurement Act is not a clear directive, and neither the President nor the federal agencies can rely on it to impose an intrusive and sweeping vaccine mandate.

161.    Further, any delegation sanctioning broad and intrusive executive action cannot be sustained without clear and meaningful legislative guidance, especially given the important separation-of-powers and federalism concerns implicated. Under the nondelegation doctrine, the Contractor Mandate is unconstitutional because Congress did not articulate a clear principle by legislative act that directs the Executive to take sweeping action that infringes on state and individual rights.

162.    Here, the Executive Order cuts deeply into the state's sphere of power without articulating the underlying reasons or providing a justification beyond a superficial, unsupported, and pretextual reference to efficiency and economy in federal contracts.

163.    Without explicit congressional authorization, the President's delegation of power in EO 14042 through the OMB Determination, the Task Force, and the various executive agencies acting to implement the Contractor Mandate cannot survive constitutional scrutiny.

## COUNT IV
### Violation of Separation of Powers and Federalism
### (Article I, Section 8 of Amendment X to The UNITED STATES CONSTITUTION)

164.    ABC incorporates each of the Complaint allegations stated above herein.

165.    To the extent Defendants argue that the Contractor Mandate is authorized, such authorization would violate the CONSTITUTION'S nondelegation principles.

166.    The Contractor Mandate exceeds congressional authority.

32

167.   Pursuant to Article I, Section 1 of the UNITED STATES CONSTITUTION, Congress is vested with all legislative powers, but Congress must act pursuant to the enumerated powers granted to it by Article I.

168.   Pursuant to Article I, Section 8 of the UNITED STATES CONSTITUTION, Congress has authority "to make all Laws which shall be necessary and proper for carrying into Execution" its general powers ("the Necessary and Proper Clause"). The Necessary and Proper Clause does not "license the exercise of any 'great substantive and independent power[s]' beyond those specifically enumerated." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 559 (2012) (citation omitted).

169.   Pursuant to the Tenth Amendment of the UNITED STATES CONSTITUTION, "the powers not delegated by the CONSTITUTION to the United States, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. Amend. X.

170.   Nothing in the CONSTITUTION authorizes the federal agencies of the executive branch to impose the Contractor Mandate on states because requiring vaccinations for state employees is an exercise of the police power left to the states under the Tenth Amendment.

171.   The CONSTITUTION does not empower Congress to require anyone who deals with the federal government to get vaccinated. It is not a "proper" exercise of Congress's authority to mandate that every employee who touches a federal contract or comes in contact with another employee who touches such a contract, has to be

vaccinated because the action here falls outside the scope of an Article I enumerated power.

172.    Defendants, through the Contractor Mandate, have exercised power that Congress does not possess under the CONSTITUTION and, therefore, cannot delegate to other branches of the federal government.

173.    If Congress intended the Procurement Act to authorize what the President claims, the Act exceeds Congress's authority, and thus Defendants must be enjoined from taking any action under the Act.

## COUNT V
## Violation of the Tenth Amendment
### (Under Amendment X to the UNITED STATES CONSTITUTION)

174.    ABC incorporates each of the Complaint allegations stated above herein.

175.    Pursuant to the Tenth Amendment of the UNITED STATES CONSTITUTION, "the powers not delegated by the CONSTITUTION to the United States, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. Amend. X.

176.    Defendants, through the Contractor Mandate, have exercised power far beyond what was delegated to the federal government by Constitutional mandate or congressional action.

177.    Neither Article II of the U.S. CONSTITUTION nor any act of Congress authorizes the federal agencies of the executive branch to implement the Contractor Mandate, which traditionally falls under the police power left to the states under the Tenth Amendment.

178.     The Tenth Amendment explicitly preserves the "residuary and inviolable sovereignty," of the states. *Printz v. United States*, 521 U.S. 898, 918–19 (1997) (quoting The Federalist No. 39, at 245 (J. Madison)).

179.     By interfering with the traditional balance of power between the states and the federal government and by acting pursuant to ultra vires federal action, Defendants violated this "inviolable sovereignty," and thus, the Tenth Amendment.

180.     Therefore, the Contractor Mandate was adopted pursuant to an unconstitutional exercise of authority by Defendants and must be invalidated.

## COUNT VI
## Unconstitutional Exercise of the Spending Clause
## (Under Article I, Section 8, Clause 1 of the UNITED STATES CONSTITUTION)

181.     ABC incorporates each of the Complaint allegations stated above herein.

182.     The challenged actions are unconstitutional conditions on the states' receipt of federal funds.

183.     Article I, Section 8, Clause 1 of the UNITED STATES CONSTITUTION gives Congress the power to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defense and the general Welfare of the United States."

184.     While "Congress may attach appropriate conditions to . . . spending programs to preserve its control over the use of federal funds," it cannot wield federal funding to unreasonably constrain state autonomy. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012). "[I]n some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *South Dakota v. Dole*, 483 U.S. 203, 211 (1987).

185.    Federal contracts are an exercise of the Spending Clause, yet the challenged actions ask Plaintiff-Intervenor's to agree to a coercive contract term.

186.    The federal contracts at issue here account for considerable portions of Plaintiff -Intervenor's budgets for essential research, education, and other necessary programs. The pressure on Plaintiff-Intervenor to comply with the Contractor Mandate rises to the level of coercion. The challenged actions are invalid for that reason alone.

## COUNT VII
## Violation of the APA
## (Under 5 U.S.C. § 706)

187.    ABC incorporates each of the Complaint allegations stated above herein.

188.    Pursuant to 5 U.S.C. § 553, agencies must publish "a notice of proposed rulemaking in the Federal Register before promulgating a rule that has legal force." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S.Ct. 2367, 2384 (2020); 5 U.S.C. § 553(b).

189.    Pursuant to 48 C.F.R. 1.501, "significant revisions" to the FAR must be made through notice-and-comment procedures. DOD, NASA, and the General Services Administration must jointly conduct the notice-and-comment process. *Id.*

190.    Instead of amending the FAR to implement this significant revision, the FAR Council issued a purported "class deviation" without engaging in the notice-and-comment process. *See* 5 U.S.C. § 553.

191.    Proper "class deviations" must fit within one of the discrete definitions set forth in 48 C.F.R 1.401.

192.    Here, however, the FAR Deviation Clause fits none of the definitions.

193.     Instead, the FAR Deviation Clause is in the nature of a rule within the meaning of the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

194.     The FAR Council violated the APA by failing to comply with the notice-and-comment requirements for rulemaking.

195.     Good cause does not excuse the FAR Council's failure to comply with the notice-and-comment process. See 5 U.S.C. § 553(b)(3)(B).

**COUNT VIII**
**Violation of the APA**
**(Under 5 U.S.C. § 706)**

196.     ABC incorporates each of the Complaint allegations stated above herein.

197.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." See 5 U.S.C. § 706(2)(A), (C).

198.     The OMB Determination adopting the Task Force guidance is contrary to law for at least four reasons.

199.     First, the OMB Determination violates 41 U.S.C. § 1303(a) because it is a government-wide procurement regulation, which only the FAR Council may issue.

200.     EO 14042 apparently seeks to circumvent § 1303 by delegating the President's Procurement Act power to the OMB Director.

201.     That attempt is unlawful because the President has no authority to issue regulations under § 1303—only the FAR Council may issue government-wide procurement regulations. See Centralizing Border Control Policy Under the

Supervision of the Attorney General, 26 Op. OLC 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President.").

202.    Second, and relatedly, the OMB rule is contrary to law because the Procurement Act does not grant the President the power to issue orders with the force or effect of law. Congress authorized the President to "prescribe policies and directives that the President considers necessary to carry out." 40 U.S.C. § 121(a).

203.    "[P]olicies and directives" describe the President's power to direct the exercise of procurement authority throughout the government. It does not authorize the President to issue regulations himself.

204.    Congress knows how to confer that power, as it authorized the GSA Administrator, in the same section of the statute, to "prescribe regulations." *Id.* § 121(c); see also *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").

205.    And Congress has given the President the power to "prescribe regulations" in other contexts, typically in the realm of foreign affairs and national defense. *See, e.g.*, 18 U.S.C. § 3496 ("The President is authorized to prescribe regulations governing the manner of executing and returning commissions by consular officers."); 32 U.S.C. § 110 ("The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard.").

206.    Third, even if the Procurement Act authorized the President to issue orders with the force or effect of law, it would not authorize approval of the Task Force guidance. The President appears to assume that the Procurement Act's prefatory statement of purpose authorizes him to issue any order that he believes promotes "an economical and efficient" procurement system. 40 U.S.C. § 101; *see* Ex. A at 1 ("This order promotes economy and efficiency in [f]ederal procurement."). In doing so, the President mistakenly construes the prefatory purpose statement for a grant of authority. *D.C. v. Heller*, 554 U.S. 570, 578 (2008) ("[A]part from [a] clarifying function, a prefatory clause does not limit or expand the scope of the operative clause.").

207.    And even if the Procurement Act did authorize the President to issue binding procurement orders solely because they may promote economy and efficiency, the OMB Determination does not adequately do so. Providing the federal government with an "economical and efficient system for" procurement is not a broad enough delegation to impose a national-scale vaccine mandate that Congress has not separately authorized.

208.    Further, the executive order is divorced from the practical needs of procurement. In order to maintain a steady and predictable flow of goods and services—and the advancement of science and technology through research and development—the federal procurement system requires a stable and reliable workforce to timely perform work required under tens of thousands of federal contracts and funding agreements. The Contractor Mandate disrupts the stability

and reliability of the contractor workforce by forcing contractors to potentially fire unvaccinated and non-exempt covered employees, many of whom are highly skilled and essential to the work.

209.    Because the OMB Determination violates § 1303(a), seeks to exercise a delegated power the President does not possess, and relies on a misreading of the Procurement Act, it is contrary to law.

## COUNT IX
## Violation of the APA
## (Under 5 U.S.C. § 706)

210.    ABC incorporates each of the Complaint allegations stated above herein.

211.    Pursuant to the Administrative Procedure Act, agency action that is "arbitrary [or] capricious" is unlawful and must be set as aside by a court of competent jurisdiction. 5 U.S.C. § 706(2)(A).

212.    Pursuant to 48 C.F.R. 1.402, "[u]nless precluded by law, executive order, or regulation, deviations from the FAR may be granted [] when necessary to meet the specific needs and requirements of each agency."

213.    The Contractor Mandate and the OMB Determination were implemented with no express findings, no explanation, and no consideration of the distinct and diverse universe of federal agencies.

214.    The Contractor Mandate and the OMB Determination impose universal and uniform requirements without regard to the particularized needs and circumstances of each federal agency and are therefore arbitrary and capricious in violation of the APA.

## COUNT X
## Declaratory Judgment
## (Under 28 U.S.C. § 2201(a))

215.    ABC incorporates each of the Complaint allegations stated above herein.

216.    For all the forgoing reasons, Plaintiff-Intervenor request that the Court declare the Contractor Mandate unlawful, unconstitutional, and unenforceable.

## COUNT XI
## Injunctive Relief

217.    ABC incorporates each of the Complaint allegations stated above herein.

218.    The Contractor Mandate threatens immediate and irreparable harm to Plaintiff-Intervenor, including a loss of highly trained employees, difficulty in completing existing contracts, and significant expenditure of time and resources in ensuring compliance.

219.    Monetary damages or other remedies at law cannot adequately address the injury caused by the Contractor Mandate.

220.    The deadlines imposed in the Contractor Mandate will have widespread and permanent effects that no legal remedy can reverse, such that the only available remedy to redress the harms is injunctive relief.

221.    Balancing the hardships to Plaintiff-Intervenor relative to the hardships to Defendants, extraordinary equitable relief is warranted.

222.    Specifically, absent an injunction, Plaintiff-Intervenor's operations will be jeopardized as a result of Defendants' adoption and implementation of the unconstitutional, illegal, and logistically unworkable Contractor Mandate.

223. On the other hand, the hardship of an injunction to Defendants is minimal; they simply must abide by the CONSTITUTION and the laws of the United States.

224. Permanent injunctive relief would not disserve the public interest, because it would enjoin unconstitutional and illegal executive action.

## COUNT XII
## VIOLATION OF SMALL BUSINESS REGULATORY ENFORCEMENT FAIRNESS ACT

225. ABC incorporates each of the Complaint allegations stated above herein.

226. Defendants violated the Small Business Regulatory Enforcement Fairness Act (SBEFA), 29 U.S.C. § 604 in that they failed to describe the steps the agencies took to minimize the significant economic impact on small entities in accordance with the requirements of the statute, and the agencies in fact took no such steps, contrary to the explicit requirements of the Act. Many ABC members who perform or seek to perform federal contracts and subcontracts covered by the Mandate are small businesses who are directly harmed by the Mandate's failure to address the injuries inflicted upon them.

## PRAYER FOR RELIEF

Wherefore, Plaintiff-Intervenor respectfully requests that this Court:

1. Enter judgment in favor of Plaintiff-Intervenor and against Defendants on all Counts asserted herein.

2. Enter a declaratory judgment that Defendants, individually and collectively, have acted to impose a broad-sweeping, unlawful, and unconstitutional

COVID-19 vaccine mandate, and that such COVID-19 vaccine mandate is unlawful and unenforceable.

3.    Grant a temporary, preliminary, and permanent injunction prohibiting Defendants and those acting in concert with them from enforcing this broad-sweeping, unlawful, and unconstitutional mandate.

4.    Grant any additional and different relief to which Plaintiff-Intervenor may be entitled.

5.    Award Plaintiff-Intervenor costs of litigation, including reasonable attorneys' fees, as allowable by law.

Respectfully Submitted this 14th day of December 2021.

Attorneys for Plaintiff-Intervenor

*/s/ J. Larry Stine*
J. Larry Stine (Ga. Bar No. 682555)
jls@wimlaw.com
Kathleen J. Jennings (Ga. Bar No. 394862)
kjj@wimlaw.com
WIMBERLY LAWSON STECKEL SCHNEIDER
 & STINE, PC
3400 Peachtree Road, N.E.
Suite 400 – Lenox Road
Atlanta, GA 30326-1107
404-365-0900 – Phone
404-261-3707 – Fax

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2021, I caused a true and correct copy of the foregoing to be served on counsel of record for all parties via ECF.


/s/ J. Larry Stine

J. Larry Stine

WIMBERLY LAWSON STECKEL SCHNEIDER
 & STINE, PC
3400 Peachtree Road, N.E.
Suite 400 – Lenox Road
Atlanta, GA 30326-1107
404-365-0900 – Phone
404-261-3707 – Fax
jls@wimlaw.com