[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-14269

_____

STATE OF GEORGIA,
STATE OF ALABAMA,
STATE OF IDAHO,
STATE OF KANSAS,
STATE OF SOUTH CAROLINA, et al.,

Plaintiffs-Appellees,

*versus*

PRESIDENT OF THE UNITED STATES,
SAFER FEDERAL WORKFORCE TASK FORCE,
UNITED STATES OFFICE OF PERSONNEL MANAGEMENT,
DIRECTOR, OFFICE OF PERSONNEL MANAGEMENT AND
CO-CHAIR
SAFER FEDERAL WORKFORCE TASK FORCE,

2                      Opinion of the Court                 21-14269

OFFICE OF MANAGEMENT AND BUDGET, et al.,

                                              Defendants-Appellants.

————————————————

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 1:21-cv-00163-RSB-BKE

————————————————

Before GRANT, ANDERSON, and EDMONDSON, Circuit Judges.

GRANT, Circuit Judge:

Executive Order 14042 directs executive agencies to include a clause in procurement agreements requiring federal contractors to comply with workplace safety rules designed to respond to the Covid-19 pandemic. We consider one of those requirements here: a mandate that employees who work on or in connection with a covered contract, or share a workplace with another employee who does, be fully vaccinated against Covid-19.

In this lawsuit—one of many brought across the country to challenge the contractor vaccine mandate—the district court entered a nationwide preliminary injunction after concluding that the plaintiffs were likely to prevail on their assertion that the mandate was outside the scope of the Procurement Act. The court ordered the federal government not to enforce the mandate in any covered

agreement. We agree that the plaintiffs' challenge to the mandate will likely succeed and that they are entitled to preliminary relief. Even so, because the injunction's nationwide scope is too broad, we vacate it in part.

## I.

## A.

When Congress passed the Procurement Act (also called the Federal Property and Administrative Services Act) in 1949, it prefaced the new statute with a declaration of policy: "It is the intent of the Congress in enacting this legislation to provide for the Government an economical and efficient system" for "the procurement and supply of personal property and nonpersonal services." Federal Property and Administrative Services Act of 1949, Pub. L. No. 81-152, § 2, 63 Stat. 377, 378. That purpose statement, with modernized language, is now found in § 101 of Title 40. *See* 40 U.S.C. § 101 ("The purpose of this subtitle is to provide the Federal Government with an economical and efficient system" for activities including "[p]rocuring and supplying property and nonpersonal services, and performing related functions.").

In line with that purpose, the Procurement Act constructed an administrative apparatus for the federal government's procurement system. At the head of that system is the President. The Act authorizes the President, in the key provision here, to "prescribe policies and directives that the President considers necessary to

carry out this subtitle," and directs that the "policies must be consistent with this subtitle." *Id.* § 121(a).

The phrase "this subtitle," in turn, covers two (lengthy) portions of the United States Code: subtitle I of Title 40, and most of Title 41, subtitle I, division C. *Id.* § 111(4). The Title 40 subtitle, among other things, creates the General Services Administration and empowers its Administrator to "procure and supply personal property and nonpersonal services for executive agencies to use in the proper discharge of their responsibilities." *Id.* §§ 301, 501(b)(1)(A). With authority echoing that of the President, the GSA Administrator can also "prescribe regulations to carry out this subtitle." *Id.* § 121(c)(1). The Title 41 division vests executive agencies with the authority to "make purchases and contracts for property and services" consistent with the "implementing regulations" of the GSA Administrator. 41 U.S.C. § 3101(a).

Title 41 also specifies parameters that executive agencies must follow when exercising their procurement authority. To begin, it generally requires agencies to use "competitive procedures" to "obtain full and open competition." *Id.* § 3301(a). And it stipulates that "a fair proportion of the total purchases and contracts for property and services" be "placed with small business concerns." *Id.* § 3104. These provisions and others like them fulfill the Act's stated purpose of providing "an economical and efficient system" for federal procurement. 40 U.S.C. § 101.

## B.

The federal government contends that the Procurement Act empowers the President to issue the contractor vaccine mandate. The mandate started with Executive Order 14042, which instructs executive agencies that contracts and solicitations generally must include a clause requiring compliance with "workplace safety guidance" published by the Safer Federal Workforce Task Force.[1] Exec. Order No. 14042, § 2, 86 Fed. Reg. 50,985, 50,985 (Sept. 9, 2021). Several categories of procurement agreements fall within that Order's sweep—those for services, construction, concessions, and property leases, as well as those made "in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public."[2] *Id.* § 5(a). The Order did not stop with new contracts and solicitations; it also covered extensions and renewals of existing contracts and stipulated

---

[1] The Order also extends to subcontractors "at any tier." Exec. Order No. 14042, § 2(a), 86 Fed. Reg. 50,985, 50,985 (Sept. 9, 2021). To simplify, we use the term "contractors" to cover both contractors and subcontractors. And we use the term "contracts" to encompass what the Order calls "contract-like instruments." *Id.*

[2] The Order does not apply to "grants," "agreements with Indian Tribes under the Indian Self-Determination and Education Assistance Act," "contracts or subcontracts whose value is equal to or less than the simplified acquisition threshold" (which is now set at $250,000 for most contracts), "employees who perform work outside the United States or its outlying areas," and "subcontracts solely for the provision of products." Exec. Order No. 14042, § 5(b), 86 Fed. Reg. at 50,986–87; FAR 2.101 (2021).

that agencies were "strongly encouraged" to add the same requirements into existing contracts as well.  *Id.* §§ 5(a), 6(c).

Task Force guidance followed after President Biden signed Executive Order 14042.  It requires "COVID-19 vaccination of covered contractor employees, except in limited circumstances where an employee is legally entitled to an accommodation."[3]  Safer Federal Workforce Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors 1, 5 (Sept. 24, 2021).  This vaccine requirement applies to employees working "on or in connection with a covered contract"; it also applies to those who share their workplace.  *Id.* at 3–4.

The Acting Director of the Office of Management and Budget soon determined that the vaccine requirement would improve "economy and efficiency" in federal contracting, which made it binding.  86 Fed. Reg. 53,691, 53,691–92 (Sept. 24, 2021); 86 Fed. Reg. 63,418, 63,423 (Nov. 10, 2021); *see* Exec. Order No. 14042, § 2(c), 86 Fed. Reg. at 50,985–86.  Together, Executive Order 14042 and the rules and determinations that implement it comprise the "contractor vaccine mandate" that is the subject of this lawsuit.

---

[3] The Task Force guidance also mandates compliance with masking and physical distancing requirements, which were not subject to the district court's order below and are not at issue on appeal.  *See* Safer Federal Workforce Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors 1, 6–7 (Sept. 24, 2021).

## C.

In October 2021, the district court docketed a complaint filed by seven States—Georgia, Alabama, Idaho, Kansas, South Carolina, Utah, and West Virginia—against the federal government, including President Biden and various executive officials and agencies. The States sought a declaration that the contractor vaccine mandate was unlawful and an injunction prohibiting its enforcement. A construction-industry trade organization, Associated Builders and Contractors, successfully moved to intervene as a plaintiff.

Considering the request for a preliminary injunction, the court found that the plaintiff States, as well as members of the trade association, "routinely" entered into contracts that would include the vaccine mandate, had "current contracts that could easily fall under" the new requirements, and "would typically continue to seek out contract opportunities with the federal government." In other words, the court found that the mandate would apply to the plaintiffs. It then agreed with them that the mandate likely exceeded the President's authority under the Procurement Act. After deciding that the other equitable factors—irreparable harm, the balance of the equities, and the public interest—also favored the plaintiffs, the court entered a nationwide preliminary injunction.

This lawsuit was one of many concerning the contractor vaccine mandate in district courts around the nation. Though other district courts also granted plaintiffs' requests for preliminary injunctive relief, the court below was the only one to enjoin the

defendants from enforcing the mandate nationwide—that is, "in all covered contracts in any state or territory of the United States of America."[4]

The federal government now appeals, challenging both the merits of the preliminary injunction and its scope.

## II.

We review the district court's "ultimate decision" to grant a preliminary injunction for abuse of discretion. *Teper v. Miller*, 82 F.3d 989, 993 (11th Cir. 1996). To earn that form of relief, the moving party must show that "(1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1270–71 (11th Cir. 2020) (footnote omitted). When the government is the

---

[4] *See Missouri v. Biden*, 576 F. Supp. 3d 622, 635 (E.D. Mo. 2021) (enjoining enforcement against plaintiff States Missouri, Nebraska, Alaska, Arkansas, Iowa, Montana, New Hampshire, North Dakota, South Dakota, and Wyoming); *Louisiana v. Biden*, 575 F. Supp. 3d 680, 695–96 (W.D. La. 2021) (enjoining enforcement against plaintiff States Louisiana, Mississippi, and Indiana, and their agencies); *Kentucky v. Biden*, 571 F. Supp. 3d 715, 735 (E.D. Ky. 2021) (enjoining enforcement in "all covered contracts in Kentucky, Ohio, and Tennessee"). In *Florida v. Nelson*, 576 F. Supp. 3d 1017 (M.D. Fla. 2021), currently pending on appeal in this Circuit, the district court entered a preliminary injunction enjoining the defendants from enforcing the mandate in Florida.

opposing party, as it is here, the third and fourth factors merge. *Id.* at 1271.

The plaintiffs' likelihood of success in this case "turns on a preliminary question"—the scope of authority that Congress delegated through the Procurement Act. *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 774 (11th Cir. 2015).  To answer that question, we must interpret the Act de novo.  *Teper*, 82 F.3d at 993 ("The interpretation and application of a federal statute raises an issue of law, subject to plenary review.");  *see also, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2407–15, 2423 (2018) (analyzing the scope of presidential authority under the Immigration and Nationality Act when reviewing a preliminary injunction).  As for the other equitable factors, "the abuse-of-discretion standard allows a range of choices for the district court, so long as any choice made by the court does not constitute a clear error of judgment." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (quotation omitted).

We likewise review the scope of any injunction for abuse of discretion.  *See Garrido v. Dudek,* 731 F.3d 1152, 1158 (11th Cir. 2013).  It is "well-settled that a district court abuses its discretion when it grants relief that is improperly or even unnecessarily broad." *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 870 (11th Cir. 2013).

## III.

We first consider the plaintiffs' likelihood of success on the merits.  The central question is whether the Procurement Act

authorizes the President to require the employees of federal contractors to be vaccinated as a condition of all procurement contracts and solicitations.

## A.

Nearly a decade before Congress passed the Procurement Act, the Supreme Court explained that the federal government has the "power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940).[5] But that authority rests in Congress's hands in the first instance—not the President's. *See id.* at 130. So the question is not whether Congress *could* authorize the President to make procurement agreements contingent on Covid-19 vaccination. It is whether Congress did so in the Procurement Act.

Before the Act was passed in 1949, no centralized agency organized the procurement activities of the federal government. Obvious problems emerged from that diffusion of authority. Recognizing those problems, Congress created the Hoover Commission and tasked it with studying Executive Branch structures with an eye toward improving their efficiency. *See* Commission on

---

[5] We have long since departed from *Perkins*'s holding that procurement decisions cannot be judicially reviewed due to bidders' lack of standing, but the propositions for which the case is cited above hold true. *Perkins*, 310 U.S. at 129; *see Hayes Int'l Corp. v. McLucas*, 509 F.2d 247, 254–56 (5th Cir. 1975).

Organization of the Executive Branch of the Government, *Concluding Report* 2 (1949).

Once the Commission was in place it indeed observed "shocking instances of wasteful practices and poor business management" in the government's supply operations. *Id.* at 22. The federal procurement process, it found, suffered "from a lack of central direction." Commission on Organization of the Executive Branch of the Government, *Office of General Services* 1 (1949). To address that failing, the Commission proposed a new agency, which would coordinate purchasing and other "housekeeping" activities "to avoid waste." *Id.* at 1–2. According to the Commission, the new agency's director should be appointed by the President and subject to his direction; this point was consistent with its overall strategy of achieving efficiency through executive accountability and centralized authority. *Id.* at 2–3; *see also* Commission on Organization of the Executive Branch of the Government, *Concluding Report* 5–11, 25 (1949). Even so, the Commission suggested that individual agencies should remain responsible for purchasing goods and services specific to their needs, thus avoiding the "congestion, red tape, and inefficiency" that may result from "too high a degree of centralization." Commission on Organization of the Executive Branch of the Government, *Office of General Services* 2 (1949).

Congress listened. In line with the Hoover Commission's recommendations, the Procurement Act consolidated several procurement-related agencies into the newly created General Services

Administration.  Federal Property and Administrative Services Act
of 1949 §§ 102–05.  As the Commission had envisioned, the statute
vested supervisory authority in the President.  But the Procure-
ment Act's delegation to the President was not unlimited; the Act
confers broad but not unbounded authority.

"The President may prescribe policies and directives that the
President considers necessary to carry out this subtitle.  The poli-
cies must be consistent with this subtitle." 40 U.S.C. § 121(a).  Two
stipulations jump off the page.  The first is that the President's pol-
icies and directives must "carry out this subtitle." *Id.*  As a re-
minder, "this subtitle" includes subtitle I of Title 40 (over one hun-
dred code sections) and much of division C of subtitle I of Title 41
(over seventy more).  *Id.* §§ 111(4), 121(a).  A delegation to carry
out those provisions does not grant the President free-wheeling au-
thority to issue any order he wishes relating to the federal govern-
ment's procurement system.  What he can lawfully carry out under
§ 121(a) are the provisions in a specified part of the U.S. Code.  That
set of provisions is lengthy, and in combination quite specific in set-
ting out the procurement-related authority of the GSA Administra-
tor, executive agencies, and other officials.  So § 121(a) generally
grants the President the power to instruct those actors on how to
exercise their statutory authority.

Consistent with the solution offered by the Hoover Com-
mission, the statutory power to direct the various federal stake-
holders within the federal procurement system to coordinate their
work is a key lever for the President—and the President has used

it.  *See, e.g.*, Exec. Order No. 13538, §§ 1–2, 75 Fed. Reg. 20,895, 20,895 (April 19, 2010) (establishing the President's Management Advisory Board to provide advice on business practices); Exec. Order No. 13327, § 4, 69 Fed. Reg. 5897, 5898 (Feb. 4, 2004) (creating a Federal Real Property Council to develop agency asset management plans); Exec. Order No. 12979, § 1, 60 Fed. Reg. 55,171, 55,171 (Oct. 25, 1995) (directing agency heads to prescribe procedures for the resolution of bid protests).  But that oversight authority is also a limit; in contrast with the few Procurement Act provisions granting the President direct authority to take action, here the President is given the power to instruct other actors to exercise their own statutory authority.  *See, e.g.*, 40 U.S.C. §§ 1303(b)(1), 1307, 1310(a) (declaration of surplus real property and disposition of securities and war supplies).

The second constraint on the President's authority is the requirement that his policies be "consistent with this subtitle."  *Id.* § 121(a).  That limitation is straightforward enough.  The President must stay within the confines of the Act, of course; but his actions must also be consistent with the policies and directives that Congress included in the statute.  Those explicit legislative policies, as we have described, include the rule that agencies must "obtain full and open competition" through most procurement procedures.  *See, e.g.*, 41 U.S.C. §§ 3301(a), 3306.

The statute's history reinforces that we should read these two provisions as cabining the President's authority.  Section 121(a) took its present form in 2002, when Congress recodified Title 40.

*See* Act of August 21, 2002, Pub. L. No. 107-217, 116 Stat. 1062.
Before then, the provision stated that the President "may prescribe
such policies and directives, *not inconsistent* with the provisions of
this Act, as he shall deem necessary to *effectuate the provisions of
this Act*, which policies and directives shall govern the Administra-
tor and executive agencies in carrying out their respective func-
tions hereunder." 40 U.S.C. § 486(a) (2001) (emphases added).[6]
When Congress edited the language in the recodified version, it
emphasized that those revisions made "no substantive change."
Act of August 21, 2002 § 5(b). The substance of the current lan-
guage thus holds the same meaning as the earlier version: the Pres-
ident can issue policies to assist and direct the GSA Administrator
and other executive actors as they carry out their authority under
the Act. But the President cannot issue policies that require those
officials to take steps outside the Act or contrary to the Act—how-
ever useful such steps may appear.

This reading also aligns with an early treatment of the Pro-
curement Act by the Supreme Court. Decades ago, in *Chrysler
Corp. v. Brown*, the Court suggested that the President's authority
should be based on a "specific reference" within the Act. 441 U.S.
281, 304 n.34 (1979). Though the Court identified other potential
sources of statutory authority for the order it was considering—an
executive order prohibiting employment discrimination by federal

_____

[6] That is the same language that Congress originally enacted in 1949. *See* Fed-
eral Property and Administrative Services Act of 1949 § 205.

contractors—it doubted that the Procurement Act on its own delegated sufficient authority.[7]  The Court, noting that § 121(a) (then codified at § 486(a)) "explicitly authorizes Executive Orders necessary to effectuate its provisions," added that "nowhere in the Act is there a specific reference to employment discrimination."  *Id.* (quotation and brackets omitted).  The Supreme Court ultimately did not decide whether any statute authorized the executive order, but suggested that the Procurement Act alone was not enough to carry the day.  *See id.* at 304–06.  *Chrysler* thus points to interpreting the Act as a limited grant of authority, empowering the President to carry out the Act's specific provisions—but not more.  For whatever reason, *Chrysler* has received scant attention from the lower courts, but we do not see ourselves at liberty to disregard it.

In sum, the Procurement Act gives the President the authority to direct subordinate executive actors as they carry out its specific provisions; directing them to go beyond the statute's boundaries would neither "carry out" the Act nor be "consistent with" it. 40 U.S.C. § 121(a).  A presidential directive can stand only if those subordinate officials have the statutory authority that they are told to exercise.

---

[7] The other statutes were Titles VI and VII of the Civil Rights Act of 1964 and the Equal Employment Opportunity Act of 1972.  *See Chrysler*, 441 U.S. at 304–06.

## B.

That background leads us to the question here: whether Executive Order 14042 directs subordinates to carry out their own lawful statutory authority, or whether the Order instead exceeds the limitations imposed by the Procurement Act's text. The Order's core directive is aimed at all executive agencies. *See* Exec. Order No. 14042, § 2(a), 86 Fed. Reg. at 50,985. To assess whether the Procurement Act gives the President authority to issue that directive, we ask whether the Act gives those agencies the authority to insert a clause into all of their procurement contracts and solicitations requiring contractors' employees to be vaccinated against Covid-19.

Again, *Chrysler*'s analysis is instructive. After questioning the statutory basis for the antidiscrimination executive order itself, the Supreme Court went on to address whether agency regulations requiring contractors to disclose information about their affirmative-action programs were statutorily authorized. *See Chrysler*, 441 U.S. at 304–06. The "pertinent inquiry," the Court explained, was whether the agency action was "reasonably within the contemplation" of any "statutory grants of authority" relied on by the regulating agency. *Id.* at 306 (emphasis omitted).

The answer was no: the Court determined that when Congress enacted the statutes the government invoked in support of the order's disclosure policies—including the Procurement Act—it was "not concerned with public disclosure of trade secrets or confidential business information." *Id.* The Court thus could not "find

in these statutes a delegation of the disclosure authority asserted." *Id.*

Our review of the Procurement Act leads us to the same answer here. Nothing in the Act contemplates that every executive agency can base every procurement decision on the health of the contracting workforce. Instead, the statutory scheme establishes a framework through which agencies can articulate specific, output-related standards to ensure that acquisitions have the features they want.

Our analysis is also informed by a well-established principle of statutory interpretation: we "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quotations omitted). That doctrine has been applied in "all corners of the administrative state," and this case presents no exception. *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022). As the Supreme Court has emphasized, requiring widespread Covid-19 vaccination is "no everyday exercise of federal power." *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022) (quotation omitted). Including a Covid-19 vaccination requirement in every contract and solicitation, across broad procurement categories, requires "clear congressional authorization." *West Virginia*, 142 S. Ct. at 2609 (quotation omitted).

A deeper dive into the statutory parameters for contracting proves the point—the "highly consequential power" asserted here

lies "beyond what Congress could reasonably be understood to have granted." *Id.* The general grant of procurement power to executive agencies is in division C of subtitle I of Title 41. There, § 3101(a) states that agencies "shall make purchases and contracts for property and services in accordance with this division and implementing regulations of the Administrator of General Services." 41 U.S.C. § 3101(a). Following that broad provision, the division lays down specific rules on how agencies are to solicit bids and award contracts.

When an agency solicits a procurement agreement for property or services, it must "specify its needs" and "develop specifications in the manner necessary to obtain full and open competition with due regard to the nature of the property or services to be acquired." *Id.* § 3306(a)(1). Those specifications may be stated in terms of "function, so that a variety of products or services may qualify"; "performance, including specifications of the range of acceptable characteristics or of the minimum acceptable standards"; or "design requirements." *Id.* § 3306(a)(3). Once the solicitation is issued and bids are submitted, an agency must award the contract "based solely on the factors specified in the solicitation." *Id.* § 3701(a).

As for architectural and engineering contracts, agency heads are tasked with selecting the "most highly qualified firm" based on "statements of qualifications and performance data." 40 U.S.C. §§ 1103–04; *see also* 41 U.S.C. § 3309(a). Alternatively, an agency can use a two-phase selection process that incorporates a list of

requirements for the project, "which may include criteria and pre-liminary design, budget parameters, and schedule or delivery re-quirements." 41 U.S.C. § 3309(a), (c).  The agency first evaluates proposals based on "specialized experience and technical compe-tence, capability to perform, past performance of the offeror's team" (as well as "other appropriate factors") and then moves on to "technical proposals and cost or price information." *Id.* § 3309(c).

These details are dry.  But they show what the Procurement Act is all about—creating an "economical and efficient system" for federal contracting.  40 U.S.C. § 101.  That is worlds away from conferring general authority for every agency to insert a term in every solicitation and every contract establishing health standards for contractors' employees.  To be sure, contract terms sometimes lead to changes in contractors' internal operations.  But agencies procuring property or services may "include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the executive agency or as authorized by law." *Id.* § 3306(a)(2)(B). An all-encompassing vaccine requirement is different in nature than the sort of project-specific restrictions contemplated by the Act.  Like other enabling legislation, this statute is not an "open book" to which contracting agencies may "add pages and change the plot line." *West Virginia*, 142 S. Ct. at 2609 (quotations omit-ted).

Indeed, imposing more criteria than necessary works against the Act's oft-repeated priority of achieving "full and open

competition" in the procurement process.   41 U.S.C. § 3301; *see also, e.g., id.* §§ 3306(a)(1), 3903(b)(2)(B).   Every requirement that an agency adds to a solicitation renders any party that cannot satisfy it "ineligible to enter into a contract."   *See id.* § 3306(f)(3)(A). Unnecessary specifications limit the pool of eligible bidders and exclude contractors who are otherwise capable of meeting an agency's needs.   That is why, in the ordinary course, prospective bidders can challenge specifications as "unduly restrictive of competition."   *See, e.g., Savantage Fin. Servs., Inc. v. United States*, 150 Fed. Cl. 307, 316 (2020); *Chas. H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 723 (1999).   We cannot say that when Congress passed the Procurement Act, it meant to delegate authority to set baseline health and safety qualifications for contractors—standards that would apply regardless of the specific needs in a given project. *See West Virginia*, 142 S. Ct. at 2607–08.

Other statutes setting out procurement rules show that when Congress wants to further a particular economic or social policy among federal contractors through the procurement process—beyond full and open competition—it enacts explicit legislation.   For example, the Service Contract Act of 1965 directs contractors for services to pay their employees the federal minimum wage, and the Clean Air Act Amendments of 1970 prevent the government from contracting with any company that has criminally violated air pollution standards.   *See* 41 U.S.C. § 6704; 42 U.S.C. §§ 7413(c), 7606.   Congress has also passed legislation to respond to significant supply-chain risks; the SECURE Technology Act of

2018, for instance, allows federal agencies to refuse to contract with firms that fail to meet certain cybersecurity qualifications. *See* 41 U.S.C. § 4713. And for some procurement categories, Congress has passed laws prohibiting contract performance in working conditions that endanger employee "health" and "safety." *Id.* § 6502(4) (contracts for materials, supplies, articles, and equipment exceeding $10,000); *id.* § 6703(3) (services contracts covered by the Service Contract Act).

Here, in contrast, no statutory provision contemplates the power to implement an across-the-board vaccination mandate.[8] It follows that the President likely exceeded his authority under the Procurement Act when directing executive agencies to enforce such a mandate.

## C.

The federal government advocates for a broader interpretation of the President's authority under the Procurement Act. The President, it says, can "prescribe policies and directives that he considers necessary to ensure an economical and efficient system for

---

[8] Respectfully, the partial dissent's conclusion that Congress likely envisioned vaccination requirements because polio was a grave danger at the time that the Procurement Act was passed, and vaccine technology was in its early stages, seems incorrect. *See* Partial Dissent at 18–19. Indeed, these circumstances seem to point in the opposite direction—given public awareness of the risks of disease and the health measures that may be taken in response, we would expect Congress to include relevant language in the Procurement Act if it wished to grant the authority to require vaccination.

procurement and contracting." Under this approach, the argument goes, the contractor vaccine mandate falls well within the Act's expansive grant of authority because "ensuring that federal contractor performance is more efficient in turn enhances the economy and efficiency of the overall federal procurement system."

It may well be that if the statute required only a perceived connection to efficiency benefits, the mandate would stand up nicely. After all, Covid-19 has caused absenteeism issues over the last few years throughout the economy, and it is at least arguable that increasing vaccination would cut lost workdays for contractors in a way that would make the procurement process more efficient.

The problem is that the statute does not offer the breadth of authority that the federal government asserts. Its proposed reading rests on an upside-down view of the statutory scheme—that Congress has granted the President complete authority to control the federal contracting process in a way he thinks is economical and efficient, subject only to certain statutory limitations. The statute's language does not support this reading.[9]

Any text-based attempt to support the federal government's expansive interpretation requires reading the Act's purpose provision as a grant of authority. As the government emphasizes, § 101

---

[9] The federal government has disclaimed reliance on any authority beyond the Procurement Act. In its opening brief, the government states that "the Executive Order is framed solely as an exercise of power given by the Procurement Act."

of the Act states that the "purpose of this subtitle is to provide the Federal Government with an economical and efficient system" for activities relating to procurement.  40 U.S.C. § 101.  That purpose provision, the federal government argues, should be read together with the grant of authority to the President in § 121(a) so that it "authorizes the President to 'prescribe policies and directives' to ensure 'an economical and efficient system' for federal contracting." (quoting 40 U.S.C. §§ 101, 121(a)).

Not so.  An executive order cannot rest merely on the "policy objectives of the Act."  *Indep. Meat Packers Ass'n v. Butz*, 526 F.2d 228, 235 (8th Cir. 1975).  Statements of purpose are "in reality as well as in name *not* part of the congressionally legislated or privately created set of rights and duties."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 217 (2012). More to the point, "an expansive purpose in the preamble cannot add to the specific dispositions of the operative text."  *Id.* at 219. Although purpose statements can "shed light on the meaning of the operative provisions that follow," they "cannot give words and phrases of the dispositive text itself a meaning that they cannot bear."  *Id.* at 218; *see Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019).

The federal government's purpose-based reading of the President's statutory authority defies these principles.  It also contravenes the text of § 121(a).  That provision does not give the President authority to "carry out" the *purpose* of the statute.  It delegates the power to "carry out *this subtitle*," which contains a compilation of contracting rules for the General Services

Administration and other executive agencies. 40 U.S.C. § 121(a) (emphasis added). And according to its own terms, the purpose statement is not an operative component of the subtitle—it offers the "purpose" animating the operative provisions. *Id.* § 101. So while it tells us that Congress crafted the Procurement Act to promote economy and efficiency in federal contracting, the purpose statement does not authorize the President to supplement the statute with any administrative move that may advance that purpose. The partial dissent erroneously equates the federal government's approach with the one taken in *Gundy v. United States*. 139 S. Ct. 2116, 2126–27 (2019). There, the plurality used the purpose statement to clarify the limits on a broad statutory grant of authority. Here, the government asks us to do the opposite—treat the purpose statement itself as a source of authority so that we can ignore the limitations within the operative text. *See id.*; Partial Dissent at 7.

Looking for firmer footing than the statute's text, the federal government encourages us to rely on a line of cases out of the D.C. Circuit, beginning with *AFL-CIO v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979) (en banc). There, the en banc court analyzed whether the Procurement Act authorized the President to issue an executive order requiring that contractors comply with wage and price standards. *Id.* at 787, 792–93. The court said yes; it determined that the Act granted the President "particularly direct and broad-ranging authority over those larger administrative and management issues that involve the Government as a whole." *Id.* at 789. It added that

the President should use that power "to achieve a flexible management system capable of making sophisticated judgments in pursuit of economy and efficiency." *Id.* An executive order based on this statutory delegation, the court explained, "must accord with the values of 'economy' and 'efficiency.'" *Id.* at 792. And because there was a "sufficiently close nexus between those criteria" and the procurement program established by the executive order at issue, the court said the program was authorized. *Id.*

Though *Kahn* has since been read in some quarters as a blueprint for near-limitless executive procurement authority, it need not be. Indeed, that decision warns that the Procurement Act does not give the President a "blank check" for him "to fill in at his will." *Id.* at 793. And it cautions that the President must still exercise the procurement power "consistently with the structure and purposes of the statute." *Id.* What's more, two concurrences separately emphasized how narrow the majority holding was. One explained that the court's opinion "does not allow the President to exercise powers that reach beyond the Act's express provisions," while another highlighted that "nothing in the court's opinion intimates any views on the validity of other Executive Orders." *Id.* at 797 (Tamm, J., concurring); *id.* at 796–97 (Bazelon, J., concurring). These opinions do not read as a mandate to accept Procurement Act mandates.[10]

_____

[10] The Fourth Circuit, for its part, has treated *Kahn*'s "nexus" test as a limiting standard rather than an expansion, one that prohibits the connection between

Even so, following *Kahn*, the D.C. Circuit has endorsed a much more expansive interpretation, one that allows the President to issue any procurement directive that has a close enough "nexus" to economy and efficiency. *See UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366–67 (D.C. Cir. 2003). But treating economy and efficiency as the only content defining the President's procurement power works the same result as embedding the purpose statement of § 101 into the operative delegation of § 121(a)—an untenable approach.

The D.C. Circuit, however, has done just that. For example, in *Chamber of Commerce v. Reich*, that court stated that the President has "authority to pursue efficient and economic procurement." 74 F.3d 1322, 1333 (D.C. Cir. 1996) (quotation omitted). Likewise, in *American Federation of Government Employees, AFL-CIO v. Carmen*, the court wrote that the Act is "effectuated if the executive action in question assists the Government in obtaining an economical and efficient system" for "the utilization of available property." 669 F.2d 815, 821 (D.C. Cir. 1981) (quotations and brackets omitted). The "nexus" test is so "lenient," in the D.C. Circuit's own estimation, that an executive order can stand even if there is "a rather obvious case that the order might in fact increase

---

"procurement costs" and the executive order's "social objectives" from being "too attenuated." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170–72 (4th Cir. 1981).

procurement costs" rather than contributing to economy and efficiency. *Chao*, 325 F.3d at 366–67.

We disagree with this purpose-based approach, detached as it is from the Act's remaining text and structure. The purpose the Act serves is, if anything, a secondary restriction on the President's authority rather than an expansion. After all, purpose provisions "can suggest only which *permissible* meanings of the enactment should be preferred" when the text is otherwise ambiguous. Scalia & Garner, *Reading Law* at 219; *see District of Columbia v. Heller*, 554 U.S. 570, 577–78 (2008). And again, any policy the President issues using his procurement power must "carry out" and be "consistent with" the operative provisions of the Act. 40 U.S.C. § 121(a). That means that the agencies and officials the President directs must themselves have authority under the Act to carry out those instructions.

The federal government also urges us to adopt the nexus approach as a reaction to past executive orders issued under the Procurement Act. We meet this argument with skepticism because we cannot use past practices to stretch the statute's text. While the Executive's "early, longstanding, and consistent interpretation of a statute" can be "powerful evidence of its original public meaning" and thus help resolve ambiguities, it cannot make ambiguous text clear, or supply meaning that the text cannot withstand. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring in the judgment) (emphasis omitted); *see Callahan v. U.S. Dep't of Health & Hum. Servs.*, 939 F.3d 1251, 1263 n.11 (11th Cir. 2019). Relying

28                        Opinion of the Court                    21-14269

on the assertion of past practices would put us on the wrong side of that line.

No doubt, *Kahn* relied on historical examples.  It emphasized what it called "the most prominent use" of the President's Procurement Act authority, "a series of anti-discrimination requirements for Government contractors."  *Kahn*, 618 F.2d at 790.  But what *Kahn* treated as a robust backdrop was nearly a blank slate for the question it faced then and we face now—whether the Procurement Act itself delegates the President the authority to issue a challenged executive order.  Indeed, in *Chrysler* the Supreme Court specifically criticized two circuit cases the *Kahn* decision later cited to support its position that the Procurement Act was the only "statutory support" for the antidiscrimination orders.  *Id.* at 790–91; *see Chrysler*, 441 U.S. at 304 n.34.  *Kahn* did not cite *Chrysler*, let alone acknowledge how it limited the force of the reasoning in those circuit decisions, which the Supreme Court had rejected as dicta that was "made without any analysis of the nexus" between the statute and the executive orders.  *Chrysler*, 441 U.S. at 304 n.34.[11]

---

[11] *Kahn* cited cases from the Third and Fifth Circuits for approving the Procurement Act as the statutory support for the orders.  *See* 618 F.2d at 791–92 (citing *Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3, 8 (3d Cir. 1964), *Contractors Ass'n of E. Pennsylvania v. Sec'y of Lab.*, 442 F.2d 159, 170 (3d Cir. 1971), and *Farkas v. Texas Instrument Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967)).  Because, as it acknowledges, the former Fifth Circuit's decision is dicta, the partial dissent is incorrect to suggest that it is binding precedent, and further errs by saying that it adopted a test that is similar to *Kahn*'s.  *See* Partial Dissent at 4–5 & n.1.  Especially in light of these conflicts, no "judicial consensus"

What's more, the antidiscrimination orders have long been justified based on intermingled sources of authority, both constitutional and statutory, and whether the Procurement Act alone could sustain them has long been contested.[12]  *See id.* at 304–06 & n.34; *see also Kahn*, 618 F.2d at 809–10 (MacKinnon, J., dissenting); Robert S. Pasley, *The Nondiscrimination Clause in Government Contracts*, 43 Va. L. Rev. 837, 849 (1957) (stating that, despite the author's support for such clauses, there is "no direct relation between" a nondiscrimination clause and "efficient performance of the basic contract obligations").  This conflicted history does little to support the federal government's assertion of authority now.

---

existed when Title 40 was recodified, let alone one "so broad and unquestioned that we must presume Congress knew of and endorsed it."  *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 349 (2005).

[12] After *Chrysler*, our predecessor court upheld the President's authority to issue antidiscrimination orders as at least impliedly authorized by a combination of statutes—the Procurement Act, the Civil Rights Act of 1964, and the Equal Employment Opportunity Act of 1972—but never held that those orders were expressly authorized by the Procurement Act alone.  *United States v. Mississippi Power & Light Co.*, 638 F.2d 899, 904–06 & n.12 (5th Cir. Unit A Mar. 1981) (affirming the court's previous analysis in *United States v. New Orleans Pub. Serv., Inc.*, 553 F.2d 459, 465–68 & n.8 (5th Cir. 1977), *vacated and remanded on other grounds*, 436 U.S. 942 (1978)); *see also Eatmon v. Bristol Steel & Iron Works, Inc.*, 769 F.2d 1503, 1516 (11th Cir. 1985) (stating that an executive order requiring government contractors to include an "equal opportunity clause" in their contracts has been found authorized by both the grant of authority to the President in the Procurement Act and Title VII).  Here, the federal government relies on the Procurement Act as the sole source of authority for the contractor vaccine mandate.

Finally, the federal government urges us to rely on more recent executive orders that Presidents have issued in the interest of economy and efficiency in the procurement system.  Only one example it offers is even remotely in the realm of public health: a directive by President Obama requiring federal contractors to provide paid sick leave to employees.  *See* Exec. Order No. 13706, 80 Fed. Reg. 54,697 (Sept. 7, 2015).  We do not weigh in on its validity here, and no other circuit court has done so either.  For our purposes, that single order falls far short of establishing the kind of "longstanding practice" that might support interpreting the Procurement Act to contemplate a vaccination power—if the text could bear that reading.  *See Biden v. Missouri*, 142 S. Ct. 647, 652–53 (2022).

\*      \*      \*

In short, the President's authority to issue Executive Order 14042, and executive agencies' authority to implement it, depend on whether Congress delegated the power to require widespread vaccination through the Procurement Act.  All signs suggest that Congress has retained this power rather than passing it on.  Agencies' bare authority to set contract specifications and terms is not enough to show that when Congress passed the Procurement Act it contemplated the general power to mandate vaccination.  The plaintiffs thus are likely to succeed on their claim that the President exceeded his authority by issuing the contractor vaccine mandate, and have satisfied "the most important preliminary-injunction

criterion." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127–28 (11th Cir. 2022).

## IV.

The plaintiffs have also met the remaining requirements for a preliminary injunction. That is, they have shown that they would suffer irreparable harm without the injunction, and that the harm they would experience outweighs the harm the injunction would cause the federal government and the public.

This Circuit has recognized that unrecoverable monetary loss is an irreparable harm. *Odebrecht Constr., Inc. v. Sec'y, Florida Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013). That includes situations where there is "no adequate remedy at law to recover damages for the harm suffered." *Transcon. Gas Pipe Line Co. v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049*, 910 F.3d 1130, 1165 (11th Cir. 2018). Here, the district court identified several obvious costs of complying with the contractor vaccine mandate—including lost employees, as well as the "time and effort" needed to identify employees covered by the mandate and implement technology to track their vaccination. The court determined that these costs were unrecoverable—and therefore irreparable. Such outlays, the district court found, "could imperil the financial viability" of many trade association members, and would require all of the plaintiffs to "make decisions which would significantly alter their ability to perform federal contract work" that is "critical to their operations."

The federal government does not push back on the existence of those costs.  Nor has it identified a way for the plaintiffs to recoup them.[13]  Instead, it tries to rely on an unpublished decision from this Circuit, which it says establishes that "[o]rdinary compliance costs are typically insufficient to render harm irreparable." *See LabMD, Inc. v. FTC*, 678 F. App'x 816, 821 (11th Cir. 2016) (unpublished).  We find it odd that the federal government would rely so heavily on a non-binding opinion, particularly one that, when read in whole, undermines the government's position by repeating the rule that unrecoverable costs of compliance constitute irreparable harm.  *See id.* at 822.

And contrary to the federal government's assertion in its reply brief, our decision in *Florida v. Department of Health and Human Services* does not foreclose the plaintiffs' argument that the harms they face are irreparable.  To start, in that case Florida claimed intrusion on its sovereign authority; a deprivation of medical staff that would lead to a healthcare-staffing shortage in the State; and harm as "*parens patriae* for the many Floridians who

---

[13] As the federal government acknowledges, the Contract Disputes Act only makes monetary relief available for disputes involving existing contracts.  *See* 41 U.S.C. §§ 7102(a), 7103(a).  The federal government argued below that monetary relief is available under the Tucker Act, but has not made that argument on appeal.  In any event, the Tucker Act does not allow recovery for costs "incurred *in anticipation of* contract award," because the contractor "assumes the risk that it will not be awarded the contract."  *Coflexip & Servs., Inc. v. United States*, 961 F.2d 951, 953 (Fed. Cir. 1992); *see* 28 U.S.C. § 1491(b).

work in healthcare and do not wish to receive a vaccine." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1291–92 (11th Cir. 2021) (quotation omitted).  The States here rely on none of the sovereign injuries we rejected there.  *See id.* at 1291–93.  And the majority opinion contained not one word about compliance costs, which were a key component of the district court's conclusion in this case.

The only real attention the *Florida* opinion gave to injuries remotely like the ones asserted here was its criticism of Florida's evidence relating to quality-of-care reductions due to staffing shortages as "speculative" and "conclusory."  *Id.* at 1292 (quotations omitted).  We affirmed the district court's conclusion that the expected worker loss was unfounded because none of the supporting evidence indicated "with any degree of certainty whatsoever" that employees would resign.  *Id.*  That was a record-based conclusion—not a categorical rule that employee losses or staff shortages could never constitute irreparable harm.  Here, the record supported a different conclusion.[14]  The district court did not abuse its

---

[14] The *Florida* panel also obliquely addressed economic injury in a footnote: "we are not persuaded that Florida has carried its burden of showing that, absent an injunction, it will suffer an economic injury that could not be redressed if the interim rule turns out to be invalid."  19 F.4th at 1292 n.6.  This is, again, a record-based conclusion, and not one that gives us any sense of what kinds of costs Florida asserted or why those costs may have been remediable in that context.

34                    Opinion of the Court                21-14269

discretion when it concluded that the plaintiffs' costs satisfy the ir-
reparable harm requirement.

Likewise, no abuse of discretion occurred when the district
court balanced the plaintiffs' harm from the mandate against the
federal government's and the public's interests in its enforcement.
Both sides have articulated powerful interests. "It is indisputable
that the public has a strong interest in combating the spread" of
Covid-19. *Alabama Ass'n of Realtors*, 141 S. Ct. at 2490. That in-
terest extends to federal contractor employees, especially consider-
ing that at least some costs of any employee's sickness during the
performance of a contract may be passed on to contracting agen-
cies. "But our system does not permit agencies to act unlawfully
even in pursuit of desirable ends." *Id.* During times of crisis and
calm alike, executive officials cannot take action founded on faulty
claims of congressional authorization. And until a final decision is
reached on the merits of the challengers' claims, many other tools
for stemming the virus and reducing procurement costs remain at
the federal government's disposal. Granting the plaintiffs a prelim-
inary injunction was within the district court's discretion.

## V.

After deciding that a preliminary injunction was appropri-
ate, the district court enjoined the enforcement of the contractor
vaccine mandate—against any contractor, anywhere in the United
States, plaintiff or not. We are both weary and wary of this drastic
form of relief. In their universal reach to plaintiffs and nonplaintiffs
alike, nationwide injunctions push against the boundaries of

judicial power, and very often impede the proper functioning of our federal court system.

The constitutional backbone of the federal judiciary is our role in deciding cases and controversies. U.S. Const. art. III, § 2, cl. 1; *see also Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018) ("constitutionally prescribed role" of the federal judiciary is "to vindicate the individual rights of the people appearing before it"). In practice, fidelity to that role often limits the relief we can offer—while "federal courts possess broad discretion to fashion an equitable remedy," that discretion is bounded by both historical practice and traditional remedial principles. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015); *see Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999).

What is the traditional scope of injunctive relief? The "extent necessary to protect the interests of the parties." *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003). The Supreme Court has cautioned that remedies should be "limited to the inadequacy that produced the injury in fact that the plaintiff has established," and "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Gill*, 138 S. Ct. at 1931 (quotation omitted); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Indeed, because the judicial power serves "to redress or otherwise to protect against injury to the complaining party," any remedial benefit extended to others is typically collateral. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). It is the political

branches—not the courts—that are broadly tasked with managing government policies in the absence of any actual or imminent injury. *See Lewis v. Casey*, 518 U.S. 343, 349–50 (1996).

Consistent with these principles, we have said that a nationwide injunction may be issued "in appropriate circumstances." *Florida*, 19 F.4th at 1281 (quotation omitted). But "those appropriate circumstances are rare." *Id.* at 1282. When considering requests to enjoin national rules and policies, courts must wrestle with whether it is possible to provide "complete relief to the plaintiffs with an injunction limited in scope" to the plaintiffs alone, or whether it is necessary to extend relief to nonparties as well. *Id.*

In some cases, that task is difficult. The district court may have "trouble fashioning a remedy" that is "certain to include all the plaintiffs" and to provide adequate relief. *Id.* A nationwide injunction might appear to be a helpful salve for that concern; by casting a wide net, the district court can be confident that its injunction captures the right parties and fully protects them from harm. But that ease comes with a cost—it gives a single district court an outsized role in the federal system.

By design, the federal court system allows courts to reach multiple answers to the same legal question, but nationwide injunctions frustrate that end. There are 94 federal district courts around the country and 12 regional circuit courts of appeals. The decision of any one of those courts typically has little effect on the other courts of its type: one circuit's decisions are not binding on the others, and a district court's decisions do not bind other district

courts, other judges on the same court, or even the same judge in another case. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011); *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc); *Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991). Conflicts are inevitable, and even helpful. Differing opinions aid "the development of important questions of law" and supply the Supreme Court with "the benefit it receives from permitting several courts of appeals to explore a difficult question" before it grants certiorari. *United States v. Mendoza*, 464 U.S. 154, 160 (1984); *see also Califano*, 442 U.S. at 702.

This divergence of decisions is expected—encouraged—in cases challenging federal government action, because the federal government is often a repeat player in lawsuits that involve significant legal questions. For instance, special collateral estoppel rules allow the federal government to relitigate an issue adjudicated against it in another lawsuit involving a different party. *See Mendoza*, 464 U.S. at 160–62. And under the doctrine of intercircuit nonacquiescence, an executive agency is "free to refuse acquiescence" and can advance its position before other circuits even after one circuit has disagreed. *Indep. Petrol. Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 n.3 (D.C. Cir. 1996).

Of course, when Congress desires to deviate from this system of diffuse review, it has the tools to do so. Congress has taken an active role in streamlining certain lawsuits against federal agencies, for instance. Ordinarily parties challenge agency action by suing in federal district courts. *See Nat'l Ass'n of Mfrs. v. Dep't of*

*Def.*, 138 S. Ct. 617, 624 (2018).  But for some categories of agency action, parties file petitions for review in regional circuit courts. *See, e.g.*, 28 U.S.C. §§ 2342, 2349; 33 U.S.C. § 1369(b)(1); 29 U.S.C. § 660(a)–(b); 49 U.S.C. § 46110(a).  Petitions filed across multiple circuits are then consolidated in a single circuit.  *See* 28 U.S.C. § 2112(a).  If that circuit court invalidates or upholds an agency decision, the ruling is binding nationwide.  *See, e.g.*, *Gorss Motels, Inc. v. FCC*, 20 F.4th 87, 97 (2d Cir. 2021).  One recent high-profile example of such centralized review was the multi-circuit lottery that resulted in OSHA vaccine mandate cases being consolidated for review in the Sixth Circuit.  *See Nat'l Fed'n of Indep. Bus.*, 142 S. Ct. at 664.

Other times Congress designates one circuit court as the exclusive forum.  Some agency actions are reviewed only in the D.C. Circuit, resulting in "only one body of precedent" rather than "a patchwork of potentially conflicting cases in multiple circuits." Eric M. Fraser et al., *The Jurisdiction of the D.C. Circuit*, 23 Cornell J.L. & Pub. Pol'y 131, 145 (2013).  Similarly, Congress has funneled appeals of cases involving patents and Tucker Act claims to the Court of Appeals for the Federal Circuit, giving that court's decisions binding effect on lower courts throughout the United States. *See* 28 U.S.C. §§ 1295(a), 1491(a)(1).  The motivating concern behind Congress's creation of the Federal Circuit was the "special need for nationwide uniformity" in those particular areas of the law. *United States v. Hohri*, 482 U.S. 64, 71 (1987) (quotation omitted).

In the context of multidistrict litigation, civil cases involving common questions of fact may be transferred to a single district court.  28 U.S.C. § 1407(a).  That court coordinates pretrial proceedings "for the convenience of parties and witnesses" and "the just and efficient conduct of such actions."  *Id.*  But once pretrial issues are resolved, remaining actions are remanded to the original districts.  *See id.*  Given Congress's power to shape the federal court system and its practice of delineating alternate avenues for litigation, federal courts should hesitate before deviating from the default system on our own terms.

By cutting off parallel lawsuits, nationwide injunctions frustrate foundational principles of the federal court system.  They encourage gamesmanship, motivating plaintiffs to seek out the friendliest forum and rush to litigate important legal questions in a preliminary posture.  They disturb comity by hindering other courts from evaluating legal issues for themselves.[15]   And they

---

[15] This problem has played out in the wake of the nationwide injunction that the district court entered here; several other district courts across the country have dismissed, stayed, or otherwise declined to address lawsuits filed in their own jurisdictions that challenge the contractor vaccine mandate.  *See, e.g., de Cristo Cano v. Biden*, No. 22-CV-193, 2022 WL 1004558, at *1–2 (S.D. Cal. Apr. 4, 2022); *Feds for Med. Freedom v. Biden*, No. 21-cv-356, 2022 WL 188329, at *1 (S.D. Tex. Jan. 21, 2022); *Conner v. Biden*, No. 21-CV-074, 2021 WL 6773174, at *8 (N.D. Tex. Dec. 28, 2021).  And given the injunction, any court's finding that the mandate is likely to be lawful has no impact.  *See Donovan v. Vance*, 576 F. Supp. 3d 816, 825 (E.D. Wash. 2021).

escalate pressure on the Supreme Court docket by limiting perco-lation and raising the stakes of individual lower-court decisions.

We are not the first to catalog these problems—many have already done so in response to the growing trend of nationwide injunctions against federal action. *See, e.g.*, *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600–01 (2020) (Gorsuch, J., con-curring in the grant of stay); *Trump*, 138 S. Ct. at 2424–29 (Thomas, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022) (Sutton, C.J., concurring); *City of Chicago v. Barr*, 961 F.3d 882, 936–38 (7th Cir. 2020) (Manion, J., concurring in the judg-ment); *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 256–62 (4th Cir. 2020) (Wilkinson, J.), *vacated for reh'g en banc*, 981 F.3d 311 (4th Cir. 2020) (dismissed Mar. 11, 2021); *California v. Azar*, 911 F.3d 558, 583–84 (9th Cir. 2018) (Wallace, J.); *see also* Ronald A. Cass, *Nationwide Injunctions' Governance Problems: Forum Shopping, Politicizing Courts, and Eroding Constitutional Struc-ture*, 27 Geo. Mason L. Rev. 29, 42–62 (2019); Samuel L. Bray, *Mul-tiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 457–65 (2017). Concerns that nationwide injunctive relief is both increasing in frequency and incompatible with the proper judicial role are widespread.

These concerns cannot be lightly set aside, as tempting as that may be after several decades of tacit acquiescence in universal, nationwide remedies. When considering a request to enjoin a na-tional rule or policy—especially on a preliminary basis—a district court should thoroughly analyze the extent of relief necessary to

protect the plaintiffs from harm, taking care that the remedy issued is not "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano*, 442 U.S. at 702.

To be sure, sometimes an injunctive order that relieves the plaintiff of an injury will affect nonparties. One example from a different context is instructive: providing relief to a voter-plaintiff injured by racial gerrymandering requires revising the boundaries of the legislative district, which necessarily impacts other voters. *See Gill*, 138 S. Ct. at 1930–31. But as this example shows, the nature of the remedy is dependent on the nature of the defendant's action—indiscriminate relief should not be issued by default. *See Lewis*, 518 U.S. at 357.

Courts have, over time, suggested a range of factors that may counsel in favor of a nationwide injunction. *See, e.g.*, *Florida*, 19 F.4th at 1281–83. But these have not been treated as a checklist. And the analysis typically circles back to the core question: whether a nationwide injunction is necessary to offer full relief to the plaintiffs. The number and geographic dispersion of the plaintiffs is a prime example; we have rejected reliance on that factor when the facts raised "no concerns that a non-nationwide preliminary injunction wouldn't provide the plaintiffs with complete relief." *Id.* at 1282. After all, "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano*, 442 U.S. at 702. And an injunction that bars action against the plaintiffs obligates a defendant to respect that injunction, no matter where in the country the plaintiffs

are located or how many plaintiffs there are. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952).

Reviewing courts should also be skeptical of nationwide injunctions premised on the need to protect nonparties. Several procedural devices allow nonparties with similar interests to seek the protection of injunctive relief—class certification under Rule 23, joinder and intervention in an existing lawsuit, or even filing a new lawsuit of their own. *See Florida*, 19 F.4th at 1282. A district court cannot circumvent these mechanisms in the name of providing injunctive relief only for nonparties' benefit. And, in cases challenging federal administrative actions, similarly situated parties may well have extremely *dissimilar* views on whether they are helped or harmed by a federal policy.

Nor should a district court enter a nationwide injunction to serve the general interest of national uniformity. As we have described, nonuniformity is a deliberate feature of our federal court system, and Congress—not one of the 94 federal district courts or 12 regional circuit courts—is best positioned to choose when to depart from that norm.[16] And when a "regulatory challenge involves important and difficult questions of law, it is especially vital that various courts be allowed to weigh in so that the issues can percolate among the courts." *Id.* at 1283.

---

[16] On appeal the plaintiffs have abandoned any argument relating to the potential availability of vacatur of an agency action as an ultimate remedy. We therefore do not consider that issue here.

Here, the district court relied on improper considerations to justify its nationwide injunction. It emphasized that members of Associated Builders and Contractors are located "all over the country," and that, in recent years, they were collectively awarded most federal construction contracts. Stretching logic, the court reasoned that if it "were to enjoin the enforcement of the mandate only in the Southern District of Georgia or only in Georgia, Alabama, Idaho, Kansas, South Carolina, Utah and West Virginia," then "members would not have injunctive relief as to covered contracts in other states." But injunctive relief operates on specific parties, not geographic territories, and identifying the plaintiff States and trade association members is possible.

The district court's other reason for a nationwide remedy was that narrower relief "would prove unwieldy and would only cause more confusion." This statement is ambiguous: it may reflect either the lack of uniformity that would result from a well-tailored injunction, or the difficulty of structuring an injunction that allows enforcement against nonparties while still providing relief to the plaintiffs. The former is an inappropriate consideration, and the latter is unsupported by the district court's analysis or the record.

Some aspects of the injunctive order are overbroad. In the context of new and existing contracts, extending the injunction to nonparties is unnecessary to provide complete relief to the plaintiffs; a contract term may be enforceable in one agreement but dormant in another. We therefore vacate the district court's

injunction to the extent that it bars enforcement of the mandate against nonparty contractors through new and existing contracts. The injunction permissibly blocks federal agencies from enforcing the mandate in contracts with any plaintiff State or member of Associated Builders and Contractors.  As a result, plaintiffs need not comply with the vaccination requirement in their capacity as contractors, and they are not responsible for including that requirement in lower-tier subcontracts.

In the solicitation context, the lines to draw are not so clear-cut.  Unlike procurement contracts, solicitations are generally issued by the federal government to many bidders, who are then expected to comply with the solicitation's terms to remain eligible for the contract award.  Enjoining the mandate in solicitations where no plaintiff participates as a bidder is unnecessary to provide relief to the plaintiffs, and the injunction should not extend that far. But the federal government agreed at oral argument that plaintiffs would be disadvantaged in the solicitation process if the federal government could consider whether a bidder is subject to the mandate.  As the federal government proposed, we leave the injunction in place to the extent that it bars federal agencies from considering the enforceability of the mandate when deciding who should receive a contract, if any plaintiff belongs to the pool of bidders.  An injunction of that scope, the federal government concedes, is "necessary to give the plaintiffs complete relief."

This case shows both the difficulty and the importance of considering whether the courts can offer complete relief to the

plaintiffs in federal regulatory challenges without issuing a nationwide injunction.  Here, we can.  So we must.

\*          \*          \*

The district court appropriately determined that the plaintiffs are entitled to a preliminary injunction against the enforcement of the contractor vaccine mandate.  But the scope of that injunction—extending nationwide and without distinction to plaintiffs and nonparties alike—was overbroad.  We **AFFIRM** the district court's order to the extent that it enjoins federal agencies from enforcing the mandate against the plaintiffs—the seven plaintiff States and their agencies and members of Associated Builders and Contractors—and to the extent that it bars the federal government from considering a bidder's compliance with the mandate when deciding whether to grant a contract to a plaintiff or to a nonparty bidder.  We otherwise **VACATE** the preliminary injunction.  As a result, the federal government is no longer enjoined from enforcing the mandate in new and existing procurement contracts between the federal government and nonparties, or in the selection process following solicitations in which no plaintiff participates as a bidder.

21-14269          EDMONDSON, J., concurring in result          1

EDMONDSON, Circuit Judge, concurring with Judge Grant in the result:

I concur in the result Judge Grant reaches for this interlocutory appeal.

After looking at the briefs, precedents, and other authorities, I easily believe that plaintiffs have a reasonable chance to succeed on the merits in the case underlying this interlocutory appeal. I agree that the district court did not abuse its discretion in granting a preliminary injunction. I also agree that a nationwide injunction (one granting supposed "relief" to absent persons who had asked for no such "relief" and might not want it) was an abuse of discretion; the preliminary injunction in this case must be limited to protecting the parties in this case. Furthermore, I agree that plaintiffs must not be disadvantaged by the federal government on account of the injunction that protects these parties.

21-14269 ANDERSON, J., concurring in part & dissenting in part      1

ANDERSON, Circuit Judge, concurring in part & dissenting in part:

I agree that the scope of the injunction should be narrowed, and I join Part V of Judge Grant's opinion (hereinafter "the lead opinion").  However, I disagree that Appellees have shown a substantial likelihood of success on the merits.  I do not think Appellees have demonstrated that the President lacks authority to require agencies to insert a clause into their future contracts and solicitations that require those federal contractors and their subcontractors to require COVID-19 vaccinations for their employees who either work on federal contracts or work in the same location as employees who work on federal contracts.  The Federal Property and Administrative Services Act of 1949 ("the Procurement Act"), 40 U.S.C. § 101 *et seq.*, gives the President authority to "prescribe policies and directives" to ensure "an economical and efficient system for" procurement and contracting.  40 U.S.C. §§ 101, 121.  This language, in my view, clearly authorizes the President's action here.  Accordingly, to this extent, I respectfully dissent.

Section 121 of the Procurement Act provides:

The President may prescribe policies and directives that the President considers necessary to carry out this subtitle.  The policies must be consistent with this subtitle.

40 U.S.C. § 121.

In pertinent part, 40 U.S.C. § 101 provides:

> The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:
>
> (1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (plurality opinion) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666, 127 S. Ct. 2518, 2534 (2007)). In addition to context and structure, courts "often look[] to 'history [and] purpose' to divine the meaning of language." *Id.* (alternations in original) (quoting *Maracich v. Spears*, 570 U.S. 48, 76, 133 S. Ct. 2191, 2209 (2013)).

Here, § 121 provides clear authority for the President to "prescribe policies and directives that the President considers necessary to carry out" the Procurement Act. 40 U.S.C. § 121. And

21-14269 ANDERSON, J., concurring in part & dissenting in part    3

§ 101, the purpose of the Procurement Act, clarifies the President's authority to prescribe those policies and directives, allowing the President to prescribe policies and directives that "provide the Federal Government with an economical and efficient system for" procurement.  40 U.S.C. § 101.  The statute, moreover, specifically contemplates numerous functions—including "contracting" —for "[p]rocuring and supplying property and nonpersonal services." *Id.* The Procurement Act, then, clearly authorizes the President to prescribe such policies and directives that carry out the purpose of the statute to ensure an "economical and efficient system for" procurement.  40 U.S.C. § 101.

That is what the President did here.  The President issued an Executive Order ("EO") requiring agencies to insert clauses into their future contracts and solicitations that, in turn, required that contractors and subcontractors assure that their employees who work on federal contracts or work in a workplace with those who do are vaccinated against COVID-19.  Exec. Order No. 14,042, 86 Fed. Reg. 50,985 (Sept. 9, 2021).  To ensure that such a policy would provide for an "economical and efficient system for" procurement, 40 U.S.C. § 101, the EO was not effective until the Director of the Office of Management and Budget ("OMB") made findings that the EO would enhance the economy and efficiency of the contracting system, 86 Fed. Reg. at 50,985–86.  The Director of OMB then made the appropriate findings.  The President's EO, thus, fits comfortably within the Procurement Act's grant of power.

4  ANDERSON, J., concurring in part & dissenting in part  21-14269

This understanding of the Procurement Act is in accord with the many court decisions upholding Presidential Executive Orders issued pursuant to § 121.  In 1979, the D.C. Circuit upheld an exercise of the President's power under the Procurement Act.  *See Am. Fed'n of Labor & Congress of Indus. Orgs v. Kahn*, 618 F.2d 784, 785 (D.C. Cir. 1979).  In *Kahn*, the D.C. Circuit, interpreting an earlier but substantively identical version of the statute, held that § 121 "grants the President particularly direct and broad-ranging authority over those larger administrative and management issues that involve the Government as a whole" and that the authority "should be used in order to achieve a flexible management system capable of making sophisticated judgements in pursuit of economy and efficiency." *Id.* at 789.  Despite that broad holding, the court emphasized that "our decision today does not write a blank check for the President to fill in at his will." *Id.* at 793.  To ensure that the decision was not a blank check, the D.C. Circuit required "a sufficiently close nexus between [economy and efficiency] and the procurement" program at issue. *Id.* at 792.

Other circuits have adopted similar tests.  In a case regarding an early executive order imposing antidiscrimination requirements on federal contractors, the former Fifth Circuit noted in dicta that the order was related enough "to the establishment of 'an economical and efficient system for . . . the procurement and supply' of property and services" that it concluded that the order "was issued pursuant to statutory authority." *Farkas v. Tex. Instrument, Inc.*,

21-14269 ANDERSON, J., concurring in part & dissenting in part     5

375 F.2d 629, 632 n.1 (5th Cir. 1967).[1]  In assessing similar antidiscrimination requirements for federally assisted construction projects, the Third Circuit upheld the Executive Order because, as in direct procurement, "the federal government has a vital interest in assuring that the largest possible pool of qualified manpower be available for the accomplishment of its projects." *Contractors Ass'n of E. Pa. v. Sec'y of Labor*, 442 F.2d 159, 171 (3d Cir. 1971). Similarly, the Fourth Circuit, while not adopting the nexus test, applied the test to determine whether the antidiscrimination provisions could validly be applied to insurance companies providing workers' compensation insurance to federal contractors. *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 165–66, 170 (4th Cir. 1981).

The lead opinion attempts to undermine this consensus in two ways.  First, it focuses on the Supreme Court's decision in *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S. Ct. 1705 (1979).  There, the Supreme Court held that the Procurement Act did not authorize the public disclosure of trade secret information, which was too remotely related to the Government's program to eliminate employment discrimination by the Federal Government and its contractors.  *Id.* at 304–07, 99 S. Ct. at 1719–20.  In doing so, the Court explicitly stated that it was not necessary to decide, and therefore did not decide, whether the executive order at issue was authorized by the Procurement Act or any other statute.  *Id.* at 304–06, 99 S.

---

[1] Precedents of the old Fifth Circuit are binding on this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

6  ANDERSON, J., concurring in part & dissenting in part  21-14269

Ct. at 1719–20.  From this decision, the lead opinion highlights a
footnote that noted that the Procurement Act contained "no spe-
cific reference to employment discrimination" while acknowledg-
ing the consensus that had found such regulations authorized by
the Act.  *Id.* at 304 n.34, 99 S. Ct. at 1719 n.34.  But the Supreme
Court's dicta—which fails to take a position on how the Procure-
ment Act should be interpreted—does not suggest that delegated
authority must always be tied to a specific statutory provision.  In-
deed*, Chrysler* expressly disavows any such requirement: "This is
not to say that any grant of legislative authority to a federal agency
by Congress must be specific before regulations promulgated pur-
suant to it can be binding on courts in a manner akin to statutes."
*Id.* at 308, 99 S. Ct. at 1720–21; *see also Florida v. Dep't of Health
& Human Servs.*, 19 F.4th 1271, 1288 (11th Cir. 2021) ("[B]y its very
nature, a broad grant of authority . . . does not require an indica-
tion that specific activities are permitted.").  Indeed, the contrary
position would make no sense in this case.  The President in this
case is acting in the role of a proprietor—not in the role of a regu-
lator.  As developed more fully below, the proprietary role of the
government here is significant.  Consistent with common sense
and common experience, it is acknowledged that there is explicit
authority for the government to identify specifications for the gov-
ernment work.  *See* 41 U.S.C. § 3306.  Pursuant to the precedent
discussed above, as well as common sense and common experi-
ence, this includes the authority to specify reasonable qualifications
for performing the government work.  Neither common sense nor
historical practices would suppose that Congress must foresee and

21-14269 ANDERSON, J., concurring in part & dissenting in part      7

explicitly authorize every qualification for government contractors and workers that the infinitely various contractual circumstances may require. Thus, *Chrysler* does not undermine this longstanding, thoughtful consensus among the Courts of Appeals.

In a second attempt to undermine this longstanding consensus, the lead opinion argues that the Act's purpose is not a provision of the Act that the President is authorized to carry out. Lead op. at 22–24. But the purpose is actually located within the subtitle and therefore is part of the subtitle that § 121 gives the President the authority to carry out. And unlike in *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228 (8th Cir. 1975), I do not rely on the proposition that the Executive Order is authorized solely by the purpose. *Id.* at 235. Here, the purpose is within the subtitle that the President has authority to carry out and guides and informs every provision of the subtitle.[2] Therefore, this case resembles *Gundy* where 34 U.S.C. § 20913(d) granted the Attorney General certain powers and the purpose of the statute, 34 U.S.C. § 20901, guided the interpretation of that grant of power. *Gundy*, 139 S. Ct. at 2127. Thus, I respectfully disagree with the lead opinion's attempts to undermine the consensus understanding of the Act.

---

[2] Like the lead opinion, Lead op. at 24–25, I expressly disavow the proposition "that the Executive Order is authorized solely by the purpose." Rather, I suggest only that the purpose "guides and informs" the authority of the President, like any proprietor, to identify reasonable specifications for the government work, including reasonable qualifications for those performing such work.

8  ANDERSON, J., concurring in part & dissenting in part  21-14269

Moreover, this understanding has served as the bedrock for the longstanding Presidential practice of issuing Executive Orders related to contracting and procurement that has been routinely upheld by court decisions. *See Biden v. Missouri*, 142 S. Ct. 647, 653 (2022) (finding informative the Government's longstanding practice of imposing similar conditions in upholding a vaccine mandate for participating facilities).  These prior EOs have routinely imposed conditions on the internal operations of federal contractors and subcontractors. *See, e.g.*, Exec. Order 10,479, 18 Fed. Reg. 4899 (Aug. 13, 1953) (requiring certain antidiscrimination requirements); Exec. Order 10,925, 26 Fed. Reg. 1977 (Mar. 6, 1961) (requiring nondiscrimination and affirmative steps to accomplish that goal); *Kahn*, 618 F.2d at 785–86 (analyzing an EO requiring certification of compliance with wage and price standards); Exec. Order 13,201, 66 Fed. Reg. 11,221 (Feb. 17, 2001) (requiring contractors to post notices of certain federal labor laws); Exec. Order 13,645, 73 Fed. Reg. 33,285 (Jun. 6, 2008) (requiring use of E-Verify for employment verification); Exec. Order 13,706, 80 Fed. Reg. 54,697 (Sep. 7, 2015) (requiring federal contractors to provide paid sick leave to their employees).  Just as the Supreme Court found this type of longstanding practice informative in *Missouri*, "the government's early, longstanding, and consistent interpretation of a statute, regulation, or other legal instrument could count as powerful evidence of its original public meaning." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring in the judgment).

21-14269 ANDERSON, J., concurring in part & dissenting in part     9

This longstanding practice and the many judicial decisions repeatedly upholding this longstanding practice provided the backdrop for Congress's recodification of the Procurement Act in 2002. As the President notes, Congress made several changes to the Procurement Act over the years without restricting or modifying the President's power.  Ultimately, Congress recodified the pertinent statutory provisions at issue here but did not make any "substantive change in existing law."  *See* Pub. L. No. 107-217, 116 Stat. 1062, 1303 (2002).  "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it *re-enacts a statute without change.*"  *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1280 (11th Cir. 2021) (quoting *Pollitzer v. Gebhardt*, 860 F.3d 1334, 1340 (11th Cir. 2017)).  And while the Supreme Court had not addressed the President's power under the Procurement Act, a re-enactment of a statute without any change is presumed to carry forward a "uniform interpretation by inferior courts."  *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536, 135 S. Ct. 2507, 2520 (2015) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)).

Thus, the combination of 40 U.S.C. § 121 (granting power to the President) and § 101 (guiding the President's action) provides clear authority for the President's actions here.  The President has authority to impose conditions on contractors, including conditions that impact the internal operations of those contractors, so

10 ANDERSON, J., concurring in part & dissenting in part  21-14269

long as those requirements have a sufficiently close nexus to providing the Government with "an economical and efficient system for" procurement.  40 U.S.C. § 101.  And this EO has such a sufficiently close nexus to economy and efficiency.  As the Director of OMB found, the EO would "promote economy and efficiency in Federal contracting by reducing absenteeism and decreasing labor costs for contractors and subcontractors."  Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, 86 Fed. Reg. 63,418, 63,418 (Nov. 16, 2021).  "When, as here, an agency is making 'predictive judgments about the likely economic effects of a rule,' we are particularly loathe to second-guess its analysis."  *Newspaper Ass'n of Am. v. Postal Regul. Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013) (quoting *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009)).

The nexus to economy and efficiency here is significantly closer than that of prior Executive Orders that courts have upheld. The D.C. Circuit upheld an order requiring federal contractors "to post notices at all of their facilities informing employees" of their rights under federal labor law.  *UAW-Labor Emp. & Training Corp. v. Chao*, 325 F.3d 360, 362 (D.C. Cir. 2003).  The court there found a sufficiently close nexus to "economy and efficiency" because the Executive Order noted that "[w]hen workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced."  *Id.* at 366 (quoting

21-14269 ANDERSON, J., concurring in part & dissenting in part   11

Exec. Order 13201, §1(a), 66 Fed. Reg. at 11,221). Similarly, a district court in Maryland upheld a requirement that federal contractors use the E-Verify system to verify employment eligibility for new hires because those contractors would be less likely to face immigration enforcement actions and, therefore, would be more efficient and dependable. *Chamber of Com. v. Napolitano*, 648 F. Supp. 2d 726, 738 (D. Md. 2009) (citing Exec. Order No. 13,465, 73 Fed. Reg. 33,285 (June 11, 2008)). And in upholding antidiscrimination requirements in federally assisted construction projects on a similar economy and efficiency rationale, the Third Circuit found that the "government has a vital interest in assuring that the largest possible pool of qualified manpower be available for the accomplishment of its projects." *Contractors Ass'n*, 442 F.2d at 171. It is clear to me that the nexus here—i.e., if contractors have vaccinated employees, they will be less likely to get sick and miss work, and thus will be more efficient—enjoys a significantly closer nexus to the purposes of the Procurement Act than those previously upheld by the learned federal courts.

Because the statute clearly authorizes the President to prescribe policies and directives that promote an "economical and efficient system for" federal procurement, and because this EO has a sufficiently close nexus to those criteria, I do not think the Appellees have shown a substantial likelihood of success on the merits.

The lead opinion relies on the major questions doctrine as a reason that the instant EO exceeds the President's authority. The Supreme Court has described the major questions doctrine in two

12 ANDERSON, J., concurring in part & dissenting in part  21-14269

ways.  First, the major questions doctrine provides that "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"  *Util. Air Regul. Grp. v. EPA (UARG)*, 573 U.S. 302, 324, 134 S. Ct. 2427, 2444 (2014) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160, 120 S. Ct. 1291, 1315 (2000)).  Second, the major questions doctrine has been described as a skepticism of agency interpretations that "would bring about an enormous and transformative expansion in . . . regulatory authority without clear congressional authorization."  *Id.*  In other words, the doctrine requires that an agency "must point to 'clear congressional authorization' for the power it claims."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quoting *UARG*, 573 U.S. at 324, 134 S. Ct. at 2444).

    While I agree this is a question of major economic and political significance, we are not dealing with delegation to an agency. Instead, the delegation is to the President who does not suffer from the same lack of political accountability that agencies may, particularly when the President acts on a question of economic and political significance.  *Cf. Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 513–14, 130 S. Ct. 3138, 3164 (2010) (holding that the structure of an independent agency violated the Constitution because the President, "who is accountable to the people for executing the laws," did not have the ability to hold the independent agency accountable).

21-14269 ANDERSON, J., concurring in part & dissenting in part   13

Moreover, this Executive Order does not bring about an enormous and transformative expansion in regulatory authority. *Cf. Florida*, 19 F.4th at 1288 (quoting *UARG*, 573 U.S. at 324, 134 S. Ct. at 2444). Past Executive Orders—enjoying not nearly as close a nexus to the statutory delegation of authority as does the instant EO—have imposed requirements on federal contractors and sub-contractors. Thus, this EO does not bring about an enormous and transformative expansion of regulatory authority. Also, and even more significant, this is an exercise of the Federal Government's proprietary rather than regulatory authority.[3] *Cf. UARG*, 573 U.S.

---

[3] An exercise of proprietary authority can amount to a regulation if it seeks to regulate conduct unrelated to the government's proprietary interests. *See Wis. Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 287–88, 106 S. Ct. 1057, 1061–62 (1986) (holding that a state's use of its spending power to sanction certain conduct unrelated to the state contract at issue was regulatory); *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 35 (D.C. Cir. 2002) (holding that a use of the spending power is regulatory if "it 'addresse[s] employer conduct unrelated to the employer's performance of contractual obligations to the [Government].'" (quoting *Bldg. & Constr. Trades Council of Metropolitan Dist. v. Associated Bldg. & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 228–29, 113 S. Ct. 1190, 1197 (1993))). But the EO here does not do so. The vaccine mandate extends only to those employees of contractors and subcontractors who either work on federal contracts or work in the same workplace as employees who do. It is a matter of common sense and common experience that those who share a workplace can spread a contagious disease to other employees sharing that workspace. Thus, the EO here is tailored to the government's proprietary interest in ensuring "an economical and efficient system for" procurement. 40 U.S.C. § 101.

14 ANDERSON, J., concurring in part & dissenting in part  21-14269

at 324, 134 S. Ct. at 2444 (expressing skepticism regarding enormous and transformative expansions of *regulatory* authority).

Although the major questions doctrine has never been applied to an exercise of proprietary authority and has never been applied to the exercise of power by the President, I will assume that the doctrine does apply.  When interpreting a statute, we seek to determine Congress's intent, *Chickasaw Nation v. United States*, 534 U.S. 84, 94, 122 S. Ct. 528, 535 (2001), and the major questions doctrine attempts to discern Congress's intent, s*ee* Stephen G. Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 370 (1986) ("Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration.").  I see no reason why we should not apply the doctrine as a tool of statutory interpretation along with all other available tools.

Applying the major questions doctrine, along with the other traditional canons of statutory interpretation described above, I conclude that the authority exercised by the President in this EO was clearly authorized by the 1949 Congress that enacted the Procurement Act.  As Justice Gorsuch pointed out in his concurrence in *West Virginia*, the major questions doctrine is essentially a clear-statement rule.  *West Virginia*, 142 S. Ct. at 2616 (Gorsuch, J., concurring).  As the *West Virginia* majority held, the proponent of the authority at issue "must point to 'clear congressional

21-14269 ANDERSON, J., concurring in part & dissenting in part   15

authorization' for the power it claims." *Id.* at 2609 (quoting *UARG*, 573 U.S. at 324, 134 S. Ct. at 2444).

In addition to the reasons detailed above that show why the statute clearly authorizes the President's action here, two additional considerations bolster my conviction that the President's authority here satisfies the clear statement rule of the major questions doctrine—first, the President is delegated broad discretion to achieve broad goals, and second, the President is delegated authority to exercise in the role of a proprietor.

Regarding the first consideration, the grant of power to the President is broadly worded. Not only does the statue provide that the "President may prescribe policies and directives that the President *considers necessary*," 40 U.S.C. § 121 (emphasis added), the provision that guides this authority requires that those policies and directives "provide the Federal Government with an economical and efficient system for" procurement, 40 U.S.C. § 101. Thus, the delegation to the President here provides broad discretion to achieve broad goals. The major questions doctrine has never been used to find unlawful an exercise of power that was delegated by Congress through such a broadly worded grant. Instead, the major questions doctrine has proved potent when Congress has created a detailed regulatory scheme and the purported exercise of power does not fit clearly within that scheme. *See, e.g., Brown & Williamson*, 529 U.S. at 126, 120 S. Ct. at 1297 (determining the definitions of "drug" and "device" under the Food, Drug, and Cosmetic Act); *UARG*, 573 U.S. at 308–10, 134 S. Ct. at 2435 (interpreting the

16 ANDERSON, J., concurring in part & dissenting in part  21-14269

term "air pollutant" for stationary-source permitting in the Clean Air Act); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 663, 665 (2022) (finding the major questions doctrine applicable where the statute provided OSHA authority to create emergency standards in the workplace where "employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards" (quoting 29 U.S.C. § 665(c)(1))).  But here, Congress has delegated authority to the President to issue policies and directives that "provide the Federal Government with an economical and efficient system for" procurement.  40 U.S.C. § 101.

Regarding the second consideration, the exercise of authority is proprietary.  As a general matter, proprietary authority is a type of authority where the government typically has more leeway to act.  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15, 133 S. Ct. 2321, 2328 (2013) (noting that government can impose "conditions that define the limits of the government spending program" but cannot "seek to leverage funding to regulate speech outside the contours of the program itself").  Thus, insofar as the major questions doctrine sheds light on Congress's intended delegation, this statute clearly authorizes the President to issue policies and directives that enhance the economy and efficiency of the Federal Government's procurement system.

In my judgment, it is of especial significance for this case that the President has been delegated authority to exercise in the role of a proprietor (not as a regulator).  The President is explicitly

21-14269 ANDERSON, J., concurring in part & dissenting in part   17

authorized to set policies and directives to guide the Executive
Branch in the exercise of its authority as proprietor to enter into
contracts in which the contractor and its employees and subcon-
tractors will be performing services to complete government work.
Any proprietor is expected to require, in the contract, specifications
for the work to be done and reasonable qualifications for those per-
forming the work. *See Perkins v. Lukens Steel Co.*, 310 U.S. 113,
127, 60 S. Ct. 869, 876 (1940) (holding that the Government, acting
in the role of a proprietor, has the power "to determine those with
whom it will deal").  Any proprietor would obviously choose to
deal with persons whom the proprietor perceives as most likely to
perform the work competently and most likely to complete the
work in a timely manner.  Thus, the Procurement Act very clearly
grants to the President the authority to include in the contract pro-
visions designed to result in the government work being per-
formed by persons qualified to complete the work in a competent
and timely manner.  Because the vaccination requirement has such
a close nexus to best assuring that the government work will be
completed without delay and in a timely manner, it seems to me
that it falls comfortably within the clearly authorized powers dele-
gated to the President.  It seems clear to me that the vaccination
requirement here has an extremely close nexus to the authority of
the President to "prescribe . . . directives" to carry out the econom-
ical and efficient procurement authorized by Congress.  40 U.S.C.
§ 121.

18 ANDERSON, J., concurring in part & dissenting in part  21-14269

The Supreme Court refers to the major questions doctrine as a common sense rule.  *See West Virginia*, 142 S. Ct. at 2609 (referring to "common sense as to the manner in which Congress [would have been] likely to delegate such power" (internal quotations omitted)).  Unlike the situation in *West Virginia* and in all of the cases in which the Supreme Court has found a lack of authority under the major questions doctrine, the common sense interpretation of the statute in this case clearly grants authority to the President to prescribe the instant EO.

Moreover, I do not find it surprising[4] that the President would mandate vaccination for certain employees of federal contractors and subcontractors.  *Compare Missouri*, 142 S. Ct. at 653 (noting that requiring vaccination as a response to the pandemic "is not a surprising [response]"), *with Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (expressing surprise that the CDC was regulating evictions and wondering if anything would be outside the CDC's authority based on its reasoning).  Requiring a vaccination in the midst of an ongoing pandemic would not have been surprising to the 1949 Congress.  At that time, the country was suffering from a polio epidemic.  *1955 Polio*, Mayo Clinic (last visited May 24, 2022),

---

[4] In assessing whether Congress has delegated the challenged authority, and the clarity thereof, both the Supreme Court—*West Virginia*, 142 S. Ct. at 2613; *Missouri*, 142 S. Ct. at 653—and this Court, *Florida*, 19 F.4th at 1288, have evaluated whether the exercise of the challenged authority was "surprising."

21-14269 ANDERSON, J., concurring in part & dissenting in part   19

https://www.mayoclinic.org/coronavirus-covid-19/history-disease-outbreaks-vaccine-timeline/polio.   While 1949 was shortly before the polio vaccine was widely available, there were precursor vaccines invented before 1949. *Polio*, History of Vaccines (last visited May 24, 2015),   https://historyofvaccines.org/history/polio/timeline.   Moreover, in 1905, the Supreme Court found that mandated vaccination was permissible under the Due Process Clause. *Jacobson v. Massachusetts*, 197 U.S. 11, 24–25, 25 S. Ct. 358, 360–61 (1905).   Thus, the recognition at the time of the Procurement Act's enactment in 1949 of the fact that the Supreme Court had previously upheld vaccination mandates combined with the extraordinary nature of the instant pandemic caused by the highly contagious COVID-19 disease persuades me that it would not have been surprising to the 1949 Congress for the President—faced with this extraordinary situation—to impose a vaccination requirement on federal contractors for efficiency reasons.

In sum, even applying the major questions doctrine, the President's exercise of authority here was clearly authorized.   First, the statutory language clearly authorizes the President to contract for services to perform government work and prescribe directives such that the procurement work will be done economically and efficiently.   This provides clear congressional authorization for the instant EO—especially in light of the longstanding practice of previous Presidents, whose executive orders having considerably lesser nexus to the statutory language have been repeatedly upheld by the several Courts of Appeals, and in light of the congressional

20 ANDERSON, J., concurring in part & dissenting in part  21-14269

re-enactment with knowledge of that uniform judicial interpretation. Second, the congressional grant of power is broad, suggesting broad authority. Third, the exercise of authority is proprietary. And of especial significance in this case, the clear authority for a President, as proprietor, to choose contractors best suited to complete the government work in a competent and timely manner and the close nexus of the instant EO to that clear authority persuade me that the clear statement rule of the major questions doctrine is satisfied in this case. In other words, the instant EO is not an exercise of "power beyond what Congress could have reasonably understood to have granted." *West Virginia*, 142 S. Ct. at 2609.

Because I believe the Procurement Act clearly authorizes the President's actions here, I would hold that Appellees have failed to establish a substantial likelihood of success on the merits. Thus, I believe the district court abused its discretion in granting the injunction because it made an error of law. *See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2, 134 S. Ct. 1744, 1748 n.2 (2014) (holding that a district court "abuse[s] its discretion if it based its ruling on an erroneous view of the law" (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S. Ct. 2447, 2461 (1990))).

Although I agree with and join Part V of the lead opinion—holding that the scope of the injunction should be narrowed—I respectfully dissent from the holding that Appellees have shown a substantial likelihood of success on the merits.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 26, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  21-14269-BB
Case Style:  State of Georgia, et al v. President of the United States, et al
District Court Docket No:  1:21-cv-00163-RSB-BKE

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website. Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Tonya L. Richardson, BB at (404) 335-6174.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion



# 1955
# Polio

*History of polio: Outbreaks and vaccine timeline*

Learn about polio epidemics and the development, approval and impact of the polio vaccine.



**Children with polio**

Children and a teacher with polio participate in a class at Saint Marys Hospital.

---

# 1948-1955

Before a polio vaccine became available, several polio epidemics had occurred between 1948 and 1955. Many people avoided crowds and public gatherings, such as fairs, sports games and swimming pools, during this time due to concern about getting polio. Some parents wouldn't let their children play with new friends and regularly checked them for symptoms.

At Saint Marys Hospital in Rochester, Minnesota, many people with polio were treated in the isolation ward. Some people with polio whose breathing muscles were paralyzed

Feedback

were placed in large machines called iron lungs. These machines helped them breathe and may have helped them live longer. The hospital was short of medical staff. Doctors, nurses and others worked long hours during the epidemics.



**Iron lung**
A man with polio in an iron lung talks with former President Dwight Eisenhower at Saint Marys Hospital.

---

# 1952-1955

Dr. Jonas E. Salk and colleagues research and develop a polio vaccine.

# 1955

The polio vaccine developed by Dr. Salk and colleagues is licensed in the U.S. Before the polio vaccine, the disease had been a major cause of disability in children. About 16,000 cases of polio (paralytic poliomyelitis) occurred each year in the U.S. in the 20th century compared with none in 2020.

The first polio vaccine arrives at Mayo Clinic on April 13, 1955, one day after it's licensed in the U.S.





**Polio vaccine**

Dr. Thomas Magath sits next to the first shipment of the polio vaccine at Mayo Clinic in 1955.

---

# 1961

Dr. Albert B. Sabin develops a second polio vaccine that is licensed in the U.S. A third polio vaccine will be licensed in 1963. These vaccines help control the spread of polio in industrialized countries.

# 1994

Polio is considered eliminated in North and South America.

**SHOW REFERENCES**

1. Plotkin SA, et al., eds. Plotkin's Vaccines. 7th ed. Elsevier; 2018. https://www.clinicalkey.com. Accessed Oct. 8, 2021.

2. Blake JB. Benjamin Waterhouse and the introduction of vaccination. Reviews of Infectious Diseases. Oxford University Press. 1987;doi:10.1093/clinids/9.5.1044.

3. Desmond A, et al. On the shoulders of giants — From Jenner's cowpox to mRNA Covid vaccines. The New England Journal of Medicine. 2021; doi:10.1056/NEJMp2034334.

4. Saleh A, et al. Vaccine development throughout history. Cureus. 2021; doi:10.7759/cureus.16635.

5. The history of vaccines. College of Physicians of Philadelphia. https://www.historyofvaccines.org. Accessed Oct. 7, 2021.

6. Stokes J, et al. Trivalent combined measles-mumps-rubella vaccine. JAMA. 1971;218:57.

7. Klein NP. Licensed pertussis vaccine in the United States: History and current state. 2014; doi:10.4161/hv.2957

Feedback

8. Influenza historic timeline. Centers for Disease Control and Prevention. https://www.cdc.gov/flu/pandemic-resources/pandemic-timeline-1930-and-beyond.htm. Accessed Oct. 7, 2021.

9. Poland GA, et al. Development of vaccines against Zika virus. The Lancet. Infectious Diseases. 2018; doi:10.1016/S1473-3099(18)30063-X.

10. Poland GA, et al. Zika vaccine development: Current status. Mayo Clinic Proceedings. 2019; doi:10.1016/j.mayocp.2019.05.016.

11. Li YD, et al. Coronavirus vaccine development: From SARS and MERS to COVID-19. Journal of Biomedical Science. 2020; doi:10.1186/s12929-020-00695-2.

12. Dolgin E. The tangled history of mRNA vaccines. Nature. 2021; doi:10.1038/d41586-021-02483-w.

13. Goodman RA, et al., eds. Vaccination mandates: The public health imperative and individual rights. In: Law in Public Health Practice. Oxford University Press; 2007.

14. Centers for Disease Control and Prevention. Current trends childhood immunization initiative, United States — 5-year follow up. MMWR Morbidity and Mortality Weekly Report. 1982; http://www.cdc.gov/mmwr/preview/mmwrhtml/00001091.htm. Accessed Oct. 7, 2021.

15. Immunization and infectious diseases. HealthyPeople.gov. https://www.healthypeople.gov/2020/topics-objectives/topic/immunization-and-infectious-diseases. Accessed Oct. 7, 2021.

16. The history of vaccines. History of the immunization schedule. College of Physicians of Philadelphia. https://www.historyofvaccines.org/content/history-immunization-schedule. Accessed Oct. 7, 2021.

17. NNDS surveillance materials and resources. Centers for Disease Control and Prevention. https://www.cdc.gov/ncird/surveillance/materials-resources.html. Accessed Oct. 7, 2021.

18. Roush SW, et al. Historical comparisons of morbidity and mortality for vaccine-preventable disease in the United States. JAMA. 2007;doi:10.1001/jama.298.18.2155.

19. Poland GA (expert opinion). Mayo Clinic. Sept. 17, 2021.

20. Vaccine effectiveness: How well do flu vaccines work? Centers for Disease Control and Prevention. https://www.cdc.gov/flu/vaccines-work/vaccineeffect.htm. Accessed Oct. 8, 2021.

21. 1918 pandemic influenza timeline. Centers for Disease Control and Prevention. https://www.cdc.gov/flu/pandemic-resources/1918-commemoration/pandemic-timeline-1918.htm. Accessed Oct. 8, 2021.

22. Safety of COVID-19 vaccines. Centers for Disease Control and Prevention. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/safety-of-vaccines.html. Accessed Oct. 8, 2021.

23. Understanding mRNA COVID-19 vaccines. Centers for Disease Control and Prevention. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/mRNA.html. Accessed Oct. 8, 2021.

24. COVID-19 vaccines. U.S. Food and Drug Administration. https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-vaccines. Accessed Oct. 12, 2021.

Feedback

25. Poland GA, et al. The age-old struggle against the antivaccinationists. The New England Journal of Medicine. 2011; doi:10.1056/NEJMp1010594.

26. Clapesattle H. The Doctors Mayo. The University of Minnesota Press; 1941.

27. Saint Mary's isolation hospital during the influenza pandemic. Saint Marys Hospital Annals; 1918.

28. Harren R. Olmsted country in the grippe of Spanish influenza. The Scribe. History Center of Olmsted Country. 2018.

29. Strand PK. A Century of Caring: 1889-1989. Saint Marys Hospital; 1988.

30. Mayo Clinic: The battle plan for H1N1. Mayo Alumni Magazine; 2009.

31. First polio vaccine delivery. MayoVox. Mayo Clinic; 1955.

32. Rosenow EC. Prophylactic inoculation against respiratory infections during the present pandemic of influenza: Preliminary report. Mayo Clinic; 1918.

33. Rules concerning the report of contagious diseases. The Clinic Bulletin. 1919;1;1.

34. Maltezou HA, et al. Immunization of health-care providers: Necessity and public-health policies. Healthcare. 2016; doi: 10.3390/healthcare4030047.

35. Voigt EA, et al. Defending against smallpox: A focus on vaccines. Expert Review of Vaccines. 2016; doi:10.1080/14760584.2016.1175305.

36. Wright GH, et al. Effect of reduced dose schedules and intramuscular injection of anthrax vaccine adsorbed on immunological response and safety profile: A randomized trial. Vaccine. 2014; doi:10.1016/j.vaccine.2013.10.039.

37. Spikevax and Moderna COVID-19 vaccine. U.S. Food and Drug Administration. https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/spikevax-and-moderna-covid-19-vaccine#additional. Accessed Feb. 11, 2022.

Any use of this site constitutes your agreement to the Terms and Conditions and Privacy Policy linked below.

A single copy of these materials may be reprinted for noncommercial personal use only. "Mayo," "Mayo Clinic," "MayoClinic.org," "Mayo Clinic Healthy Living," and the triple-shield Mayo Clinic logo are trademarks of Mayo Foundation for Medical Education and Research.

© 1998-2022 Mayo Foundation for Medical Education and Research (MFMER). All rights reserved.



# Polio

## Poliomyelitis

OVERVIEW          **TIMELINE**

An infectious disease that once terrorized parents the world over
is now on the verge of being eradicated.

**CHAPTERS**

**01** Polio Arrives to America

**02** The Search for a Polio Vaccine

**03** The Polio Vaccine Arrives

**04** Polio Is Marked for Eradication

**CHAPTER 1**

# Polio Arrives to America

The first polio epidemic in 1894 was just the beginning of a yearly threat to
the public from an unseen threat.

JUNE 17, 1894

## First U.S. Polio Epidemic

1905

# Contagious Nature of Polio Discovered



1908

# Poliovirus Identified





Cells showing changes due to a polio infection



Distribution of polio in United States, 1910

In Vienna, Karl Landsteiner, MD (1868–1943), and Erwin Popper, MD (1879–1955), announced that the infectious agent in polio was a virus.

Popper and Landsteiner deduced the viral nature of polio by carefully filtering preparations of spinal cord fluid from a person who had died of polio. The filters were known to trap bacteria. When Popper and Landsteiner injected the filtered preparations into monkeys, the monkeys developed polio. The researchers then concluded that an infectious particle smaller than bacteria caused the disease.

Poliovirus itself would not be visible to researchers until the 1950s, when the electron microscope was available.

JUNE 17, 1916

New York City Polio Epidemic 

AUGUST 8, 1921

Polio Strikes FDR 

**CHAPTER 2**

# The Search for a Polio Vaccine

The polio virus was unseen and unknown until certain key events helped pave the way for a vaccine.

1931

More Than One Type of Poliovirus Proposed 

1936

Growing Poliovirus in Human Nervous Tissue 

1938

March of Dimes Born 



1941

## Poliovirus in Digestive System



1948

## Koprowski Tests Polio Vaccine on Himself





Hilary Koprowski, MD

Lederle Laboratories researcher Hilary Koprowski, MD (1916–2013), after testing his attenuated Type II poliovirus vaccine on chimpanzees, drank a concoction of his vaccine. He and his assistant, who also took the vaccine, seemed to suffer no ill effects.

1949

## Bodian Finds Three Types of Poliovirus



1952

## Polio Cases Surge







A girl exercising after polio infection, 1950s

57,628 polio cases were reported in the United States in 1952, a number that heightened parents' fears of the disease and focused public awareness on the need for a vaccine.

MAY 16, 1953

# Salk Gives Vaccine to His Family





Peter Salk receiving the polio vaccine from his father, Jonas Salk, in 1953    *March of Dimes Foundation*

Salk injected himself, his wife, and their three sons with his experimental poliovirus vaccine.

**CHAPTER 3**

# The Polio Vaccine Arrives

Big breakthroughs bring two highly effective and safe vaccines.

APRIL 25, 1954

## Massive Polio Vaccine Trial Begins in U.S.



APRIL 12, 1955

# Polio Vaccine Results Announced





Polio vaccine and workers, 1963   *CDC/Mr. Stafford Smith*



Thomas Francis Jr., MD, and Jonas E. Salk, MD, at polio evaluation meeting, 1955

In a press conference at the University of Michigan, Thomas Francis, Jr., MD (a scientist with extensive experience with influenza vaccines), and colleagues announced the results of the Salk poliovirus vaccine trial. The vaccine, they said, was 80-90% effective against paralytic polio.

The U.S. government licensed Salk's vaccine later this same day. The press conference and licensure paved the way for widespread distribution and use of the vaccine.

1959

## Soviet Trials of Sabin's Live Poliovirus Vaccine



AUGUST 24, 1960

## Sabin's Polio Vaccine Licensed



CHAPTER 4

# Polio Is Marked for Eradication

Following the footsteps of the smallpox eradication program, the polio eradication campaign begins with some successes.

1985

## Goal Set for Polio Elimination in the Americas



1988

## Global Polio Eradication Initiative



SEPTEMBER 29, 1994

# Polio Declared Eliminated from the Americas



This boy, Luis Fermin Tenorio, is the last known case of polio in the Americas. Peru, 1991.

On August 20, 1994, the Pan American Health Organization had reported that three years had passed since the last case of wild polio in the Americas. A three-year-old Peruvian boy, Luis Fermín, had the last registered case there.

The International Commission for the Certification of Poliomyelitis Eradication in the Americas examined this report as well as extensively reviewing lab and surveillance data.

Based on the results of these analyses, wild poliovirus was declared eliminated from the Americas in September 1994, making the Americas the first World Health Organization Region to meet the goal of polio elimination.

1997

## Massive Vaccination Efforts in India



1998

## Polio Immunization Efforts in Sudan



JUNE 21, 2002

# Polio Eliminated in Europe

Fourteen years after the launch of the global eradication program, the World Health Organization declared polio eliminated in Europe on June 6, 2002.

The last case of wild polio in Europe occurred in a young boy. Melik Minas, who lived in Turkey, contracted polio in November 1998. Minas, who had not been vaccinated, was paralyzed as a result of the infection—although he did partially recover.

MARCH 27, 2014

South-East Asia Region Polio F



South-East Asia Region Polio-free 

APRIL 17, 2016

## Type 2 Oral Polio Vaccine Discontinued



## History of Vaccines

THE COLLEGE OF PHYSICIANS OF PHILADELPHIA

19 S 22ND STREET

PHILADELPHIA, PA 19103

215.563.3737

INFO@COLLEGEOFPHYSICIANS.ORG

  

Vaccines 101

Diseases

Pioneers

Getting Vaccinated

Educational Resources

Blog

**ABOUT**

Our Staff

Overview

Donate

Press & Media

Work With Us

Privacy Policy

Terms & Conditions

© 2022 College of Physicians of Philadelphia